GIBSON, DUNN & CRUTCHER LLP
CHRISTOPHER CHORBA, SBN 216692
DIANA FEINSTEIN, SBN 302626
EMILY SAUER, SBN 324695
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:     (213) 229-7396
Facsimile:     (213) 229-6396
cchorba@gibsondunn.com
dfeinstein@gibsondunn.com
esauer@gibsondunn.com

LAUREN R. GOLDMAN (admitted *pro hac vice*)
MICHAEL BRANDON (admitted *pro hac vice*)
200 Park Avenue, New York, NY 10166
Telephone:     (212) 351-4000
Facsimile:     (212) 351-4035
lgoldman@gibsondunn.com
mbrandon@gibsondunn.com

LUCAS TOWNSEND (admitted *pro hac vice*)
AMANDA STERLING (admitted *pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:     (202) 955-8500
Facsimile:     (202) 467-0539
ltownsend@gibsondunn.com
asterling@gibsondunn.com

*Attorneys for Defendant Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| NATALIE DELGADO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 3:23-cv-04181-SI<br><br>**DEFENDANT META PLATFORMS, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Action Filed:  August 16, 2023<br>Hearing Date:  February 23, 2024<br>Trial Date:  None Set<br>Judge Susan Illston |

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ................................................................................................. 1

II.  ARGUMENT ...................................................................................................... 2

A.   The BIPA Claims Are Barred By The Parties' California Choice-Of-Law Clause To Which Ms. Delgado Agreed In Meta's Terms Of Service ......................... 2

1.   California Law Does Not Fundamentally Conflict With Illinois' BIPA ......... 2

2.   Illinois Does Not Have A Materially Greater Interest In This Case ................ 4

3.   Enforcing The Parties' Agreement Would Not Cause A "Substantial Injustice" ...................................................................................................... 6

B.   Even If Illinois Law Applies, Ms. Delgado's BIPA Claims Fail Because They Are Conclusory And Speculative ........................................................................ 7

1.   Ms. Delgado Does Not Plausibly Allege Meta Collects Voiceprints From Anyone ................................................................................................ 7

2.   Ms. Delgado Does Not Plausibly Allege That Meta Collected *Her* Voiceprint ....................................................................................................... 11

3.   Ms. Delgado Does Not Plausibly Allege That Meta Collected Her Voiceprint From Audio Recordings Provided By Any Third Party ............. 12

C.   Ms. Delgado's BIPA Claims For Profiting And Storage Fail For Independent Reasons ............................................................................................. 14

1.   Ms. Delgado Has Not Plausibly Alleged That Meta "Profits" From Her Voiceprint ...................................................................................................... 14

2.   Ms. Delgado Has Not Plausibly Alleged That Meta Failed To Exercise Reasonable Care In Storing Her Voiceprint .................................................. 15

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

## Cases

*ABF Capital Corp. v. Costello & Lanahan*,
  2005 WL 3514288 (Cal. Ct. App. Dec. 23, 2005) ............................................3

*Alonso v. Blue Sky Resorts, LLC*,
  179 F. Supp. 3d 857 (S.D. Ind. 2016) ...................................................13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...........................................................9, 12, 15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................15

*Bell v. Petco Animal Supplies Stores, Inc.*,
  No. 1:22-cv-06455 (N.D. Ill. May 11, 2023) ............................................8

*Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*,
  622 F.3d 996 (9th Cir. 1010) ...........................................................6

*C.M.D. v. Facebook, Inc.*,
  2014 WL 1266291 (N.D. Cal. Mar. 26, 2014) ............................................6

*Carpenter v. McDonald's Corp.*,
  580 F. Supp. 3d 512 (N.D. Ill. 2022) .........................................7, 8, 9, 10

*Chung v. Vistana Vacation Ownership, Inc.*,
  2017 WL 6886721 (C.D. Cal. Oct. 19, 2017) ............................................5

*In re Clearview AI, Inc. v. Consumer Privacy Litig.*,
  585 F. Supp. 3d 1111 (N.D. Ill. 2022) .................................................14

*Corazon v. Aurora Loan Servs.*,
  2011 WL 1740099 (N.D. Cal. May 5, 2011) ..............................................9

*Ctr. for Biological Diversity v. Bernhardt*,
  946 F.3d 553 (9th Cir. 2019) ..........................................................15

*Demitropoulos v. Bank One Milwaukee, N.A.*,
  915 F. Supp. 1399 (N.D. Ill. 1996) ....................................................4

*Discover Bank v. Superior Ct.*,
  134 Cal. App. 4th 886 (2005) ..........................................................7

*Emblaze Ltd. v. Apple Inc.*,
  2015 WL 396010 (N.D. Cal. Jan. 29, 2015) .............................................9

*In re Facebook Biometric Info. Privacy Litig.*,
  185 F. Supp. 3d 1155 (N.D. Cal. 2016) ...........................................2, 4, 6

*Foster v. Elliot*,
  2020 WL 9889553 (E.D. Cal. Apr. 22, 2020) ............................................6

Gibson, Dunn & Crutcher LLP

*Franklin v. Facebook, Inc.*,
  2015 WL 7755670 (N.D. Ga. Nov. 24, 2015) .................................................................7

*Hamilton v. Wells Fargo Bank, N.A.*,
  2010 WL 1460253 (N.D. Cal. Apr. 12, 2010) .............................................................7

*Hogan v. Amazon.com, Inc.*,
  2022 WL 952763 (N.D. Ill. Mar. 30, 2022) ...........................................................3, 4, 6

*Huynh v. Quora, Inc.*,
  2019 WL 11502875 (N.D. Cal. Dec. 19, 2019) ..........................................................3, 7

*Janice Doty Unlimited, Inc. v. Stoecker*,
  697 F. Supp. 1016 (N.D. Ill. 1988) ...........................................................................4

*King Instruments Corp. v. Perego*,
  65 F.3d 941 (Fed. Cir. 1995) ..................................................................................10

*Kuklinski v. Binance Capital Mgmt. Co.*,
  2023 WL 2788654 (S.D. Ill. Apr. 4, 2023) ..............................................................4

*LeBoeuf v. NVIDIA Corp.*,
  2019 WL 13210428 (N.D. Cal. Nov. 18, 2019) ........................................................2

*M. Block & Sons, Inc. v. Int'l Bus. Machs. Corp.*,
  2004 WL 1557631 (N.D. Ill. 2004) ...........................................................................4

*Mahmood v. Berbix, Inc.*,
  2022 WL 3684636 (N.D. Ill. Aug. 25, 2022) ...........................................................14

*Mayhall v. Amazon Web Servs., Inc.*,
  2022 WL 2718091 (W.D. Wash. May 24, 2022) ......................................................14

*McCann v. Foster Wheeler LLC*,
  48 Cal. 4th 68 (2010) ...............................................................................................5

*McGoveran v. Amazon Web Servs., Inc.*,
  2023 WL 2683553 (D. Del. Mar. 29, 2023) ..........................................................8, 11

*Mell v. Goodbody & Co.*,
  10 Ill. App. 3d 809 (1st Dist. 1973) .........................................................................4

*Melzer v. Johnson & Johnson Consumer Inc.*,
  2023 WL 3098633 (D.N.J. Apr. 26, 2023) ..............................................................14

*Midway Home Ent., Inc. v. Atwood Richards, Inc.*,
  1998 WL 774123 (N.D. Ill. 1998) .............................................................................4

*In re Nexus 6P Prod. Liab. Litig.*,
  293 F. Supp. 3d 888 (N.D. Cal. 2018) ...................................................................3, 7

*Palomino v. Facebook, Inc.*,
  2017 WL 76901 (N.D. Cal. Jan. 9, 2017) .............................................................2, 3, 6

-iii-

Gibson, Dunn &
Crutcher LLP

*Patterson v. Respondus, Inc.*,
  593 F. Supp. 3d 783 (N.D. Ill. 2022) ................................................................4, 6

*Pfaff v. Wells Elecs., Inc.*,
  525 U.S. 55 (1998) ......................................................................................9

*Pinela v. Neiman Marcus Grp., Inc.*,
  238 Cal. App. 4th 227 (2015) ........................................................................7

*Potomac Leasing Co. v. Chuck's Pub, Inc.*,
  156 Ill. App. 3d 755 (1987) ...........................................................................4

*Rivera v. Google, Inc.*,
  238 F. Supp. 3d 1088 (N.D. Ill. 2017) ...........................................................11

*Robinson v. Lake Ventures LLC*,
  2023 WL 5720873 (N.D. Ill. Sept. 5, 2023) .....................................................8

*Rojas-Lozano v. Google, Inc.*,
  159 F. Supp. 3d 1101 (N.D. Cal. 2016) .........................................................3, 7

*Ruiz v. Affinity Logistics Corp.*,
  667 F.3d 1318 (9th Cir. 2012) ........................................................................6

*Sternberg v. Town of Danville*,
  2015 WL 9024340 (N.D. Cal. Dec. 16, 2015) ..................................................13

*Strautins v. Trustwave Holdings, Inc.*,
  27 F. Supp. 3d 871 (N.D. Ill. 2014) ...............................................................13

*Terpin v. AT&T Mobility, LLC*,
  399 F. Supp. 3d 1035 (C.D. Cal. 2019) ............................................................3

*United States v. Smith*,
  869 F.2d 348 (7th Cir. 1989) ..........................................................................8

*Vance v. Amazon.com Inc.*,
  534 F. Supp. 3d 1314 (W.D. Wash. 2021) ......................................................14

*Vanguard Logistics Servs. (USA) Inc. v. Groupage Servs. of New England, LLC*,
  2023 WL 4843070 (C.D. Cal. July 28, 2023) ....................................................3

*Ventura v. 1st Fin. Bank USA*,
  2005 WL 2406029 (N.D. Cal. Sept. 29, 2005) ..............................................3, 5, 7

*Volks USA Inc. v. A2 Hosting, Inc.*,
  2016 WL 6808113 (C.D. Cal. Nov. 16, 2016) ................................................5, 6

*Williams v. Facebook, Inc.*,
  384 F. Supp. 3d 1043 (N.D. Cal. 2018) ......................................................2, 3, 6

## Statutes

2012 Cal. Leg. Serv. Ch. 733 § 1(a)(1) ...............................................................5

2012 Cal. Leg. Serv. Ch. 733 § 1(b) ..............................................................................5

740 Ill. Comp. Stat. 14/20 ...........................................................................................4

Cal. Civ. Code § 1798.140(c) ..............................................................................10, 11

Cal. Civ. Code § 1798.150 ...........................................................................................4

Cal. Civ. Code § 1798.155 ...........................................................................................4

Cal. Code Regs. tit. 18, § 17014 ..................................................................................2

**Other Authorities**

*Proposition 24, The California Privacy Rights Act of 2020*, Gen. Elec. (Nov. 3, 2020),
   https://tinyurl.com/28mt4yxp (last visited Dec. 20, 2023) ......................................5

Public Access Opinion, No. 17-011, 2017 WL 10084298 (Ill. A.G. Aug. 14, 2017)..........................11

Restatement (Second) of Conflict of Laws § 187 (1971) .................................................2, 4

Gibson, Dunn &
Crutcher LLP

# I.	INTRODUCTION

Ms. Delgado (formerly Ms. Turck) does not dispute that she agreed to a California choice-of-law clause and that enforcing it requires dismissing her claims under Illinois' BIPA.  She instead asks the Court not to enforce that agreement, which requires her to demonstrate that California law fundamentally conflicts with BIPA, *and* that Illinois' interest in this case is materially greater than California's interest.  Ms. Delgado does not meet either burden.  On the first, she argues that there is a fundamental conflict because she cannot bring her claims under California law.  But the test is not whether applying the chosen state's law would bar the plaintiff's claims; it is whether the two states have comparable laws, and California's biometric privacy laws are undeniably comparable to BIPA.  As to the second, Ms. Delgado simply asserts that she is an Illinois resident.  That, too, is insufficient: Meta is a California resident, and California has a significant interest in ensuring predictable enforcement of privacy laws for the many technology companies like Meta that call it home.  California thus has *at least* an equal interest in this case.  The Court should enforce California's strong policy favoring choice-of-law clauses and dismiss Ms. Delgado's claims with prejudice.

Even if Illinois law applied, the complaint should still be dismissed.  Ms. Delgado admits that a *voiceprint* is more than a *voice recording*; it is an identifier template created *from* a voice recording.  She also admits that the plausibility of her claim that Meta created voiceprints from her voice recordings depends entirely on inferences drawn from Meta's patents and a disclosure required by California law.  These "inferences," however, amount to rank speculation—that because the patents contemplate technology that *could* use recordings to create voiceprints, and the disclosure contemplates collection of recordings from which voiceprints *could* be created, Meta must *be* creating voiceprints from recordings.  In reality, these sources support only a theoretical possibility that Ms. Delgado's allegations are true.  Her reliance on authorities indicating that a voiceprint is data that "could" be used to identify a person ignores that she must plausibly allege that Meta created such data in the first place.  And nothing in her complaint supports the assertion that Meta did that, much less that Meta created such data about *her* from recordings she uploaded or that Meta received from unknown third parties.

At minimum, Ms. Delgado's BIPA Section 15(c) claim should be dismissed because she alleges only that Meta benefited from her alleged voiceprint, not that Meta profited from disseminating the

Gibson, Dunn &
Crutcher LLP

data. And her BIPA Section 15(e) claim should be dismissed because her sole supporting factual allegation—that Meta could theoretically be targeted by a "cyberattack"—says nothing about whether Meta has done anything short of what is reasonably required to securely store or transmit voiceprints.

## II.     ARGUMENT

### A.     The BIPA Claims Are Barred By The Parties' California Choice-Of-Law Clause To Which Ms. Delgado Agreed In Meta's Terms Of Service

Meta's Terms of Service require the application of California law. Mot. at 6–7. Ms. Delgado has not established *either* a fundamental conflict between California law and Illinois law *or* that Illinois has a materially greater interest in this case, much less both. *LeBoeuf v. NVIDIA Corp.*, 2019 WL 13210428, at *6 (N.D. Cal. Nov. 18, 2019) (plaintiff must establish exception to avoid a choice-of-law clause). She also mischaracterizes the "substantial injustice" exception, which also does not apply.

#### 1.     California Law Does Not Fundamentally Conflict With Illinois' BIPA

Meta explained that there is no fundamental policy conflict between California and Illinois because the CCPA and BIPA are at least comparable. Mot. at 9–12; *see In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1169–70 (N.D. Cal. 2016) (indicating that a law with the components ultimately embodied in the CCPA would present no conflict with BIPA).

Ms. Delgado responds that the CCPA fundamentally conflicts with BIPA because it applies only to California residents, and thus she cannot pursue claims against Meta under that law.[1] Opp. at 7–8. But in determining whether two state laws fundamentally conflict, courts consider whether the laws "aim to accomplish the same end," regardless whether their application "would lead to a different result." *Palomino v. Facebook, Inc.*, 2017 WL 76901, at *4 (N.D. Cal. Jan. 9, 2017) (quoting Restatement (Second) of Conflict of Laws § 187 (1971)); *see also Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1056 (N.D. Cal. 2018) ("inquiry must focus on the fundamental policies" served by each statute).

In *Palomino*, Meta moved to dismiss the plaintiff's New Jersey consumer protection claims pursuant to the California choice-of-law clause in Meta's Terms of Service. 2017 WL 76901, at *2.

---

[1] The CCPA in fact applies to individuals residing *or present more than temporarily* in California. Cal. Code Regs. tit. 18, § 17014. Although Ms. Delgado alleges she is a "citizen" of Illinois, Compl. ¶ 25, she provides no basis for concluding that the CCPA necessarily would not apply to her, let alone that the same would be true for all members of the putative class, *id.* ¶ 153.

Gibson, Dunn & Crutcher LLP

The plaintiff was a New Jersey resident who had used Facebook in New Jersey. *Id.* at *1. She argued that there was a fundamental conflict because California's consumer protection law provided "different rights and remedies" than New Jersey's law. *Id.* at *4. The court rejected that argument and dismissed the case, holding that there was no fundamental conflict because California "has its own robust body of consumer protection law"—even though that body of law did not permit the plaintiff in that case to bring a claim. *Id.*; *Terpin v. AT&T Mobility, LLC*, 399 F. Supp. 3d 1035, 1047–48 (C.D. Cal. 2019) (California's consumer protection laws do not apply extraterritorially); *see also Williams*, 384 F. Supp. 3d at 1056 (holding California and New York consumer protection laws did not conflict because each statute "broadly protects consumers from the deceptive practices," without regard to whether those protections would in fact apply to the plaintiff).[2] Ultimately, Ms. Delgado's assertion that enforcing the choice-of-law clause here would "write out of existence Illinois' fundamental policy set forth in BIPA" overlooks that California courts routinely enforce choice-of-law clauses where doing so extinguishes a plaintiff's claim—without regard for whether the plaintiff would have the same sort of claim under the chosen law, and even where it is clear that the plaintiff would not.[3] Opp. at 8.

Ms. Delgado next asserts that the CCPA "provides far less protection than BIPA." Opp. at 8. That is both legally irrelevant and factually wrong. As discussed, courts consider whether the relevant laws "aim to accomplish the same end," *Palomino*, 2017 WL 76901, at *4, not whether they afford identical protections, *see Rojas-Lozano*, 159 F. Supp. 3d at 1112 (enforcing chosen state law that offered weaker protections). It is therefore irrelevant that the laws have slightly *different* notice and consent requirements, *see* Opp. at 8, because both *have* such requirements. In any event, the CCPA's protections go *beyond* BIPA's in numerous critical respects. Although BIPA provides a private right

---

[2] Ms. Delgado attempts to dismiss these cases on the ground that "cases analyzing consumer fraud statutes 'shed[] no light on the status of BIPA.'" Opp. at 10 (quoting *Hogan v. Amazon.com, Inc.*, 2022 WL 952763, at *3–4 (N.D. Ill. Mar. 30, 2022)). But *Hogan* said nothing about consumer fraud statutes generally; it simply said that because *Illinois'* Consumer Fraud Act is not a "fundamental policy" of Illinois, cases enforcing choice-of-law clauses to preclude claims under that statute offer little guidance in cases where such a clause would preclude claims under BIPA. 2022 WL 952763, at *4.

[3] *See, e.g.*, *Vanguard Logistics Servs. (USA) Inc. v. Groupage Servs. of New England, LLC*, 2023 WL 4843070, at *36–38 (C.D. Cal. July 28, 2023); *Huynh v. Quora, Inc.*, 2019 WL 11502875, at *12 (N.D. Cal. Dec. 19, 2019); *In re Nexus 6P Prod. Liab. Litig.*, 293 F. Supp. 3d 888, 935 (N.D. Cal. 2018); *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1112 (N.D. Cal. 2016); *ABF Capital Corp. v. Costello & Lanahan*, 2005 WL 3514288, at *5–6 (Cal. Ct. App. Dec. 23, 2005); *see Ventura v. 1st Fin. Bank USA*, 2005 WL 2406029, at *4 (N.D. Cal. Sept. 29, 2005) (extinguishing plaintiff's defense to contract enforcement).

of action for damages if a company acted negligently or intentionally, 740 Ill. Comp. Stat. 14/20, the CCPA provides a private right of action for damages in the event of a data breach *irrespective* of the defendant's scienter while *also* authorizing the California Attorney General to seek penalties for a wide range of violations, Cal. Civ. Code §§ 1798.150, 1798.155. That California and Illinois made different decisions about how to implement comparable policies is not a sufficient reason to reject the parties' choice of law. There is no fundamental conflict where, as here, both states have "recognized a right to privacy in personal biometric data" and implemented "specific protections for that right or afforded a private cause of action to enforce violations of it." *Facebook Biometric*, 185 F. Supp. 3d at 1170.

Ms. Delgado's authorities are readily distinguishable. *See* Opp. at 9. In both *Hogan*, 2022 WL 952763, at *4, and *Patterson v. Respondus, Inc.*, 593 F. Supp. 3d 783, 812 (N.D. Ill. 2022), the courts held that Washington's biometrics law conflicted with BIPA because the Washington law lacks any private right of action at all; the CCPA, in contrast, provides a private right of action. And in *Kuklinski v. Binance Capital Mgmt. Co.*, 2023 WL 2788654 (S.D. Ill. Apr. 4, 2023), the court misapplied Illinois' choice-of-law rules in declining to enforce a California choice-of-law clause in a BIPA case on the ground that applying California law "would likely foreclose" the plaintiff's claims under "an Illinois statute." *Id.* at *9. Like California law, Illinois law requires courts to consider whether the states have a fundamental policy conflict—something the *Kuklinski* court did not even do—not whether applying the chosen law "would lead to a different result." *See* Restatement (Second) of Conflict of Laws § 187 (1971). Indeed, Illinois courts have long enforced choice-of-law clauses where doing so forecloses a plaintiff's claim under an Illinois statute.[4] After all, if a choice-of-law clause did not have the potential to be outcome-determinative, no party would ever bother litigating to enforce one.

### 2. Illinois Does Not Have A Materially Greater Interest In This Case

Even if there were a fundamental conflict between the CCPA and BIPA, the Court should still enforce the parties' agreement because California's interest is at least equal to Illinois' interest in this

---

[4] *See M. Block & Sons, Inc. v. Int'l Bus. Machs. Corp.*, 2004 WL 1557631, at *7 (N.D. Ill. 2004); *Midway Home Ent., Inc. v. Atwood Richards, Inc.*, 1998 WL 774123, at *2–3 (N.D. Ill. 1998); *Demitropoulos v. Bank One Milwaukee, N.A.*, 915 F. Supp. 1399, 1414 (N.D. Ill. 1996); *Janice Doty Unlimited, Inc. v. Stoecker*, 697 F. Supp. 1016, 1019–20 (N.D. Ill. 1988); *Mell v. Goodbody & Co.*, 10 Ill. App. 3d 809, 813–14 (1st Dist. 1973); *see also Potomac Leasing Co. v. Chuck's Pub, Inc.*, 156 Ill. App. 3d 755, 759 (1987).

dispute between a California business and an Illinois individual—and, in these circumstances, a tie means the chosen law applies. *See Ventura*, 2005 WL 2406029, at *5 (chosen state had "an equal interest" where the defendant was a "resident business[]"). Ms. Delgado talks past this argument, Opp. at 10–11, suggesting that Illinois' interest is stronger simply because *she* is an Illinois resident. But California courts consider the states' interests in *both* parties—not just the plaintiff. *Volks USA Inc. v. A2 Hosting, Inc.*, 2016 WL 6808113, at *7–8 (C.D. Cal. Nov. 16, 2016).

More fundamentally, California's interest is founded on much more than the fact that Meta happens to be a California company. *See* Mot. at 12–13. California's interest is particularly compelling here, given the careful balance its legislature struck to protect consumer privacy while promoting innovation to support its unique and crucial technology sector. California enacted its biometric privacy regime in recognition that "California is the world leader in many new technologies," *Proposition 24, The California Privacy Rights Act of 2020*, Gen. Elec. (Nov. 3, 2020), https://tinyurl.com/28mt4yxp (last visited Dec. 20, 2023), and that technology companies choose to operate there in reliance on its laws. California also regulates "Internet-based services" "only as specified by the Legislature" because "[t]he continued vitality and success of California's technology . . . sector" is "dependent on a business climate that supports the . . . Internet." 2012 Cal. Leg. Serv. Ch. 733 § 1(a)(1), (b). As the California Supreme Court has recognized, California has a "predominant interest" in "assur[ing] individuals and commercial entities operating within its territory that applicable limitations on liability set forth in the jurisdiction's law will be available." *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 98 (2010); *see also Chung v. Vistana Vacation Ownership, Inc.*, 2017 WL 6886721, at *5 (C.D. Cal. Oct. 19, 2017), *aff'd sub nom.*, 719 F. App'x 698 (9th Cir. 2018) (noting "importance of enforcing choice of law provisions for businesses with nationwide customers," such as Meta, "to limit the risk and expenses of litigation under different [state] laws"). The legislature's decision about how to regulate a particular industry represents a significant interest in the choice-of-law calculus. *See Ventura*, 2005 WL 2406029, at *5 (recognizing that "South Dakota has enacted a number of statutes explicitly aimed at facilitating the workings of its resident financial institutions," and enforcing the parties' choice of South

Dakota law given the state's "interest in protecting the rights of its resident businesses" like the defendant bank). California's interest renders many of Ms. Delgado's authorities inapposite.[5]

In an attempt to manufacture a greater interest for Illinois, Ms. Delgado asks the Court to "infer that Meta engaged in relevant conduct in Illinois." Opp. at 11. But the Court should not "read allegations into the complaint that [the] plaintiff has not made explicit." *Foster v. Elliot*, 2020 WL 9889553, at *2 (E.D. Cal. Apr. 22, 2020). At most, Ms. Delgado has alleged only that Meta obtained voice audio from Illinois, Compl. ¶¶ 25, 149; nothing in her complaint suggests Meta would have created any recordings, much less voiceprints, in Illinois as opposed to California. Ms. Delgado similarly asserts that "[a]ny relevant 'contract' would have been executed by [her] in Illinois." Opp. at 11. But that assertion, which also does not appear in her complaint, ignores that Meta's Terms of Service were offered from California and that the "place of contracting" was on the Internet, not her home state. *Volks*, 2016 WL 6808113, at *8. And although she alleges she used Facebook and Messenger in Illinois, she ignores that they were designed in and offered from California. Compl. ¶ 26. Ultimately, Ms. Delgado's arguments distract from the relevant point. It is not enough for her to establish that Illinois has *some* interest in this case; she must establish that Illinois has a *materially greater* interest in this case, which involves (1) a California resident party; (2) an area of fundamental California policy; and (3) relevant conduct within California. Ms. Delgado cannot do that.

### 3. Enforcing The Parties' Agreement Would Not Cause A "Substantial Injustice"

Ms. Delgado also argues that enforcing the choice-of-law clause would cause a "substantial injustice" because it appears in what she calls an "adhesion contract" and would extinguish her claims. Opp. at 13–14. But courts routinely enforce choice-of-law clauses in contracts like—and *including*—Meta's Terms of Service, even where doing so extinguishes a party's claims.[6] The "substantial

---

[5] *See Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1324 (9th Cir. 2012) (*nothing* "suggest[ed] that [the chosen state] ha[d] a material interest in the resolution of th[e] case" other than it was defendant's place of incorporation); *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004 (9th Cir. 2010) (chosen state had *no* "significant policy of protecting its franchisors"). Ms. Delgado also relies on *Patterson*, 593 F. Supp. 3d 783, and *Hogan*, 2022 WL 952763, a pair of BIPA cases that are inapposite because the chosen state there (Washington) did not have a law comparable to BIPA, undermining any interest it had. Relatedly, Ms. Delgado's repeated reliance on *Facebook Biometric* ignores that it was decided *before* California enacted the CCPA. 185 F. Supp. 3d at 1169–70.

[6] *See, e.g.*, *Williams*, 384 F. Supp. 3d at 1055–56 (Meta's Terms of Service, then known as the "Statement of Rights and Responsibilities"); *Palomino*, 2017 WL 76901, at *4–5 (same); *C.M.D. v.*

injustice" exception applies only where a choice-of-law clause "was included because of improper means," such as by misrepresentation, duress, undue influence, or mistake. *Discover Bank v. Superior Ct.*, 134 Cal. App. 4th 886, 896–97 (2005). Ms. Delgado "does not argue that the choice-of-law provision was included" by such means, and therefore, this exception "does not apply." *Id.* at 897; *Hamilton v. Wells Fargo Bank, N.A.*, 2010 WL 1460253, at *2 (N.D. Cal. Apr. 12, 2010) (similar).[7]

**B.      Even If Illinois Law Applies, Ms. Delgado's BIPA Claims Fail Because They Are Conclusory And Speculative**

If the Court declines to enforce the parties' choice-of-law clause, it should still dismiss Ms. Delgado's complaint because she has not plausibly alleged that Meta violated BIPA.

**1.      Ms. Delgado Does Not Plausibly Allege Meta Collects Voiceprints From Anyone**

As Ms. Delgado acknowledges, a voiceprint is "more than a 'mere recording of a voice.'" Opp. at 14; Mot. at 14. A "voiceprint" is a unique identifier template created *from* a voice recording "by a machine that measures human vocal sounds." *Carpenter v. McDonald's Corp.*, 580 F. Supp. 3d 512, 515 (N.D. Ill. 2022). While Ms. Delgado alleges that Meta ingests voice recordings, she alleges no facts to support the allegation that it then created voiceprints from those recordings. Mot. at 14–17.

Ms. Delgado's response is to point out repeatedly that an entity can create a voiceprint without using it to identify anyone; like a fingerprint that is scanned and stored in a database rather than matched to a subsequent fingerprint, a voiceprint is still a voiceprint so long as it *can be used* to identify the speaker. Opp. at 14–16. Maybe so. But she extrapolates from that the notion that the term "voiceprint" encompasses a *voice recording* that *can be used to identify* a speaker—i.e., a voice recording from

---

*Facebook, Inc.*, 2014 WL 1266291, at *5 (N.D. Cal. Mar. 26, 2014) (same); *Rojas-Lozano*, 159 F. Supp. 3d at 1112 (Terms of Service); *In re Nexus*, 293 F. Supp. 3d at 935 (Terms of Sale); *Huynh*, 2019 WL 11502875, at *12 (Terms of Service); *Ventura*, 2005 WL 2406029, at *3 (credit card agreement).

[7]   *Pinela v. Neiman Marcus Grp., Inc.*, 238 Cal. App. 4th 227 (2015), is inapposite. There, an employee's mandatory arbitration agreement, which included a choice-of-law clause, was unconscionable "as a whole." *Id.* at 250–51. It included provisions "beyond the ken of most anyone" without the aid of a "skilled" lawyer. *Id.* at 244. No similar circumstances exist here. On the contrary, courts have repeatedly enforced the dispute resolution provisions in Meta's Terms of Service. *See* Mot. at 7 n.3 (collecting cases); *see also Franklin v. Facebook, Inc.*, 2015 WL 7755670, at *2 (N.D. Ga. Nov. 24, 2015) ("The Court cannot identify a single instance where any federal court has struck down [Meta's Terms of Service] as an impermissible contract of adhesion induced by fraud or overreaching[.]").

Gibson, Dunn &
Crutcher LLP

which a voiceprint can be created.[8] That is *not* so. If Ms. Delgado's theory that a voice recording is a voiceprint were correct, any entity that ingests voice recordings—any radio station, videoconferencing service, or entity that records its phone calls—would be liable for voiceprinting simply because there has for decades existed technology that could turn those recordings into voiceprints.[9] Ms. Delgado cannot use imprecise language to absolve herself of her duty to plausibly allege that Meta *in fact created* voiceprints from audio—not merely that Meta *could have* done so.[10] Her own cases make this clear.

In *Bell v. Petco Animal Supplies Stores, Inc.*, No. 1:22-cv-06455 (N.D. Ill. May 11, 2023) (ECF No. 47-1), employees sued Petco for collecting their voiceprints through "Vocollect" headsets they were required to use. The plaintiffs alleged that the headsets used "a voice and speaker recognition technology," but they *supported* this allegation by alleging how they were required to undergo an enrollment process whereby they were asked to "read a series of words repeatedly into the Vocollect system" so that it could learn and "create[] a template of their voices"; they then alleged the software in fact recognized their voices and accepted their subsequent voice commands. *Id.* at 2, 4. The court explained that *this* alleged that the defendant created voiceprints "in a non-conclusory way." *Id.* at 4.[11]

*Carpenter* concerned McDonald's' use of an AI voice assistant to take orders at its drive-throughs. The plaintiff claimed that the system was collecting voiceprints from customers who spoke to it. 580 F. Supp. 3d at 514. But the plaintiff *supported* that allegation by alleging how the system "present[s] [customers] certain menu items based on their past visits" and otherwise provides them "a tailored experience," indicating that the company *was* recognizing its customers by their voice. *Id.* at 516. The court considered all of this, *plus* a patent that *the defendant affirmatively argued covered* the technology at issue, which described how the technology analyzes a voice recording and "outputs" data

---

[8] *See* Opp. at 14 (asserting that while a "mere recording of a voice" is not a voiceprint, "that digitized voice data, combined with an ability to use that data to identify . . . constitutes a voiceprint"); *id.* at 17 (referring to digital voice data as "what [Meta] calls voice recordings").

[9] *E.g.*, *United States v. Smith*, 869 F.2d 348, 353 (7th Cir. 1989) (admitting evidence of voiceprinting).

[10] *McGoveran v. Amazon Web Servs., Inc.*, 2023 WL 2683553 (D. Del. Mar. 29, 2023), is instructive. The court dismissed a BIPA claim that the defendant disclosed voiceprints because all it disclosed were voice recordings; this was so even though the court did not dismiss a claim that the defendant created voiceprints from those recordings. *Id.* at *10. In other words, voice recordings are not covered by BIPA even if those same recordings can be—or *are*—turned into voiceprints.

[11] Ms. Delgado also relies on *Robinson v. Lake Ventures LLC*, 2023 WL 5720873 (N.D. Ill. Sept. 5, 2023). But that case concerned the same Vocollect headset and simply applied the holding in *Bell*. *Id.* at *8.

representing "identifying speaker characteristics such as [the speaker's] accent[], speech pattern[], gender, [and] age" so they can be recognized. *Id.* The court held that *this* combination of facts made it plausible that the defendant was creating voiceprints. *Id.* at 517.

This case is nothing like *Bell* and *Carpenter*. Ms. Delgado cites her conclusory allegations that Meta uses voice recordings to "obtain encoded digital data of the acoustic signals of the speaker's voice," which it processes through an "acoustical model" trained to recognize speakers. Opp. at 16. But these "naked assertions devoid of further factual enhancement" do not make her voiceprinting claim *plausible* rather than speculative. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). Ms. Delgado admits that her only support for these allegations pertain to Meta's patents and Regional Privacy Notice, but unlike the allegations in her authorities, these sources support only "a mere generality with no specifics relating to the instant case." *Corazon v. Aurora Loan Servs.*, 2011 WL 1740099, at *5 (N.D. Cal. May 5, 2011).[12]

### a. Meta's Patents Do Not Plausibly Suggest That Meta Collects Voiceprints

Meta explained that a patent represents only the right to exclude others from practicing a claimed invention; it says nothing about whether the owner can, much less does, practice that invention. *See* Mot. at 15–17; *Emblaze Ltd. v. Apple Inc.*, 2015 WL 396010, at *8 (N.D. Cal. Jan. 29, 2015), *aff'd*, 639 F. App'x 639 (Fed. Cir. 2016). Meta's ownership of patents for a voiceprinting technology thus does not make Ms. Delgado's assertions that Meta actually creates voiceprints plausible. Ms. Delgado responds that she is not relying on an inference that Meta practices the patents. She is wrong.

Ms. Delgado notes again that she need only allege that Meta used voice recordings to create data that *could* identify speakers, and she claims she has done so because the patents make "evident" that "there is a type of technology" that could use the "voice data" Meta created from voice recordings to identify speakers. Opp. at 18. This argument mischaracterizes both patent law and the patents at issue. As a legal matter, the patents do not support the assertion that *any* technology exists. They mean only that *if* the technology they describe existed, Meta would have intellectual property protections over it. *See, e.g.*, *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 60 (1998); *King Instruments Corp. v. Perego*,

---

[12] Ms. Delgado also suggests Meta's alleged "prior practice of ignoring user privacy rights for financial gain" supports her allegations. Opp. at 22. But whether Meta has been sued for privacy violations in the past says nothing about whether Meta committed the specific violations of BIPA she alleges here.

Gibson, Dunn &
Crutcher LLP

65 F.3d 941, 949 (Fed. Cir. 1995); Mot. at 16 (collecting cases).  The inquiry should end there because the patents are irrelevant as a matter of law.

And as a factual matter, there is no basis for Ms. Delgado's assertion that the patents describe a type of technology that could use the "voice data" that Meta creates from recordings to identify speakers, because the patents do not say anything about *any* so-called "voice data" that Meta supposedly creates from recordings.  The patents simply describe a technology that *could* create voice data from recordings that *could* be used to identify.  But Ms. Delgado must plausibly allege that Meta *in fact created* such data in the first place.  Nothing about Meta's ownership of the patents supports the assertion that Meta took that necessary step.[13]

Ms. Delgado's alternative argument that she plausibly alleges Meta practices its patents because "it is reasonable to infer Meta has pursued" the financial benefits she alleges might result from practicing them exceeds the bounds of a "reasonable" inference.  Opp. at 18.  This argument asks the Court to rule that it is plausible to infer that *every* patent holder practices *every* patent so long as it might be profitable to do so.  Such a ruling, which entirely ignores the possibility of patent licensing and infringement litigation, would wreak havoc on the law far beyond BIPA.

b.     **Meta's Regional Privacy Notice Does Not Plausibly Suggest That Meta Collects Voiceprints**

Meta explained that the disclosure in its Regional Privacy Notice that states—consistent with California law—that Meta may collect "*voice recordings* which may be used to identify you" in no way supports the inferential leap that Meta *created voiceprints* from voice recordings.  Mot. at 17.  Ms. Delgado offers three responses; all are meritless.

First, Ms. Delgado suggests that this language should not be read as limited to disclosing the collection of mere voice recordings, as required by the CCPA, because the notice applies to U.S. users generally, not just users in California.  Opp. at 19.  That argument is groundless; this language appears in a section of the notice *expressly directed* at complying with the CCPA, *see* ECF No. 35-4 at 2–4, which is why, unsurprisingly, the language closely tracks the CCPA's text.  *Compare id.* at 4

---

[13]  None of Ms. Delgado's cases support her theory.  *See* Opp. at 18.  The sole case she cites that even mentions a patent is *Carpenter*, where the defendant affirmatively argued that the patent at issue in fact covered the technology the defendant was using.  580 F. Supp. 3d at 516.

(disclosing that Meta may collect "voice recordings which may be used to identify you"), *with* Cal. Civ. Code § 1798.140(c) (requiring disclosure where a company may collect "voice recordings[] from which an identifier template, such as a . . . voiceprint, can be extracted"). And it is unreasonable to read the language in the notice as saying something other than what it says: voice recordings.

Second, Ms. Delgado asserts that the language actually describes a voiceprint because a "voiceprint" is any voice recording that could be turned into a voiceprint and therefore could "be used to identify" people. Opp. at 19. As explained above (*supra*, at 7–8), Ms. Delgado misunderstands the definition of a "voiceprint": Under Illinois law, a "voiceprint" is not a "recording of a voice" but rather a distinct identifier template "made by a machine" *from* a recording of a voice that can be used to "identify[] an individual speaker." Public Access Opinion, No. 17-011, 2017 WL 10084298, at *3 (Ill. A.G. Aug. 14, 2017); *McGoveran*, 2023 WL 2683553, at *10; *Rivera v. Google, Inc.*, 238 F. Supp. 3d 1088, 1097 (N.D. Ill. 2017). In other words, a voice recording that can be used to identify is merely a voice recording from which a voiceprint can be created—i.e., any recording of a voice. *See id.*

Third, Ms. Delgado argues that disclosing the collection of voice recordings to comply with the CCPA means that Meta intended to collect voiceprints, because language in the CCPA describes "biometric" data as data "that is used or is intended to be used" to identify. Opp. at 19. This argument proves too much. The CCPA is clear: "Biometric [data] includes . . . voice recordings," Cal. Civ. Code § 1798.140(c), and thus Meta must disclose that it collects voice recordings lest it risk noncompliance. That does not make it plausible that Meta collects voiceprints instead of voice recordings. Surely the innumerable companies that disclose the collection of voice recordings to comply with the CCPA would be shocked to learn—as Ms. Delgado asserts—that they have plausibly confessed to BIPA violations.[14]

### 2. Ms. Delgado Does Not Plausibly Allege That Meta Collected *Her* Voiceprint

Even if Ms. Delgado plausibly alleged that Meta creates voiceprints, she has not plausibly alleged that Meta created *her* voiceprint from Facebook and Messenger audio. Mot. at 17–18.

---

[14] Ms. Delgado also suggests that Meta would not disclose the collection of data covered by Illinois law if it were collecting such data. Opp. at 19–20. This contradicts her assertion that the Regional Privacy Notice does exactly that. The argument also ignores Meta's point that it is implausible that Meta disclosed the collection of data covered by Illinois law in a notice expressly limited to disclosing data covered by the laws of California, Colorado, Connecticut, Utah, and Virginia. Mot. at 17.

Gibson, Dunn &
Crutcher LLP

Ms. Delgado argues that the "most reasonable inference" is that the patents' reference to a hypothetical "social-networking system" refers to Facebook and Messenger. Opp. at 21–22. But she provides no explanation for why that is reasonable, particularly given that Meta itself operates several prominent "social-networking" services, including Instagram and WhatsApp. *See* ECF No. 35-3 at 2–3, 58–61. And the inference is unreasonable, given that the patents describe features she does not even allege *exist* on Facebook or Messenger, such as one that uses a "dongle in communication with [a] TV" to analyze voices and target TV content at a user watching TV at someone else's home. Mot. at 15 n.5. More fundamentally, the patents do not describe the audio calling, voice messaging, or voice-dictation features Ms. Delgado alleges she used on Facebook or Messenger, much less the creation of voiceprints from voice recordings collected through those features. Compl. ¶ 149. Thus, nothing connects the patents to anything Ms. Delgado alleges she experienced. To accept her allegation that *her* voiceprint was collected, the Court must assume *both* that Meta actually practices its patents *and* that it does so in a specific manner not even *contemplated* in the patents. She offers no basis for such speculation.

Ms. Delgado's argument that the Regional Privacy Notice necessarily "covers Facebook and Messenger," Opp. at 21, similarly relies on layers of speculation. The notice discloses at most that Meta "may" collect voice recordings, which "may" be used to create voiceprints, *if* a user uses certain unnamed "features," on one of *numerous* services offered by Meta *in addition to* Facebook and Messenger. Compl. ¶ 141; ECF No. 35-4 at 2–4. Thus, Ms. Delgado's argument merely speculates that Meta (1) *actually* created voiceprints; (2) *specifically* from recordings collected through Facebook and Messenger; and (3) in connection with the *specific* features that she actually used—*none* of which involved *any* indication of voice analysis such as an enrollment process (*Bell*) or personalized service in response to a voice (*Carpenter*). But Ms. Delgado cannot meet her pleading burden by piling speculation upon speculation in this way. *Iqbal*, 556 U.S. at 678. She must allege something *plausible*—not merely a bespoke chain of contingencies that is *conceivable*—and she has not done so.

### 3. Ms. Delgado Does Not Plausibly Allege That Meta Collected Her Voiceprint From Audio Recordings Provided By Any Third Party

Ms. Delgado's claims must also be dismissed to the extent they are premised on the theory that Meta created voiceprints from recordings of her voice that it received from unnamed "third party

Gibson, Dunn &
Crutcher LLP

sources," *independent of anyone's use of Facebook and Messenger*. *See* Compl. ¶ 81 (alleging Meta created voiceprints from recordings "received via Facebook or Messenger *and/or received from third parties*") (emphasis added). This theory rests on sheer speculation; Ms. Delgado offers no well-pled allegations about the identity of any third parties that collect recordings, why they would have her recording, that they actually shared recordings with Meta, that Meta created voiceprints from those recordings, or that *her* recording was among those voiceprinted. Mot. at 19–20.

Ms. Delgado responds that the patents support an inference that Meta is bugging "third party microphones" on "mobile devices" and in "public places, such as stores" so as to collect voice recordings and create voiceprints from them. Opp. at 22. This is downright conspiratorial, not plausible, and it illustrates why hypothetical situations described in patents cannot serve as factual support for allegations of actual conduct. *See* Mot. at 16. Even if the Court were to entertain these hypotheses, however, Ms. Delgado has still not pleaded facts to suggest this happened to *her*, such as that she actually spoke into a microphone at a store to begin with. Rather, she suggests that any such recording would have been captured "without [her] knowledge," demonstrating that she is merely speculating that Meta even obtained her voice recording from a third-party source, much less that it then created a voiceprint from that recording. Opp. at 22. Ms. Delgado falls back on the Regional Privacy Notice's disclosure that Meta may receive information about users from third parties, such as information about "websites you visit, apps you use, games you play, and purchases you make," ECF No. 35-4 at 7, but that, too, does not suggest that Meta obtained Ms. Delgado's voice recording from any third party, let alone that it then created a voiceprint from any such recording.

Ms. Delgado asks the Court to ignore that these third-party allegations are too speculative even to satisfy Article III standing because Meta did not move to dismiss under Rule 12(b)(1). But Ms. Delgado bears the burden of establishing standing, and the Court must assure itself of standing in all cases. *Sternberg v. Town of Danville*, 2015 WL 9024340, at *9 (N.D. Cal. Dec. 16, 2015). Courts routinely dismiss for lack of standing claims like Ms. Delgado's, which contemplate conduct that only *might* apply to the plaintiff. *See Strautins v. Trustwave Holdings, Inc.*, 27 F. Supp. 3d 871, 880 (N.D. Ill. 2014) ("[T]he complaint provides no basis to infer that the hacker . . . obtained *her* data.") (emphasis in original); *Alonso v. Blue Sky Resorts, LLC*, 179 F. Supp. 3d 857, 864 (S.D. Ind. 2016) (similar).

**C.** **Ms. Delgado's BIPA Claims For Profiting And Storage Fail For Independent Reasons**

Even if Ms. Delgado has plausibly alleged that Meta collected her voiceprint, the Court should dismiss her claims under BIPA Sections 15(c) and 15(e).

**1.** **Ms. Delgado Has Not Plausibly Alleged That Meta "Profits" From Her Voiceprint**

Meta explained that Ms. Delgado has not plausibly alleged a claim of "profiting" under BIPA Section 15(c) because she alleges only that Meta benefited from collecting voiceprints, not that it disseminated them for gain. Mot. at 20–22. Specifically, she alleges only that Meta has used voiceprints to improve its technology and products and to serve targeted ads, which involve no dissemination at all. Ms. Delgado asserts that these activities nonetheless constitute "profiting" under cases involving the creation of "technology so intertwined with . . . biometric data and/or" where the "use of biometric data is a necessary component of [a company's] business model." Opp. at 23–24. But those descriptions are misleading; *all* of the cases she cites involve providing a third party with access to data in exchange for consideration—an element absent from Ms. Delgado's allegations.[15]

Aware that her allegations are thus insufficient, Ms. Delgado pivots to the Regional Privacy Notice. Opp. at 24. But the complaint provides no allegations tying the notice to the Section 15(c) claim. *Compare* Compl. ¶ 141, *with id.* ¶¶ 184–94. And the tortured string of inferences that Ms. Delgado now invites the Court to make are not sufficient to elevate her claim from *possible* to *plausible*. In essence, she observes as follows. The left-most column in a chart lists *dozens* of types of information that Meta "may" collect, some of which are as broad as "other information you provide." *Id.* ¶ 141. The middle column lists various "examples" of how Meta "may" use information in the left-most column, such as to "promot[e] safety, integrity, and security," and "[r]esearching . . . for social good."

---

[15] *See Vance v. Amazon.com Inc.*, 534 F. Supp. 3d 1314, 1324 (W.D. Wash. 2021) (defendant sold access to database of facial recognition data to "customers, including law enforcement agencies" to "monitor individuals"); *In re Clearview AI, Inc. v. Consumer Privacy Litig.*, 585 F. Supp. 3d 1111, 1125–26 (N.D. Ill. 2022) (defendant "sold access to [a] database [of facial recognition data] to more than 200 private companies"); *Mahmood v. Berbix, Inc.*, 2022 WL 3684636, at *2 (N.D. Ill. Aug. 25, 2022) (third party "paid for access to [defendant's] facial recognition platform to verify [plaintiff's] identity"); *Mayhall v. Amazon Web Servs., Inc.*, 2022 WL 2718091, at *11 (W.D. Wash. May 24, 2022) (defendant shared biometric data with third party whose "right to access or use" the data was conditioned on "payment"); *Melzer v. Johnson & Johnson Consumer Inc.*, 2023 WL 3098633, at *5 (D.N.J. Apr. 26, 2023) (defendant "acknowledged that it may have sold [biometric] data").

*Id.* Lastly, the right-most column lists categories of parties—ranging from "academics" to "[l]aw enforcement"—with whom information in the left-most column "may" be disclosed. *Id.* From this, Ms. Delgado asserts that Meta specifically takes "voice recordings" (from the left column); discloses them specifically to "apps, websites," and "partners offering goods and services," as well as "measurement and marketing vendors" (from the right column); and does so specifically for the purpose of "providing, personalizing, and improving [its] products," as well as "providing marketing communications" and "business services" (from the middle column). Opp. at 24.

Ms. Delgado's attempt at pleading by Mad Libs does not withstand scrutiny. Although she may be entitled to *reasonable inferences* from the notice, she is not entitled to rewrite the notice with the precise combination of words that suits her claim. At most, the assertion Ms. Delgado has assembled is *possible*, not plausible, and that does not suffice. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 560 (9th Cir. 2019).[16]

### 2. Ms. Delgado Has Not Plausibly Alleged That Meta Failed To Exercise Reasonable Care In Storing Her Voiceprint

Finally, Ms. Delgado has not plausibly alleged that Meta's handling of her alleged voiceprints fell short of industry or internal company standards under BIPA Section 15(e). The parties agree that, apart from parroting the text of Section 15(e), the sole allegation Ms. Delgado advances to support this claim is that Meta is an attractive target for cyberattacks and was once the victim of such an attack. Mot. at 22–23; Opp. at 24–25. But as Meta explained, this allegation says absolutely *nothing* about how securely Meta stores or transmits voiceprints, much less how its methods for doing so fall short of some unarticulated standard. Mot. at 22–23. Ms. Delgado does not allege that voiceprints were compromised in a prior attack or that Meta has done less than what is reasonably required to protect them from a future attack. She responds that Meta is improperly demanding "evidence" at the pleadings stage, Opp. at 25, but Meta merely asks that Ms. Delgado be required to provide plausible factual *allegations* in support of her claims—not rank speculation, *Iqbal*, 556 U.S. at 678.

---

[16] Ms. Delgado also asserts that because the notice contains a link that allows consumers to limit the use of their information under the CCPA, that "lead[s] to the reasonable inference" that Meta "uses and discloses biometric data for purposes other than those stated in the CCPA," which could hypothetically include "disclosures to third parties" for "commercial purposes." Opp. at 24 n.9. Plaintiff has made no such allegation in her complaint, and even if she had, it amounts to pure speculation.

Dated: December 22, 2023

GIBSON, DUNN & CRUTCHER LLP

By: _/s/ Christopher Chorba_
Christopher Chorba

_Attorneys for Meta Platforms, Inc._