**ARIAS SANGUINETTI WANG & TEAM LLP**
Mike Arias (CSB #115385)
Elise R. Sanguinetti (CSB #191389)
Arnold C. Wang (CSB #204431)
Craig S. Momita (CSB #163347)
M. Anthony Jenkins (CSB #171958)
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: (310) 844-9696
mike@aswtlawyers.com
elise@aswtlawyers.com
arnold@aswtlawyers.com
craig@aswtlawyers.com
anthony@aswtlawyers.com

**GOLDENBERG HELLER & ANTOGNOLI, P.C**
Thomas P. Rosenfeld (admitted *pro hac vice*)
Kevin P. Green (admitted *pro hac vice*)
Thomas C. Horscroft (admitted *pro hac vice*)
Daniel S. Levy (admitted *pro hac vice*)
2227 South State Route 157
Edwardsville, Illinois 62025
Telephone: (618) 656-5150
tom@ghalaw.com
kevin@ghalaw.com
thorscroft@ghalaw.com
daniel@ghalaw.com

*Attorneys for Plaintiff Natalie Delgado*

**FILED UNDER SEAL**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATALIE DELGADO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 3:23-cv-04181-SI<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISQUALIFY EXPERT RITA SINGH**<br><br>Action Filed: August 16, 2023<br>Trial Date: None Set<br>Judge: Hon. Susan Illston |

-1-

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................1

FACTUAL BACKGROUND ..........................................................................................................7

ARGUMENT .................................................................................................................................14

      I.     Meta Fails to Establish a Reasonable Belief of a Confidential Relationship................14

           A.     No Long-Standing Relationship with Frequent Contacts .................................15

           B.     No Formal Confidentiality Agreement ..............................................................15

           C.     No Retention .......................................................................................................15

           D.     Two 30-Minute Repetitive Meetings .................................................................15

           E.     No Prohibition on Talking to Other Side ...........................................................15

           F.     No Fee .................................................................................................................15

           G.     No Specific Ideas Derived from Interaction with Meta ....................................16

           H.     No Confidential Documents Provided ...............................................................16

           I.     No Work Product Discussed ..............................................................................16

      II.     Meta Fails to Establish it Disclosed Confidential Information....................................19

      III.     Fundamental Fairness and Prejudice to Plaintiff Weigh Against Disqualification.......23

      IV.     Policy Concerns Weigh Against Disqualification...........................................................25

CONCLUSION .............................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Adams v. Merck Sharp & Dohme Corp. (In re Incretin-Based Therapies Prods Liab. Litig.),*
    721 F. App'x 580 (9th Cir. 2017) ................................................................................ 6, 22, 23

*AstraZeneca Pharms, LP v. Teva Pharmss USA, Inc.,*
    2007 U.S. Dist. LEXIS 88996 (D.N.J. Dec. 4, 2007) ..................................................... 19

*Atl. City Assocs., LLC v. Carter & Burgess Consultants, Inc.,*
    2007 U.S. Dist. LEXIS 1185 (D.N.J. 2007)..................................................................... 22

*Aventis Pharma S A v. Amphastar Pharm., Inc.,*
    2005 U.S. Dist. LEXIS 54292 (C.D. Cal. Jan. 5, 2005)............................................... 5, 19

*Calendar Research LLC v. StubHub, Inc.,*
    2017 U.S. Dist. LEXIS 163408 (C.D. Cal. Sep. 22, 2017)............................................. 18

*Chan v. Arcsoft, Inc.,*
    2023 U.S. Dist. LEXIS 138118 (N.D. Cal. Aug. 8, 2023)...................................... *passim*

*Cooper v. Quora, Inc.,*
    2020 LX 26697 (N.D. Cal. July 15, 2020).............................................................. 17, 18

*Daddono v. Hoffman,*
    2022 U.S. Dist. LEXIS 126962 (M.D. Fla. July 18, 2022)............................................. 22

*Finisar Corp. v. Nistica, Inc.,*
    2015 U.S. Dist. LEXIS 94975 (N.D. Cal. July 21, 2015) ....................................... *passim*

*Hewlett-Packard Co. v. EMC Corp.,*
    330 F. Supp. 2d 1087 (N.D. Cal. 2004) ................................................................. *passim*

*In re Xyrem Sodium Oxybate Antitrust Litig.,*
    2022 U.S. Dist. LEXIS 23458 (N.D. Cal. Feb. 9, 2022)......................................... 18, 23, 24, 25

*Kane v. Chobani, Inc.,*
    2013 U.S. Dist. LEXIS 109900 (N.D. Cal. Aug. 2, 2013) ....................................... *passim*

*Larson v. Rourick,*
    284 F. Supp.2d 1155 (N.D. Iowa 2003) ....................................................................... 17

*LifeWatch Serv. v. Braemer Inc.,*
    2010 U.S. Dist. LEXIS 105088 (N.D. Ill. Sep. 28, 2010)......................................... 19, 23

*M&T Bank v. Worldwide Supply LLC,*
    2022 U.S. Dist. LEXIS 115109 (D.N.J. June 28, 2022) ................................................ 18

*Mays v. Reassure Am. Life Ins. Co.,*
    293 F. Supp. 2d 954 (E.D. Ark. 2003) ......................................................................... 21

*Nikkal Indus., Ltd. v. Salton, Inc.,*
    689 F. Supp. 187 (S.D.N.Y. 1988).............................................................................. 19

*Staley v. Gilead Scis., Inc.*,
   2022 U.S. Dist. LEXIS 136535 (N.D. Cal. July 29, 2022) .......................................................... 18

*United States ex rel. Cherry Hill Convalescent Center v. Healthcare Rehab Sys.*,
   994 F. Supp. 244 (D.N.J. 1997) ................................................................................................ 24

*Zaluda v. Apple*, *Inc.*,
   2019-ch-11771 (Cook Cnty, Ill.)............................................................................................... 21

**Statutes**

815 ILCS 505/1 *et. seq.* ................................................................................................................... *passim*

PLAINTIFF'S OPPOSITION TO MOTION DISQUALIFY EXPERT RITA SINGH
CASE NO. 3:23-CV-04181-SI

**INTRODUCTION**

"[D]isqualification is a drastic measure that courts should impose only hesitantly, reluctantly, and rarely." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087 (N.D. Cal. 2004). Meta seeks this extraordinary remedy based on a 30-minute vetting conference with Dr. Singh in March 2024, some non-substantive scheduling emails, and a second, shorter conference in June 2024 in which the first discussion was simply repeated because it had been so long. The relevant factors all weigh against a finding that there was any reasonable basis for Meta's experienced counsel to believe it had a confidential relationship with Dr. Singh. Meta simply ignores the factors: There was no prior relationship between Meta's Counsel and Dr. Singh; no offered or executed confidentiality agreement, non-disclosure agreement, protective order, retention agreement, or engagement letter; no fee paid; no confidential documents provided; and no services or opinion provided to Meta. The record also lacks the required specificity to find any confidential information was disclosed, which Dr. Singh directly disputes. And all policy factors disfavor disqualification here. The Court should deny the motion.

The timeline is also relevant. By March 21, 2024—the date of Meta's first 30-minute Zoom conference with Dr. Singh—Meta had already made extensive disclosures of its factual and legal positions. Since filing its Motion to Dismiss in 2023, Meta has asserted numerous factual and legal defenses, including that it does not collect voice data regulated by BIPA; Digital Voice Data is not a voiceprint under BIPA but a mere voice recording; and it has never used voice data to identify Illinois Facebook or Messenger users. The Court's Order on the Motion provided guidance that whether voice data Meta collects *could* be used to identify someone is relevant, regardless of whether it was actually used to identify. On March 7-8, 2024, Meta also served 104 pages of discovery responses disclosing its legal theories, defenses, themes, and factual positions—including that it ████████ ████████████████████████████ ████████. On March 29, 2024, Meta filed its answer admitting or denying each of the 202 paragraphs of the Complaint and asserting sixteen affirmative defenses. In April 2024, Meta's Counsel advocated to the Court for an early summary judgment motion on the issue of whether Digital Voice Data collected by Meta constituted a voiceprint under BIPA, explaining its view that this was "a core, threshold legal issue that would substantially streamline this case" Dkt. 60 at 10-11. In 2024, Meta also served discovery on

-1-

Plaintiff, had extensive discussions and written exchanges with Plaintiff about facts, legal arguments, views of the case, and the scope of discovery, deposed the Plaintiff, supplemented its discovery responses, produced over 8,000 pages of documents, and withheld production of documents based on its objections and legal theories. The withholding of documents came to a head in a discovery dispute with a joint 20-page brief (Dkt. 78), and in January 2025, the Court overruled Meta's objections and ordered Meta to produce documents relating to its technologies by February 14, 2025 (Dkt. 80). Thereafter, in late January/early February 2025, the parties met and conferred, and Meta advised it would provide information and documents about its technologies on a rolling basis. *See* Dkt. 83.

After all this, Plaintiff's Counsel entered into a retention agreement with Dr. Singh in early March 2025. Plaintiff's Counsel had no interactions with Dr. Singh before February 2025. Pursuant to the Court's Discovery Order, Meta supplemented its interrogatory responses on March 5 and 31, and April 17, and on April 1, 9, 10, and 11, produced documents it self-selected as sufficient to show how the technologies it identified work. Meta thereafter made six additional or supplemental productions.

On October 23, 2025, pursuant to the scheduling order, Plaintiff disclosed Dr. Singh as an expert related to Meta's "early summary judgment motion," along with a copy of her report (the "Report"). The Report contains five opinions: (a) ███████████████████████; (b) █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; (c) ████████████████████████████████████████████; (d) ██████████████████████████████████████████████████████████████; and (e) ████████████████████████████████████████████████████████████.

Meta moves to disqualify Dr. Singh, claiming it had "extensive discussions with Dr. Singh during multiple phone calls and email exchanges" that occurred "throughout Spring 2024." Dkt. 120-6 at 3, 5, 7. In truth, Meta's Counsel had one roughly 30-minute Zoom conference on March 21, 2024, that, according to Meta's Counsel was "for purposes of vetting her for possible retention by Meta." *Id.* at 5. A second conference occurred on June 10, 2024, but that was a shorter repeat of the first discussion because of the nearly three-month gap. Dkt. 120-2 ¶ 20 (During June 10 conference, "I reiterated the

-2-

information discussed with Dr. Singh during the retention interview on March 21 . . . ."); Declaration of Rita Singh ("Singh Decl.") ¶ 24 (second conference on June 10 involved a discussion that was repetitive of the March 21 conference because of nearly 3-month gap, but it was shorter because parties also discussed a potential conflict). Any "further discussions via email" (Dkt. 120 at 1) were all non-substantive—mostly scheduling emails, some not with licensed attorneys, and none of which Meta's Counsel designated as "Privileged or Confidential Attorney-Client/Work Product." *See* Dkt. 120-3, 120-4, 120-5. Meta also claims it did not move forward with Dr. Singh because a potential conflict from Dr. Singh's work on another BIPA case was "revealed late in our discussions" (Dkt. 120-6 at 3) and at the "last minute" (Dkt. 120 at 1). Hardly so. Dr. Singh indicated her work on that case in an email on March 21 after the first 30-minute conference. Meta's Counsel did not respond to that email. Dkt. 120-5 at 7-8. During the second conference in June, a discussion about the potential conflict occurred, and the conflict was confirmed the next day. The only reason Meta views this as "last-minute" is because it waited nearly three months to talk to Dr. Singh a second time.

"Disqualification is a drastic measure" and it is the movant's burden to establish (1) that it was reasonable for it to believe a confidential relationship existed *and* (2) relevant confidential information was disclosed. Courts also consider if disqualification would be fair to the affected party and promote the integrity of the legal process. *Hewlett-Packard*, 330 F. Supp. 2d at 1092-95. Here, all of the factors courts consider weigh against disqualification. *See id.* In fact, Meta does not set forth all the relevant factors, much less appropriately analyze them. Thus, Meta falls well-short of satisfying its burden to show a reasonable belief of a confidential relationship and disclosure of confidential information.

Applying the factors, there is no basis for Meta's Counsel to have reasonably concluded it had entered a confidential relationship with Dr. Singh. Neither Meta nor Meta's Counsel had a prior relationship with Dr. Singh. Within less than 24 hours after its initial contact with Dr. Singh, Meta's Counsel had one 30-minute vetting conference in March 2024, along with non-substantive scheduling emails that were not even marked as privileged and confidential. Dr. Singh was given no documents prior to that conversation. A second conference occurred on June 10, 2024, which involved a discussion that was repetitive of the March 21 conference, but shorter because there also was discussion of a potential

PLAINTIFF'S OPPOSITION TO MOTION DISQUALIFY EXPERT RITA SINGH
CASE NO. 3:23-CV-04181-SI

conflict. Although Dr. Singh disclosed her work for plaintiffs on another BIPA case on March 21, Meta did not even ask for the name of the case until after the June 10 conference.

Additionally, Meta's Counsel never presented to Dr. Singh, nor did either party negotiate or execute a confidentiality agreement, non-disclosure agreement, protective order, engagement letter, or retention agreement. Meta's Counsel never paid Dr. Singh. Meta never asked Dr. Singh not to discuss the case with the opposing party or counsel. Meta's Counsel never asked Dr. Singh for services or an opinion. And none of the ideas or opinions in the October 2025 Report are influenced by, derived from, reflect, or reveal anything said during the two repetitive 30-minute conferences. This is self-evident. The Report is predominantly factual and extensively cited, containing 192 footnotes, 191 of which are citations to articles/scientific literature, public documents, Meta's Interrogatory responses, Bates-stamped documents produced in the litigation, and deposition testimony. The first two opinions are not even about Meta—they are about ███████████████████ generally. The third and fourth opinions are about ██████████████████████████████, both of which rely on technical facts from discovery. The final opinion follows from the facts in the prior sections of the Report.

The interaction between Meta's Counsel and Dr. Singh was simply not the type of continuing relationship that generates a reasonable belief of a confidential relationship. This is more so considering Meta's Counsel's own stated practices. Indeed, Ms. Feinstein and other lawyers at Gibson Dunn publicly teach[1] that in communicating with third parties, such as auditors and consultants, attorneys should: "stick to the facts," "avoid disclosing mental impressions or legal conclusions," "avoid sharing written materials," "stay closely involved," "retain the consultant," "ensure the engagement letter expressly sets forth that the consultant's work is intended to assist counsel in the provision of legal advice," and direct the consultant's work "once hired." It "strains credulity" to think Meta's Counsel threw these principles out the window and, only a day after contacting a potential expert witness, disclosed aspects of its litigation strategy to someone who had not yet signed a retention or confidentiality agreement within the span of a half-hour conversation that was for vetting purposes.

---

[1] Diana Feinstein, Casey McCracken, and Joe Rose, *Attorney-Client Privilege for In-House Counsel: Ethical and Practical Considerations*, Gibson Dunn, PowerPoint at 44, 46, *available at* https://www.gibsondunn.com/wp-content/uploads/2023/01/WebcastSlides-Attorney-Client-Privilege-for-In-House-Counsel-Ethical-and-Practical-Considerations-10-JAN-2023.pdf (last visited 11/13/25).

-4-

*See Hewlett-Packard*, 330 F. Supp. 2d at 1096 (finding "it strains credulity" that counsel would disclose litigation strategy to expert who had not yet signed a confidentiality agreement, only a few weeks after contacting them, during a one-hour conversation relating to technically complex patents, and the "conversation appears to have been only an initial discussion, the goal of which was to decide whether EMC wanted to employ Katz and whether Katz wanted to work for EMC"); *Finisar Corp. v. Nistica, Inc.*, 2015 U.S. Dist. LEXIS 94975, *29 (N.D. Cal. July 21, 2015) ("Finisar seeks to disqualify [expert] based on one 42-minute telephone conversation with [counsel] about possibly serving as Finisar's expert in the Cheetah cases. At best, this relationship spans two phone calls, which is not the type of continuing relationship that generates a reasonable belief in a confidential relationship.").

With no chance of satisfying the relevant factors, Meta simply ignores them and instead cherry-picks quotes from cases that are distinguishable in which the experts and counsel engaged in "repeated, detailed, and confidential strategy sessions" that were "covered by a confidentiality provision in a written agreement," *Kane v. Chobani, Inc.*, 2013 U.S. Dist. LEXIS 109900, *6-7, 18-19 (N.D. Cal. Aug. 2, 2013), often with long-standing prior relationships, *see, e.g.*, *Aventis Pharma S A v. Amphastar Pharm., Inc.*, 2005 U.S. Dist. LEXIS 54292, *12-14 (C.D. Cal. Jan. 5, 2005) (21-year relationship).

Meta thus fails to satisfy its burden of showing a reasonable belief in a confidential relationship.

Meta also fails to meet its burden of proving it disclosed confidential information. Discussions with experts do not carry the presumption that confidential information was exchanged. *Hewlett-Packard*, 330 F. Supp. 2d at 1094. And "communication based upon technical information as opposed to legal advice is not considered privileged." *Id.* As in *Hewlett-Packard*, it is implausible that Meta's experienced Counsel would disclose attorney-client, work-product, or confidential information to a potential expert with whom they had never worked who had not yet been retained or signed a confidentiality agreement. It is equally implausible that such substantive and profuse disclosures could have occurred during a half-hour vetting conversation where the first portion was taken up by discussion of Dr. Singh's extensive credentials, testifying experience, "and other topics." Dkt. 120-2 ¶¶ 9-10. Meta's account is further undermined by its mischaracterization of the two repetitive 30-minute conferences and scheduling emails as "extensive discussions . . . during multiple phone calls and email exchanges" occurring "throughout Spring 2024." Dkt. 120-6 at 3, 5, 7.

-5-

Moreover, Meta fails to provide the specificity required to show confidential information was disclosed—particularly given the breadth of legal theories, defenses, views of Plaintiff's allegations, affirmative themes, and facts Meta had disclosed by March 21, 2024, including in its 100+ pages of discovery responses. It is hard to imagine what additional information Meta's Counsel could have disclosed in a 30-minute vetting call to a non-retained third party who had not seen the Complaint and where the first part involved discussion of credentials, experience, and "other topics." But speculation is all that can occur here because Meta provides no specifics. Rather, it only points to "defense arguments," "legal theories," "mental impressions," "assessment[s]," "strategies" and other "conclusory or *ipse dixit* assertions," *Hewlett-Packard*, 330 F. Supp. 2d at 1096, all of which could characterize the extensive information Meta had already disclosed before March 21.

And Meta made even more disclosures prior to Plaintiff's Counsel's first contact with Dr. Singh in February 2025, including, filing its answer and affirmative defenses, producing thousands of pages of documents, supplementing discovery, engaging in extensive discussions and written exchanges with Plaintiff, deposing Plaintiff, briefing a discovery dispute regarding "whether Plaintiff may obtain discovery regarding Meta's voice identification technology that could be used on voice data collected from Illinois Facebook and Messenger Users even if that technology was not applied to voices of Illinois Facebook and Messenger users" (Dkt. 74 at 2), and being ordered to supplement its discovery responses regarding its technologies. Meta has thus not provided the "specific and unambiguous" disclosures required for the drastic step of disqualifying an expert. *See Adams v. Merck Sharp & Dohme Corp. (In re Incretin-Based Therapies Prods. Liability Litig.)*, 721 F. App'x 580, 584 (9th Cir. 2017) ("[D]efendants did not meet their burden of showing 'specific and unambiguous' disclosures required to trigger disqualification.") (quoting *Hewlett-Packard*, 330 F. Supp. 2d at 1094); *Chan v. Arcsoft, Inc.*, 2023 U.S. Dist. LEXIS 138118, *21-22 (N.D. Cal. Aug. 8, 2023) ("Defendants have also not explained how the revelation of any such confidential information would prejudice them. By the time Plaintiffs' counsel met with [the expert], Defendants had already . . . revealed Defendants' views of Plaintiffs' allegations and strategy for opposing them. Moreover, Defendants have not identified any information that was shared with [the expert] that was not subsequently disclosed . . . .").

Meta thus fails to meet its burden to establish it disclosed confidential information to Dr. Singh.

Finally, fundamental fairness, prejudice to Plaintiff, and policy concerns also weigh against disqualification. This case involves a specialized field of voice biometrics and speaker identification technologies. *See* Singh Decl. ¶ 30. Finding a replacement expert witness to re-review and explain Meta's thousands of pages of technical documents would be difficult, particularly because Plaintiff is prohibited from retaining any past or present employee of Meta or its competitors—companies that typically hire subject-matter experts in voice processing technology. Dkt. 71 ¶¶ 2.7, 2.2; Singh Decl. ¶ 30. And Dr. Singh was not the only technical expert Meta contacted, further complicating the ability to find a replacement if Dr. Singh is disqualified under these facts. Dkt. 120-2 ¶ 3. Policy concerns also weigh against disqualification. Allowing disqualification based on the 30-minute discussion that was "for the purposes of vetting," repeated three months later, would hinder experts' pursuit of their trade and parties' ability to select their experts, while incentivizing attorneys "to create relationships with numerous potential experts at a nominal fee" (or no fee, as here) "for the purpose of preventing their adversaries from using the services of a particular expert"—a concern more pronounced in this case where courts and the public "rely on experts to explain complicated technologies." *Hewlett-Packard*, 330 F. Supp. 2d at 1095, 1098. Accordingly, Meta's Motion should be denied.

## FACTUAL BACKGROUND

Plaintiff filed her 61-page Complaint on August 16, 2023. Dkt. 1. Prior to March 21, 2024, Meta extensively disclosed facts, interpretations of Plaintiff's Complaint, "defense arguments," "legal theories," "mental impressions," "certain information," "assessment[s]," "strategies," "affirmative themes, and defenses that Meta intended to develop" and "particular arguments [it] anticipated would be central to the case." Dkt. 120-2 ¶¶ 10, 20. Meta's 38-page motion to dismiss briefing and the 2023 CMC statement identified disputed points of law and outlined Meta's views that a voiceprint "is different from a voice recording" and the Complaint "describe[s] activity that BIPA does not regulate," and has "not plausibly alleged that Meta collects voiceprints from anyone, let alone *her* voiceprint (as opposed to her voice recording)." *See* Dkt. 35 at 1; Dkt. 44 at 2; Dkt. 52; Dkt. 56 at 20:3-29:15. The February 27, 2024 Order provided more guidance on the analysis and central arguments. Dkt. 55.

On March 7-8, 2024, Meta served 104 pages of discovery responses disclosing more facts, legal theories, themes, assessments, and defenses. Green Decl. Exs. 1 & 2. Meta's responses included a

"██████████████" setting out ████████████████████

████████████████████████████████

███████████████. Green Decl. ¶ 4 & Ex. 1 at Meta Ans. To Pl. 1st Int. p. 3.

Throughout its responses, Meta disclosed its "assessment of the relevance of [its voice-related] technologies" (Dkt. 120-2 at ¶ 11) and indicated many other themes and defenses, including that:

- ████████████████████████████████ and (b) █████████████████████████. Green Decl. ¶ 5(a)-(b).

- ████████████████████████████████." *Id.* ¶ 5(c).

- ████████████████████████████████
████████████████████████ *Id.* ¶ 5(d)-(f).

Meta also disclosed facts about its technologies and practices. For example, Meta disclosed information about ████████████████████████:



*Id.* ¶ 6 & Ex. 1 at Meta Ans. to Int. No. 5.

In these discovery responses, Meta also framed factual disclosures, which it said were "based upon information known at this time," to Plaintiff in light of its disclosed legal defenses, legal theories, and themes. *Id.* ¶ 4 & Ex. 1 at Meta Ans. to Pl. 1st Int. p. 4. Meta thus claimed, *inter alia*:

- ████████████████████████████████ Green Decl. ¶ 7(a)-(c).

- "████████████████████████████████
████████" and "████████████████████
████████████████████."*Id.* ¶ 7(d)-(e).

- ████████████████████████████████
████████████████████████



. *Id.* ¶ 7(f)-(g).

- ." *Id.* ¶ 7(h)-(l).

- . *Id.* ¶ 7(k), (m).

- " ." *Id.* ¶ 7(n).

Subsequently, on March 20, 2024, Meta's Counsel emailed Dr. Singh requesting to speak about "a lawsuit concerning alleged voiceprinting." Dkt. 120-3. Dr. Singh had no prior relationship consulting or providing expert opinions to Meta or its Counsel. Singh Decl. ¶ 6. The parties agreed to a Zoom conference for the next day. Dkt. 120-4; 120-5 at 8-15. According to Meta' Counsel, the conference was "for purposes of vetting her for possible retention by Meta." Dkt. 120-6 at 5. The Zoom invite was for 2:15-2:45 p.m. Singh Decl. ¶ 11. Meta's Counsel did not send Dr. Singh the Complaint or any documents prior to this conference. Dkt. 120-4, 120-5 at 8-15; Singh Decl. ¶ 12.

On March 21, 2024, Meta's Counsel had an approximately 30-minute Zoom conference with Dr. Singh. Singh Decl. ¶ 13. At no time before, during, or after this conference did Meta's Counsel pay Dr. Singh; present, negotiate, or execute a non-disclosure or confidentiality agreement, protective order, engagement letter, or retention agreement; or direct Dr. Singh not to speak to Plaintiff's Counsel. *Id*. ¶¶ 8-9,13. The first part of the March 21 conference involved three questions about potential conflicts of interest, then discussion of Dr. Singh's extensive credentials, testifying experience, "and other topics." Dkt. 120-2 ¶¶ 9-10. In the next part of the conference, Meta's Counsel discussed generally the Complaint's allegations and that they were looking for an expert to help with the defense of the case. Singh Decl. ¶ 13. They discussed potential factual information, in a general, non-specific manner. Dr. Singh did not, and still does not, know if the facts discussed were hypothetical facts or actual facts. *Id.* Meta's Counsel did not discuss litigation or other strategies, legal theories, defense arguments, anticipated theories or arguments, strengths or weaknesses of the case, potential experts, or expert

-9-

arguments or theories. *Id.* Meta's Counsel did not discuss the kinds of experts Meta expected to retain or other potential experts in the case, and never said anything to the effect of: "We need an expert who can say X" or "We need an expert who can say X because then we can do or avoid A, B, C." *Id.*

After the conference ended, it was Dr. Singh's understanding that she did not have any relationship with Meta, was not working with Meta, and that Meta's Counsel did not reveal any private, proprietary, confidential, or privileged information. *Id.* ¶ 14. This was based on the general nature of the conversation that had been quickly arranged, the lack of any confidentiality or non-disclosure agreement or engagement/retention agreement, and the fact that Dr. Singh had worked with attorneys and large technology companies before, and her experience was that they heavily guard against any disclosure of any confidential or proprietary information without written agreements in place. *Id.*

On March 21, 2024, after the Zoom conference had ended, Paige Petrashko, a "recent law graduate, not admitted to practice law," emailed Dr. Singh a copy of the Complaint and the publicly-available patent cited in the Complaint. Dkt. 120-5 at 8. Dr. Singh neither received nor saw any other documents from Meta's Counsel. Singh Decl. ¶ 15. In response to Ms. Petrashko's email, Dr. Singh said that it was not surprising to her that the lawsuit was filed given that Meta had filed the patent. Dr. Singh said she was "ok" continuing to engage with Meta, with a "caveat," however, that she was already an expert on the plaintiff side in two BIPA cases. *Id.* ¶ 16; Dkt. 120-5 at 7-8. Dr. Singh thought this might present an issue if Meta wanted to continue talking to her, but she did not spend time looking into it at that time because it was unclear to her if anything further would occur. Singh Decl. ¶ 16. She thus said, "Let me know if you'd like to proceed with this," and stated that if Meta did want to continue, then "post-formalities" Dr. Singh would "ask for a bunch of interviews with the inventor [of the patent] and some of the SID [speaker ID] and ASR [automatic speech recognition] technical team members." *Id.*; Dkt. 120-5 at 7-8. By "post-formalities," Dr. Singh meant after potential conflicts had been resolved and she had entered retention and confidentiality agreements establishing a relationship with Meta. Singh Decl. ¶ 16. Meta's Counsel did not ask for the names of the two other cases, indicate they would be proceeding or that further discussions would occur, or otherwise respond to this email. *Id.* ¶ 17; Dkt. 120-5 at 7-8.

Over a month later, on April 22, 2024, Ms. Petrashko emailed Dr. Singh saying, "we are currently working through things with the client regarding the expert role." Dr. Singh did not know what this meant.

-10-

Ms. Petrashko also indicated that Dr. Singh was on a list of potential experts and said they would be in touch if she "d[id]n't mind hanging tight." Singh Decl. ¶ 18; Dkt. 120-5 at 7. More than a month after that, on June 3, 2024, Mistry Prachi emailed Dr. Singh to schedule another conference. Dr. Singh said she was available June 10, but requested a reminder of "which case this is." Singh Decl. ¶¶ 19-20; Dkt. 120-5 at 5-6. Meta's Counsel did not respond to the request. Dkt. 120-5. Two days later, Ms. Mistry asked to reschedule the conference to June 11. Dkt. 120-5 at 4-5. The next day, Ms. Feinstein emailed Dr. Singh saying: "If possible, would be great for us to connect just the Gibson Dunn team and you for 15 minutes before we have the call on Tuesday with Meta counsel." Ms. Feinstein asked if June 10 would still work for this "initial touchbase call." Dkt. 120-5 at 3. It was not clear to Dr. Singh what was meant by "the Gibson Dunn team" or "Meta counsel" or a "touchbase call," but Dr. Singh confirmed her availability and received a Zoom invite for June 10 from 1:00-1:30 p.m. Singh Decl. ¶¶ 22-23.

Because it had been nearly three months since Meta's Counsel had spoken with Dr. Singh, this June 10, 2024, conference involved a discussion that was repetitive of the March 21 conference; however, this discussion was shorter than before because they also discussed a potential conflict. *Id.* ¶ 24; Dkt. 120-2 ¶ 20 (During the June 10 "call, I reiterated the information discussed with Dr. Singh during the retention interview on March 21"). As with the first conference, any discussion of potential factual information was in a general, non-specific manner. Singh. Decl. ¶ 24. As before, there was no discussion about litigation or other strategies, legal theories, defense arguments, anticipated theories or arguments, strengths or weaknesses of the case, potential experts, or expert arguments or theories. *Id.* The other part of this June 10 conference involved a discussion about Dr. Singh's work as an expert for plaintiffs in the other BIPA cases that she had mentioned in her March 21, 2024 email. *Id.* ¶ 25. Dr. Singh discussed the potential conflict of interest that could arise if she worked for Meta, a competitor of the defendant in one of the other cases. *Id.* The conference ended with Dr. Singh telling Meta's Counsel that she would need to check with the attorneys in that case because she was uncertain if she could even work with Meta. At this point, it was still clear to her that she was not yet working with or in any relationship with Meta. *Id.* Later that day, Ms. Mistry emailed Dr. Singh to request the name of the BIPA case they had discussed in which Dr. Singh was an expert for the plaintiff. *Id.* ¶ 26; Dkt. 120-5 at 1. The next morning, Dr. Singh responded by providing the case name (*Zaluda vs. Apple*); advising she had checked with the lawyers in *Zaluda* and "[w]orking

-11-

with Meta would likely disqualify me as an expert" in *Zaluda* because Meta was a competitor of the defendant (Apple). Singh Decl. ¶ 27; Dkt. 120-5 at 1. No further meetings with Meta's Counsel or Meta occurred thereafter. Singh Decl. ¶ 27. Meta's Counsel "believed that she could not serve as Meta's expert in this matter and so ultimately retained a different testifying expert." Dkt. 120-2 ¶ 25.

Meta's Counsel never asked Dr. Singh to provide Meta with services or an opinion, and she could not have provided an opinion had they done so because she did not have facts with which to do so. *Id.* ¶ 28.

In 2024, Meta made more disclosures to Plaintiff's Counsel of facts, legal theories, and views of the case. On March 29, 2024, Meta filed its Answer, admitting or denying the 202 paragraphs of allegations and asserting sixteen affirmative defenses. Dkt. 57. In April 2024, Meta's Counsel advocated its view that whether Digital Voice Data collected by Meta was a "voiceprint" was "a core, threshold legal issue that would substantially streamline this case" that "should be resolved on an efficient basis through a targeted motion—ideally early in the case." Dkt. 60 at 10-11. In May through October 2024, counsel engaged in numerous written and verbal meet and confers about discovery objections, where both sides discussed their views of the case, law, facts, and legal theories. Green Decl. ¶ 8.

Meta supplemented its discovery responses in September, October, and November 2024, and produced over 8,000 pages of documents, but continued to withhold production of documents about its technologies based on its objections and legal theories. *Id.* ¶ 9. The parties eventually reached an impasse on this issue. *See* Dkt. 74 at 2. The parties laid out more of their factual analysis, views of the other sides' anticipated arguments, and legal theories in their 20-page Joint Statement. Dkt. 78. On January 28, 2025, the Court overruled Meta's objections and ordered Meta to produce documents. Dkt. 80. In late January/early February 2025, the parties met and conferred, and Meta advised it would begin providing rolling discovery responses, including information and documents sufficient to show how its technologies worked, beginning in March. *See* Dkt. 83. On multiple occasions, Meta's Counsel communicated to Plaintiff's Counsel that Meta viewed this case like a patent case in that resolving the legal questions involves facts about how Meta's technologies work. Green Decl. ¶ 10.

Plaintiff's Counsel had no interactions with Dr. Singh before February 2025. Green Decl. ¶ 11. In early March 2025, Plaintiff's Counsel entered into a retention agreement with Dr. Singh. *Id.* In March 2025, Meta's Counsel advised of its intent to seek a modified schedule to allow for its summary

judgment motion prior to class certification. *Id.* ¶ 12; Dkt. 93. On April 14, 2025, Meta again provided factual and legal analysis in support of its summary judgment motion on the "threshold legal issue" it had identified in the April 2024 CMC statement ("whether the data Meta actually collected constitutes a 'voiceprint'"). Dkt. 94 at 3-7. Meta began its rolling production in response to the Court's Discovery Order, with productions on April 1, 9, 10, and 11, 2025. Green Decl. ¶ 13. The Court granted Meta's request to file its summary judgment motion and adopted an expert disclosure and briefing schedule. Dkt. 97, 102. On May 7, 2025, Meta's Counsel emailed Plaintiff's Counsel five summary judgment arguments Meta anticipated making. Green Decl. ¶ 14. Meta also supplemented its productions and interrogatory responses multiple times between April 16 and September 24, 2025. *Id.* ¶ 15.

On October 23, 2025, pursuant to the scheduling order, Plaintiff disclosed Dr. Singh as an expert related to Meta's early summary judgment motion, along with a copy of her Report. Dkt. 120-6. The Report contains five separate opinions relating to the ███████████████████, and ███████████. Singh Decl. Ex. 1 at § VII.A-E. None of the ideas or opinions in the Report are influenced by, derived from, reflect, or reveal anything said to Dr. Singh by Meta's Counsel during the two short, repetitive conferences on March 21 and June 10, 2024. Singh Decl. ¶ 29.

On October 27, 2025, Meta's Counsel told Plaintiff's Counsel that it had "had extensive discussions with Dr. Singh regarding the Delgado case throughout Spring 2024" and demanded Plaintiff's Counsel disclose their communications with Dr. Singh "no later than tomorrow." Dkt. 120-6 at 7. Plaintiff's Counsel responded the next day that they "are not trying to be obstructionist, but your questions call for privileged information and are not relevant to whether a disqualifying conflict exists." *Id.* at 6. In response, Meta's Counsel again characterized its two repetitive 30-minute discussions with Dr. Singh as "extensive" and said these discussions occurred "during multiple phone calls and email exchanges." *Id.* at 5. Meta's Counsel also confirmed the discussions were "for the purposes of vetting [Dr. Singh] for possible retention by Meta." *Id.* Meta's Counsel again demanded Plaintiff's Counsel disclose their communications with Dr. Singh. *Id.*

After Plaintiff's Counsel responded, Meta's Counsel sent another email on November 3, 2025, characterizing their interactions with Dr. Singh as "conversations with Dr. Singh [that] took place (as we already told you) throughout Spring 2024," including email exchanges on March 21, April 22, June 3, June 5, and June 6. *Id.* at 3. Meta's Counsel said a conflict causing them not to retain Dr. Singh was "revealed

-13-

late in our discussions." *Id.* They again demanded disclosure of Plaintiff's Counsel's communications with Dr. Singh. *Id.* at 3-4. On the morning of November 5, 2025, Meta's Counsel declared, "Meta intends to move to disqualify Dr. Singh," and requested a meet and confer to discuss the scheduling for the motion. *Id.* at 2-3. On November 6, 2025, Plaintiff's Counsel responded to both prior emails stating it could meet and confer that afternoon and again explaining that Meta's assertion that communications between Dr. Singh and Plaintiff were "necessary" and "highly relevant" was "inconsistent with case law and further undermined by [Meta's] stated intention to file a motion to disqualify based on Defense Counsel's purported communications with Dr. Singh." *Id.* at 1-2. Meta's Counsel stated in response that they "disagree." *Id.* at 1. During the November 6 meet and confer, Plaintiff's Counsel reiterated their view about the irrelevance of their communications with the expert under the case law but told Meta's Counsel if they wanted to provide a case addressing their relevance, Plaintiff's Counsel would consider it. Green Decl. ¶ 18. Meta's Counsel did not do so and filed the motion the next day. *Id.*

## ARGUMENT

Disqualification of an expert is warranted "if (1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed confidential information to the expert that is relevant to the current litigation. However, if only one of the two factors is present, disqualification likely is inappropriate." *Hewlett-Packard*, 330 F. Supp. 2d at 1092-93 (citations omitted). "In addition to these two factors, the Court also should consider whether disqualification would be fair to the affected party and would promote the integrity of the legal process." *Id.* at 1093. "[D]isqualification is a drastic measure that courts should impose only hesitantly, reluctantly, and rarely." *Id.* at 1092. "The moving party bears the burden of proof with respect to each of these factors." *Id.* at 1096.

## I.    Meta Fails to Establish a Reasonable Belief of a Confidential Relationship

Meta must "demonstrate[e] that it was reasonable for it to believe that a confidential relationship existed, and, if so, whether the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate." *Id.* at 1093 (citations omitted). In evaluating reasonableness, courts consider many factors, including: (a) "whether the relationship was one of long standing and involved frequent contacts instead of a single interaction with the expert," (b) "whether the parties entered into a formal confidentiality agreement," (c) "whether the expert was retained to assist in

-14-

the litigation," (d) "the number of meetings between the expert and the attorneys," (e) "whether work product was discussed or documents were provided to the expert," (f) "whether the expert was paid a fee," (g) "whether the expert was asked to agree not to discuss the case with the opposing parties or counsel," and (h) "whether the expert derived any of his specific ideas from work done under the direction of the retaining party." *Id.* (citations omitted). All the factors weigh against a reasonable belief of a confidential relationship here. Tellingly, Meta ignores most of these factors, which is a failure to satisfy its burden.

**No Long-Standing Relationship with Frequent Contacts.** Dr. Singh had no prior relationship with Meta or Meta's Counsel. Within less than 24 hours after its initial contact with Dr. Singh, Meta's Counsel had one 30-minute vetting conference in March 2024, along with non-substantive scheduling emails, sometimes months apart, that were not marked as privileged and confidential. A second, repetitive, conference occurred nearly three months later on June 10, 2024. Although Dr. Singh disclosed her work for plaintiffs in two other BIPA cases on March 21, Meta did not even ask for the name of the cases until after the June 10 conference. Singh Decl. ¶ 7, 13, 16, 18-24.

**No Formal Confidentiality Agreement.** Meta's Counsel never presented, negotiated or executed a non-disclosure or confidentiality agreement or protective order with Dr. Singh. *Id.* ¶ 8.

**No Retention.** Meta's Counsel never presented, negotiated, or executed an engagement letter or retention agreement with Dr. Singh, nor asked for nor received services or an opinion. Dr. Singh could not have provided an opinion had they asked because she did not have facts with which to do so. *Id.* ¶ 8, 28.

**Two 30-Minute Repetitive Meetings.** Meta's Counsel had one 30-minute vetting conference on March 21, 2024. *Id.* ¶ 13. A second conference occurred on June 10, and it is undisputed that the second conference was repetitive of the March 21 conference because it had been nearly three months since Meta's Counsel and Dr. Singh had last spoken. Dkt. 120-2 ¶ 20 ("I reiterated the information discussed with Dr. Singh during the retention interview on March 21"). That repetitive second discussion was even shorter than the first because there was also a discussion of a potential conflict. Singh. Decl. ¶ 25.

**No Prohibition on Talking to Other Side.** Meta's Counsel never asked Dr. Singh not to discuss the case with the opposing party or counsel. *Id.* ¶ 13.

**No Fee.** Meta did not pay Dr. Singh anything. No discussion of a retainer even occurred. *Id.* ¶ 8-9.

**No Specific Ideas Derived from Interaction with Meta.** None of the ideas or opinions in the October 2025 Report are influenced by, derived from, reflect, or reveal anything said during the two repetitive 30-minute conversations between Meta's Counsel and Dr. Singh in March and June of 2024. This is evident by reviewing the Report, which is predominantly factual and extensively cited (the Report contains 192 footnotes, 191 of which are citations to articles/scientific literature, publicly-available documents, Meta's Interrogatory responses, Bates-stamped documents produced in the litigation, and Meta deposition testimony). The first two opinions are not even about Meta— ███████████████ ███████████████ generally. The third and fourth opinions are about ████████████ ███████████████████, both of which rely on technical facts from discovery. The final opinion follows from the facts in the prior sections of the Report. *Id.* ¶ 29.

**No Confidential Documents Provided.** Dr. Singh was given no documents prior to the March 21 conference. After it had ended, she was provided with a copy of the Complaint and publicly-available patent cited in the Complaint. She neither saw nor received any other documents. *Id.* ¶ 15.

**No Work Product Discussed.** As described in § II below, Meta fails to meet its burden of establishing that work product was discussed. *See also id.* ¶¶ 13, 24.

Accordingly, the factors weigh against a finding that it was objectively reasonable for Meta's Counsel to believe that a confidential relationship existed. *See also Hewlett-Packard*, 330 F. Supp. 2d at 1094, 1096 (finding no reasonable confidential relationship where expert was previously consultant for party for over a year, spent three hours reviewing multiple patents and had an hour-long conference with counsel that included discussion of expert's impressions; counsel stated he disclosed his impressions, litigation and trial strategy, types of evidence needed, and other potential experts and that it was his understanding that communications were confidential; and expert was paid for his four hours of work: "[A] confidential relationship is not necessarily established just because some information concerning the litigation is shared. . . .The March 20, 2001 conversation appears to have been only an initial discussion, the goal of which was to decide whether EMC wanted to employ Katz and whether Katz wanted to work for EMC. EMC thus has not met its burden of showing that it was objectively reasonable for it to believe that a confidential relationship existed as of March 20, 2001.") (citing *Larson v. Rourick*, 284 F. Supp.2d 1155, 1158 (N.D. Iowa 2003) ("To get to the point where an . . .

-16-

expert is comfortable proceeding to the step of reviewing factual information, [counsel] must necessarily review certain basic facts and theories concerning the litigation."); *Finisar*, 2015 U.S. Dist. LEXIS 94975 at *29 ("[T]his relationship spans two phone calls, which is not the type of continuing relationship that generates a reasonable belief in a confidential relationship."); *Chan*, 2023 U.S. Dist. LEXIS 138118 at *5-7 (no reasonable basis for confidential relationship where counsel's hired expert finder had call with expert, subsequently sent overview of litigation and requested additional background in email that said "You agree that all information regarding this case is confidential, and that you will not discuss any details . . . with any persons, including . . . opposing parties," and "Your reply to this email denotes your acceptance," expert responded to email, and thereafter counsel had approximately 40-minute conference in which he shared, *inter alia*, case strategy, confidential views of Plaintiff's claims and allegations, mental impressions, and views that could strengthen or undermine Plaintiff's allegations, and solicited the expert's thoughts on their proposed strategy).

Rather than properly addressing the relevant factors, Meta incorrectly conflates the two-part test into one and argues that it disclosed confidential information and, therefore, it had reason to believe a confidential relationship existed. Dkt. 120 at 5-6. *But see Hewlett-Packard*, 330 F. Supp. 2d at 1093 ("If any confidential disclosures were undertaken without an objectively reasonable expectation that they would be so maintained (hence, any confidentiality was waived), or if, despite a relationship conducive to such disclosures, no significant disclosures were made, disqualification is inappropriate.") (citation and internal quotation marks omitted). If a moving party could establish a reasonable belief of a confidential relationship simply by the fact that it purportedly disclosed confidential information, the second factor would entirely swallow the first factor. Meta cites only one case, *Cooper v. Quora, Inc.*, 2020 LX 26697 (N.D. Cal. July 15, 2020) (Cousins, Mag. J.), to claim that courts "*regularly find* that a confidential relationship exists between a party and a prospective expert based simply on the fact that litigation strategy was discussed." Dkt. 120 at 6 (emphasis added). But *Cooper* does not support that proposition, and it is factually distinguishable. *See* 2020 LX 26697 at * 3-8 (finding confidential relationship reasonable based on "relevant facts" surrounding relationship and communications of counsel and expert, including that counsel and expert had numerous phone calls in 2019, one lasting over an hour; identified with specificity what was discussed; counsel told expert they wanted to retain

-17-

it; and then they spent over a month negotiating/revising a retention letter, including over additional phone calls, which they executed and which included a confidentiality agreement).

All the other cases cited by Meta (Dkt. 120 at 5-8) are likewise distinguishable. *See Chobani*, 2013 U.S. Dist. LEXIS 109900 at *6-7, 18-19 ("Chobani's counsel had 'repeated, detailed, and confidential strategy sessions' about the allegations in the instant case, which were 'covered by a confidentiality provision in a written agreement'" including seven in-person meetings or telephone conversations); *Staley v. Gilead Scis., Inc.*, 2022 U.S. Dist. LEXIS 136535, *27-29 (N.D. Cal. July 29, 2022) (expert was retained by opposing party in connection with several matters, subject to formal written agreement, and had received relevant confidential deposition transcripts from other litigation and prepared report); *In re Xyrem Sodium Oxybate Antitrust Litig.*, 2022 U.S. Dist. LEXIS 23458, *17-18 (N.D. Cal. Feb. 9, 2022) (no analysis of factors because "Plaintiffs do not dispute" existence of reasonable confidential relationship where expert had previously been retained by opposing party "for an extended period and developed expert reports"); *M&T Bank v. Worldwide Supply LLC*, 2022 U.S. Dist. LEXIS 115109, *11-12 (D.N.J. June 28, 2022) (counsel had phone call with expert; expert requested confidential materials to evaluate defenses and counterclaims; attorney provided "key documents" including privileged written timeline/summary prepared by client; attorney and expert subsequently discussed in detail on a phone call six days later; attorney designated written exchanges as "ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL; expert could not recall the discussion); *Calendar Research LLC v. StubHub, Inc.,* 2017 U.S. Dist. LEXIS 163408, *1-4 (C.D. Cal. Sep. 22, 2017) (one party could not use expert that had previously been hired by both parties in litigation to analyze source code and provide report for settlement discussions, who had been "retained pursuant to a formal, written agreement containing confidentiality obligations on all parties," received source code from and had substantive discussions with both parties and produced a report); *AstraZeneca Pharms, LP v. Teva Pharmss USA, Inc.*, 2007 U.S. Dist. LEXIS 88996, *5 (D.N.J. Dec. 4, 2007) (experts were "paid AstraZeneca consultants" who had "ongoing confidential relationships with AstraZeneca" and it was "clear from both parties' submissions that [the experts] have been . . . subject to express, written confidentiality agreements with AstraZeneca pertaining to Seroquel"); *Aventis Pharma*, 2005 U.S. Dist. LEXIS 54292, at *12-14 (expert with 21-year confidential relationship

with Aventis worked on particular product at issue in litigation and had executed multiple written consultant and confidentiality agreements, including one that was still in effect); *LifeWatch Serv. v. Braemer Inc.*, 2010 U.S. Dist. LEXIS 105088, *2-3, 6 (N.D. Ill. Sep. 28, 2010) (expert "was the named inventor on the patent," had assigned his interest in patent to Lifewatch, had a written contractual and confidentiality agreement with Lifewatch, and had "worked intimately with Lifewatch for nine years").

Accordingly, Meta fails to satisfy its burden of establishing an objectively reasonable belief of a confidential relationship, which alone is a sufficient basis to deny Meta's Motion.

## II.    Meta Fails to Establish it Disclosed Confidential Information

"Confidential information essentially is information of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege." *Hewlett-Packard*, 330 F. Supp. 2d at 1094 (citations and internal quotation marks omitted). "Unlike attorney-client communications, discussions between parties or counsel and experts do not carry the presumption that confidential information was exchanged." *Id.* (citation omitted). "'[C]ommunication based upon technical information as opposed to legal advice is not considered privileged.'" *Id.* (quoting *Nikkal Indus., Ltd. v. Salton, Inc.*, 689 F. Supp. 187, 191-92 (S.D.N.Y. 1988)). "Because the burden is on the party seeking to disqualify the expert, that party should point to specific and unambiguous disclosures that if revealed would prejudice the party." *Id.* (citations omitted). "The party requesting disqualification may not meet its burden with mere conclusory or *ipse dixit* assertions." *Id.* at 1096. Here too, Meta fails to satisfy its burden of showing it disclosed confidential information to Dr. Singh.

Meta's account of its interactions with Dr. Singh differs from Dr. Singh's. It is undisputed that the first part of the approximately 30-minute conference on March 21, 2024 involved three questions about potential conflicts, then discussion of Dr. Singh's extensive credentials, testifying experience and "other topics." Dkt. 120-2 ¶ 10. Meta's Counsel also discussed generally the Complaint's allegations and that they were looking for an expert to help with the defense of the case. Singh Decl. ¶ 13. In the short time that had to be remaining, they discussed potential factual information, in a general, non-specific manner, but Dr. Singh did not know if the discussion involved hypothetical facts or actual facts. *Id.* Meta's Counsel did not discuss litigation or other strategies, legal theories, defense arguments, anticipated theories or arguments, strengths or weaknesses of the case, potential experts, or expert

-19-

arguments or theories. *Id.* Meta's Counsel did not discuss the kinds of experts Meta expected to retain or other potential experts in the case, and never said anything to the effect of: "We need an expert who can say X" or "We need an expert who can say X because then we can do or avoid A, B, C." *Id.* It is not credible that Meta's Counsel, in the span of the limited time remaining after it finished the first part of the March 21 conversation with Dr. Singh involving "other topics," disclosed the abundance of confidential information it claims—or that it would have any reasonable basis to do so. The second conference on June 10 just repeated the information from the first. And none of the emails purported to or did disclose work product, evidenced by their lack of such designation and public filing.

Meta's account of its interactions with Dr. Singh is undermined by its admission that this initial conference was a "retention interview" (Dkt. 120-2 ¶ 10) that was "for the purposes of vetting [Dr. Singh] for possible retention by Meta" (Dkt. 120-6 at 5). Other evidence further calls into question Meta's account, including Meta's Counsel's characterizations of its interactions with Dr. Singh that are contrary to the record. In confronting Plaintiff's Counsel, Meta's Counsel described "extensive discussions with Dr. Singh regarding the Delgado case throughout Spring 2024," "extensive discussions with Dr. Singh during multiple phone calls and email exchanges" (Dkt. 120-6 at 3, 5, 7), "further discussions via email over approximately three months" (Dkt 120 at 1), and a potential conflict that was "revealed late in our discussions" (Dkt. 120-6 at 3) and at the "last minute" (Dkt. 120 at 1). Those descriptions do not align with two repetitive 30-minute conferences separated by nearly three months and scheduling emails. And Meta appears to have lacked interest in or clarity about Dr. Singh's other engagements. In the March 21 meeting, Meta's Counsel asked only three questions about potential conflicts. Dkt. 120-2 ¶ 9. Later that day, Dr. Singh emailed that she was an expert for plaintiffs in two BIPA cases. Meta's Counsel did not respond. Dkt. 120-5 at 7-8. By June, Meta's Counsel remained unaware of one of these cases. Only on June 10, after the second conference, did Meta ask for the case name, learning it was *Zaluda v. Apple, Inc.* Dkt. 120-5 at 1. The public docket for *Zaluda* shows Dr. Singh's report was filed on August 31, 2023. Green Decl. Ex. 3 at 72. Meta's months-long gap to follow up with Dr. Singh hardly justifies its characterization of a "last minute" disclosure by Dr. Singh.

Meta's Counsel's claim that it disclosed copious amounts of confidential information during a 30-minute vetting conference is also inconsistent with the consultant retention practices described by Meta's

-20-

Counsel: "stick to the facts," "avoid disclosing mental impressions or legal conclusions," "avoid sharing written materials," "stay closely involved," "retain the consultant," "ensure the engagement letter expressly sets forth that the consultant's work is intended to assist counsel in the provision of legal advice," and direct the consultant's work "once hired." *See supra*, n.1. It "strains credulity" that Meta's Counsel disregarded these principles and that, only one day after contacting a potential expert with whom it had never worked, disclosed attorney-client, work-product, and confidential information to someone who had not yet been retained or signed a confidentiality agreement—and that such a conversation could have occurred in the span of a half-hour vetting conversation. Meta's account is further belied by the fact that none of its emails with Dr. Singh were labeled as containing privileged and confidential material.[2] In contrast, Meta's Counsel's practice of exercising extreme caution about disclosing confidential information is evidenced by its designation of the *first two pages* of its interrogatory responses—which merely state the ███████████████████████ ██████—as "Highly Confidential – Attorneys' Eyes Only." Green Decl. Ex. 1 at 2. *See Hewlett-Packard*, 330 F. Supp. 2d at 1096 ("it strains credulity" that counsel would disclose strategy to non-retained expert who had not signed confidentiality agreement, only a few weeks after contacting them, during one-hour conversation relating to technically complex patents); *Finisar*, 2015 U.S. Dist. LEXIS 94975 at *29; *Mays v. Reassure Am. Life Ins. Co.*, 293 F. Supp. 2d 954, 957 (E.D. Ark. 2003) ("In the 60 to 90 minute meeting, it is highly unlikely that there was any detailed or involved discussion concerning litigation strategies, the strengths and weaknesses of each side, the witnesses to be called, the types of experts to be retained and anticipated defenses . . . .").

Furthermore, the declaration by Meta's Counsel lacks the specificity required to show confidential information was disclosed—particularly given the breadth of the legal theories, defenses, views of Plaintiff's allegations, affirmative themes, and facts Meta had disclosed by March 21, 2024 in its motion to dismiss briefing and its 100+ pages of discovery objections and responses (served on March 7 and 8, 2024). Meta only points to "conclusory or *ipse dixit* assertions," *Hewlett-Packard*, 330 F. Supp. 2d at 1096, about "defense arguments," "legal theories," "mental impressions," "certain

---

[2] Some of the emails contained a standard statement that they "may contain confidential and privileged information." *See* Dkt. 120-5 at 14 & Dkt. 120-6 at 10 (same statement in emails to Plaintiff's Counsel).

information," "assessment[s]," "strategies" and other conclusory terms, all of which could characterize the extensive information Meta had already disclosed to Plaintiff prior to March 21, 2024. These statements are far from the specific and unambiguous disclosures required for disqualification. *See, e.g.*, *In re Incretin-Based Therapies Prods Liab. Litig.*, 721 F. App'x 580, 584 (9th Cir. 2017) (district court abused discretion in disqualifying expert where defendants "did not meet their burden of showing 'specific and unambiguous' disclosures required to trigger disqualification" and expert "did not rely on any information, confidential or otherwise, that he obtained from his consulting relationship") (quoting *Hewlett-Packard*, 330 F. Supp. 2d at 1094); *Chan*, 2023 U.S. Dist. LEXIS 138118 at *21-22 (counsel's declaration that he discussed with expert in 40 minute call "case strategy, defense counsel's mental impressions of Plaintiffs' allegations relating to the alleged plan to go public, counsel's views on the strengths and weaknesses of those allegations, Defendants' plan to respond to those allegations, and Defendants' views on how confidential information in discovery could be used to strengthen or undermine Plaintiffs' allegations" was "too general and conclusory to satisfy Defendants' burden"); *Finisar*, 2015 U.S. Dist. LEXIS 94975 at *28; *Daddono v. Hoffman*, 2022 U.S. Dist. LEXIS 126962, *12 (M.D. Fla. July 18, 2022) (declaring "legal theories, defenses, and the strengths and weaknesses of Plaintiff's case" shared with expert insufficient); *Atl. City Assocs., LLC v. Carter & Burgess Consultants, Inc.*, 2007 U.S. Dist. LEXIS 1185, *7 (D.N.J. 2007) (statements that counsel revealed "'mental impressions and trial strategies, including his views on the strength and weaknesses of the various methods for measuring delays on construction projects and calculating damages in construction disputes'. . . is hardly the sort of proffer that should compel a court to disqualify an expert.").

Nor is the fact that Meta emailed Dr. Singh the Complaint and a publicly-available patent relevant. *See Hewlett-Packard*, 330 F. Supp. 2d at 1097 (expert reviewed and discussed six publicly available patents); *Finisar*, 2015 U.S. Dist. LEXIS 94975 at *29 (N.D. Cal. July 21, 2015) (similar).

Moreover, Meta fails to identify what specific and unambiguous disclosures "would prejudice" it. *Hewlett-Packard*, 330 F. Supp. 2d at 1094. Instead, Meta says "the law is clear" that this is irrelevant; however, it quotes a portion of *In re Xyrem* where the court was not discussing *whether* information disclosed to an expert was confidential, and *Chobani* where the court was not discussing

-22-

disqualification of an expert. Dkt. 120 at 8.[3] Indeed, the court in *In re Xyrem* found relevant confidential information was disclosed because the information was "at this point, undisclosed." 2022 U.S. Dist. LEXIS 23458, at *20 n.10. *See also In re Incretin-Based Therapies Prods Liab. Litig.*, 721 F. App'x 580, 584 (9th Cir. 2017) (expert "did not rely on any information, confidential or otherwise, that he obtained from his consulting relationship"); *Hewlett-Packard*, 330 F. Supp. 2d at 1093, 1094; *Chan*, 2023 U.S. Dist. LEXIS 138118 at *22 ("Defendants have also not explained how the revelation of any such confidential information would prejudice them.").

Further, Plaintiff's Counsel had no contact with Dr. Singh prior to February 2025. As described above, by this time, Meta had made even more abundant disclosures to Plaintiff regarding Meta's "fact investigation," "defense arguments," "legal theories," "mental impressions," "strategies," and the like. *See Chan*, 2023 U.S. Dist. LEXIS 138118 at *21-22 ("By the time Plaintiffs' counsel met with [the expert], Defendants had already . . . revealed Defendants' views of Plaintiffs' allegations and strategy for opposing them."). Meta also has "not identified any information that was shared with [the expert] that was not subsequently disclosed" after this point. *Id.* at *22.

Accordingly, Meta fails to satisfy its burden of showing it disclosed relevant confidential information to Dr. Singh. As with the first factor, this alone is a sufficient basis to deny Meta's Motion.

**III.    Fundamental Fairness and Prejudice to Plaintiff Weigh Against Disqualification**

In addition to the two-prong test, courts consider fundamental fairness and prejudice, analyzing "'whether another expert is available and whether the opposing party will be unduly burdened by having to retain a new expert.'" *Hewlett-Packard*, 330 F. Supp. 2d at 1095 (quoting *United States ex rel. Cherry Hill Convalescent Center v. Healthcare Rehab Sys.*, 994 F. Supp. 244, 251 (D.N.J. 1997)). "Consideration of prejudice is especially appropriate at late stages in the litigation, at which time disqualification is more likely to disrupt the judicial proceedings." *Id.* "The interest in disqualification must substantially outweigh the interest in nondisclosure and disqualification of the expert." *Id.* (citation and internal quotation marks omitted). These factors disfavor disqualification here.

This case involves complex issues relating to voice biometrics and speaker identification

---

[3] Meta's reliance on *LifeWatch* is also misplaced, where the court found disqualification warranted based on breach of written contract "even if [it] were to find" confidential information was not disclosed. 2010 U.S. Dist. LEXIS 105088 at *6-7.

technologies, a highly technical and specialized field. *See* Singh Decl. ¶ 30. Finding a replacement expert witness to re-review and explain Meta's thousands of pages of technical documents would be particularly difficult—especially where Plaintiff cannot retain any past or present employee of Meta or its competitors, including, Google, Apple, YouTube, Twitter, ByteDance, Microsoft, and Amazon, all of which typically hire subject-matter experts in voice processing technology. Dkt. 71 ¶¶ 2.7, 2.2; Singh Decl. ¶ 30. And Dr. Singh was not the only expert Meta contacted, further complicating the ability to find a replacement if Dr. Singh is disqualified under these facts. Dkt. 120-2 ¶ 3.[4]

Meta also says the case is not in its late stages. Dkt. 120 at 9. Not so. As outlined above, the parties have engaged in years of motion practice and discovery. Pursuant to Meta's request, the Court set a merits discovery cutoff for the issues on which Meta seeks summary judgment, which has passed, along with related expert disclosures. Dkt. 102. Meta's rebuttal expert report was due on November 20, 2025, and its motion for summary judgment is to be filed on January 29, 2026. *Id.* Meta has sought and received a stay of its rebuttal deadline, while also indicating that "whether other case deadlines will need to change will depend on the Court's ruling." Dkt. 121-1 ¶ 6. This case is thus distinguishable from *In re Xyrem* and *Chobani*, on which Meta relies. Dkt 120 at 9. Compare *In re Xyrem*, 2022 U.S. Dist. LEXIS 23458 at *20-21 ("This case is in the early stages of litigation and Class Plaintiffs will have an adequate opportunity to find and retain other expert witnesses."); *Chobani*, 2013 U.S. Dist. LEXIS 109900 at *23-24 (the "case is still in the initial stages, and discovery has not yet commenced") with *Chan*, 2023 U.S. Dist. LEXIS 138118 at *23 ("The parties are about to begin summary judgment briefing . . . . Expert discovery closed on July 28, 2023. Even if the Court reopened expert discovery, it is not clear that Plaintiffs could secure another expert witness in this field in time to prevent further delays in this proceeding, which has already been pending since 2019.").

---

[4] Meta's suggestion that Plaintiff's Counsel was "on notice" also misses the mark. Dkt. 120 at 9. Here, unlike in *Chobani* and *In re Xyrem*, Dr. Singh does not have a conflict and Plaintiff's Counsel has not been "on notice" of any conflict. *See* Singh Decl. *Cf. In re Xyrem*, 2022 U.S. Dist. LEXIS 23458 at *17-21 (expert previously retained by opposing party "for an extended period and developed expert reports," counsel did not dispute prior confidential relationship between expert and other side and knew of conflict from initial contacts with expert); *Chobani*, 2013 U.S. Dist. LEXIS 109900, * 10, 18-19, 24 (expert who had "repeated, detailed, and confidential strategy sessions" with counsel "covered by a confidentiality provision in a written agreement" told Plaintiff's counsel at the outset of relationship that it could not work on the litigation because it was conflicted and "Plaintiffs' Counsel knew from their initial contacts with [expert] that [expert] had a conflict").

-24-

## IV.    Policy Concerns Weigh Against Disqualification

"It is important to consider other policy concerns in order to achieve the goal of protecting the integrity of the adversary process and of promoting public confidence in the legal system." *Hewlett-Packard*, 330 F. Supp. 2d at 1095. Courts thus weigh the policies of "allowing experts to pursue their trade, allowing parties to select their own experts, and preventing parties from creating conflicts solely for the purposes of preventing their adversary from using the services of the expert" against "the policy of preventing conflicts implicated on the particular facts of the case." *Id.*

Meta, again citing *Chobani* and *In re Xyrem*, says its discussions with Dr. Singh were "so advanced" and accuses Dr. Singh of selling her opinions to the highest bidder." Dkt. 120 at 10. Unlike in those cases, however, Meta was not a "retaining party," had not previously worked with Dr. Singh or "developed expert reports" with her, had not interacted with her "for an extended period" or engaged in multiple "detailed" "strategy sessions" that were "covered by a confidentiality provision in a written agreement." *See supra*, p. 18. Nor had Meta received any services or opinions from Dr. Singh that could arguably be "sold" to the opposing party." *Hewlett-Packard*, 330 F. Supp. 2d at 1095. On the other hand, allowing disqualification based on the 30-minute discussion that was "for the purposes of vetting," repeated three months later, would hinder experts' pursuit of their trade and parties' ability to select their experts, while incentivizing attorneys "to create relationships with numerous potential experts at a nominal fee" (or no fee, as here) "for the purpose of preventing their adversaries from using the services of a particular expert." *Id.* at 1095, 1098. *See also Finisar*, 2015 U.S. Dist. LEXIS 94975 at *31; *Chan*, 2023 U.S. Dist. LEXIS 138118 at *23-24. This concern is even more pronounced in this case where courts and the public will "rely on experts to explain complicated technologies." *Hewlett-Packard*, 330 F. Supp. 2d at 1098.

## CONCLUSION

For the foregoing reasons, Meta's Motion to Disqualify Expert Rita Sing should be denied.

Dated: November 18, 2025                    Respectfully submitted,

**GOLDENBERG HELLER & ANTOGNOLI, P.C.**

By: */s/ Kevin P. Green*
        Kevin P. Green

*Attorneys for Plaintiff Natalie Delgado*

-25-