**ARIAS SANGUINETTI WANG & TEAM LLP**
Mike Arias (CSB #115385)
Elise R. Sanguinetti (CSB #191389)
Arnold C. Wang (CSB #204431)
Craig S. Momita (CSB #163347)
M. Anthony Jenkins (CSB #171958)
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: (310) 844-9696
mike@aswtlawyers.com
elise@aswtlawyers.com
arnold@aswtlawyers.com
craig@aswtlawyers.com
anthony@aswtlawyers.com

**GOLDENBERG HELLER & ANTOGNOLI, P.C**
Thomas P. Rosenfeld (admitted *pro hac vice*)
Kevin P. Green (admitted *pro hac vice*)
Thomas C. Horscroft (admitted *pro hac vice*)
Daniel S. Levy (admitted *pro hac vice*)
2227 South State Route 157
Edwardsville, Illinois 62025
Telephone: (618) 656-5150
tom@ghalaw.com
kevin@ghalaw.com
thorscroft@ghalaw.com
daniel@ghalaw.com

*Attorneys for Plaintiff Natalie Delgado*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATALIE DELGADO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 3:23-cv-04181-SI<br><br>**DECLARATION OF RITA SINGH, PH.D. IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION TO DISQUALIFY EXPERT RITA SINGH**<br><br>Location:  Courtroom 1—19th Floor<br>Judge:     Hon. Susan Illston |

I, Rita Singh, Ph.D., hereby declare as follows:

1.    I have been retained by Plaintiff's Counsel in the above-captioned case. I make this Declaration in support of Plaintiff's Opposition to Defendant's Motion to Disqualify Expert Rita Singh, filed herewith.

2.    I submit this declaration based on my personal knowledge of the facts stated below. If called upon to do so, I could and would testify competently to the matters set forth herein.

3.    I was retained by Counsel for Plaintiff in this case to provide expert testimony. As part of my engagement, I reviewed numerous documents produced by Defendant Meta Platforms, Inc. ("Meta") and prepared a report discussing the human voice as well as many technical aspects about Meta's technologies based on Meta's document production and deposition testimony (the "Report"). A true and correct copy of my Report is attached hereto as Exhibit 1.

4.    The factual bases for statements made in the Report are heavily cited. The Report contains 192 footnotes. Of these footnotes, 191 are citations to articles/scientific literature, publicly-available documents, Meta's Interrogatory responses, Bates-stamped documents produced in the litigation, and Meta deposition testimony. The list of documents considered is included as Appendix C to the Report.

5.    My Report contains five opinions, namely:

a.    ███████████████████████████.

b.    ████████████████████████████████
████████████████████████████████
███████████████.

c.    ████████████████████████████████
██████████████████████.

d.    ████████████████████████████████
███████████████████████████████████.

e.    ████████████████████████████████
████████████████████████.

-1-

6. Approximately one year prior to my retention with Plaintiff's Counsel, Meta's Counsel had contacted me. I had two brief conversations with Meta's Counsel via Zoom, one on March 21, 2024, and one on June 10, 2024.

7. I do not have any prior relationship consulting with or providing expert opinions to Meta or Meta's Counsel.

8. Meta's Counsel never presented to me, nor did I ever negotiate or sign with Meta, any engagement letter, retention agreement, confidentiality agreement, non-disclosure agreement, or protective order.

9. Meta did not pay me anything.

10. On March 20, 2024, I received an email from Prachi Mistry indicating she would like to speak with me in connection with a lawsuit concerning alleged voiceprinting. That evening, I responded by indicating I would be traveling to Africa in two days, and said I would be "[h]appy to talk tomorrow" or if not, "we may have to wait for a week."

11. On March 21, 2024, I received a Zoom invite from Meta's Counsel for a conference that day from 2:15-2:45 p.m.

12. On March 21, 2024, I had a Zoom conference with Meta's Counsel. Prior to the conference, I had not seen the complaint and did not know anything about the lawsuit.

13. The Zoom conference on March 21, 2024, lasted approximately 30 minutes. The first part of this conference involved a discussion about my credentials and some of my work in other lawsuits. Meta's Counsel asked if I had spoken to Plaintiff's Counsel in this case. Meta's Counsel never directed me not to speak to Plaintiff's Counsel. Meta's Counsel also discussed generally the Complaint's allegations and that they were looking for an expert to help with the defense of the case. We discussed potential factual information, in a general, non-specific manner. I say "potential factual information" because I do not/did not know if the discussion involved hypothetical facts or actual facts. Meta's Counsel did not discuss litigation or other strategies, legal theories, defense arguments, anticipated theories or arguments, strengths or weaknesses of the case, potential experts, or expert arguments or theories. Meta's Counsel did not discuss the kinds of experts Meta expected to retain. Meta's Counsel did not discuss other potential experts in the case. Meta's Counsel never said anything to the effect of:

-2-

"We need an expert who can say X" or "We need an expert who can say X because then we can do or avoid A, B, C."

14.     Because my first contact with Meta's Counsel was only the day before our March 21, 2024 Zoom conference, because of the general nature of the conversation, and because I had not signed any confidentiality or non-disclosure agreement and had not been engaged or retained, it was my understanding that I did not have any relationship with Meta and that Meta's Counsel would not and did not reveal any private, proprietary, confidential, or privileged information. I have worked with attorneys and large technology companies before, and my experience is that they guard against any disclosure of any confidential or proprietary information without written agreements in place.

15.     On March 21, 2024, after the Zoom conference had ended, I received a copy of the Complaint and a copy of the publicly-available patent that is cited in the Complaint in an email from Paige Petrashko, a "recent law graduate, not admitted to practice law." I received no other documents from Meta's Counsel. Nor did they show or "screenshare" any documents with me.

16.     I skimmed the complaint and patent and, later the same day, I responded by indicating it was not surprising to me that the lawsuit was filed given that Meta had filed the patent. I said that I was "ok" with continuing to engage with Meta, with a "caveat," however, that I was already an expert on the plaintiff side in two BIPA cases. I thought this might present an issue if Meta wanted to continue talking to me, but did not spend time looking into it at this time because it was unclear to me if anything further would occur. I also said, "Let me know if you'd like to proceed with this." I stated that if Meta did want to proceed, then "post-formalities" I would "ask for a bunch of interviews with the inventor [of the patent] and some of the SID [speaker ID] and ASR [automatic speech recognition] technical team members." By "post-formalities," I meant after potential conflicts had been resolved and we had entered retention and confidentiality agreements establishing a relationship.

17.     Meta's Counsel did not ask for the names of the two other cases I was involved in, indicate we would be proceeding or that any further discussions would occur, or otherwise respond to this email.

18.     The next time I heard from Meta's Counsel was over a month later. On April 22, 2024, I received an email from Ms. Petrashko that "we are currently working through things with the client regarding the expert role." I did not know what this meant. Ms. Petrashko also indicated that I was on a list

-3-

of potential experts and said they would be in touch if I "don't mind hanging tight." My schedule was very busy at this time, and I did not respond to this email.

19.    On June 3, 2024, I received an email from Mistry Prachi. The email stated that Meta's Counsel was "getting further into the expert retention process" and they wanted to schedule a meeting to introduce me "to some of the other attorneys working on the matter." The email provided potential dates and times for a Zoom conference. It did not contain anything substantive about the case, or even the case name. A second email followed with additional potential times.

20.    I responded to these emails the same day by saying that June 10 would work, but also asking: "[C]ould you please remind me which case this is… sorry about this but too many things have been happening and I have lost track of who is related to what." I did not receive a response to this request.

21.    On June 5, 2024, I received an email from Prachi Mistry requesting to reschedule to June 11, which was agreeable.

22.    On June 6, 2024, I received an email from Diana Feinstein saying it "would be great for us to connect just the Gibson Dunn team and you for 15 minutes before we have a call on Tuesday with Meta counsel." Ms. Feinstein asked if June 10 would still work for this "initial touchbase call." It was not clear to me what was meant by "the Gibson Dunn team" or "Meta counsel" or a "touchbase call."

23.    On June 10, 2024, I confirmed with Ms. Feinstein that we could have a Zoom conference that day, and I received a Zoom invite for a conference that afternoon from 1:00-1:30 p.m.

24.    The beginning of this second Zoom conference with Meta's Counsel involved a discussion that was repetitive of the March 21 conference because it had been nearly three months since we had last spoken, but this discussion was shorter than the first because we also talked about a potential conflict I had. As with the first conference, any discussion of potential factual information was in a general, non-specific manner. Meta's Counsel did not discuss litigation or other strategies, legal theories, defense arguments, anticipated theories or arguments, strengths or weaknesses of the case, potential experts, or expert arguments or theories. Meta's Counsel did not discuss the kinds of experts Meta expected to retain. Meta's Counsel did not discuss other potential experts in the case. Meta's Counsel never said anything to the effect of: "We need an expert who can say X" or "We need an expert who can say X because then we can do or avoid A, B, C." At this time, I had still not signed any confidentiality or non-

-4-

disclosure agreement and had not been engaged or retained, and it was still my understanding that I did not have any relationship with Meta and that Meta's Counsel would not and did not reveal any private, proprietary, confidential, or privileged information.

25. The other part of this June 10 conference involved a discussion about my work as an expert for plaintiffs in the other BIPA cases that I had mentioned in my March 21, 2024 email, and the potential conflict of interest that could arise if I worked for Meta, a competitor of the defendant in one of those cases. The conference ended with me telling Meta's Counsel that I would need to check with the attorneys in that case because I was uncertain if I could even work with Meta. At this point, it was still clear to me that I was not yet working with Meta or in any relationship with Meta.

26. After this second meeting ended, Ms. Mistry followed up later in the day to request the name of the BIPA case we had discussed where I was a retained expert.

27. The next morning, I responded by providing Ms. Mistry the name of the case (*Zaluda vs. Apple*), stating the case was still underway, and explaining that after checking with the lawyers in that case, "[w]orking with Meta would likely disqualify me as an expert" in that case because Meta was a competitor of the defendant, Apple. No further meetings with Meta's Counsel or Meta occurred thereafter.

28. Meta's Counsel never asked me to provide Meta with services or an opinion, and I could not have provided an opinion had they done so because I did not have facts with which to do so. Nor would it have been my practice to provide services or an opinion before being retained.

29. Absolutely none of the ideas or opinions in my Report are influenced by, derived from, reflect, or reveal anything said to me by Meta's Counsel during my two brief conversations and emails with Meta's Counsel in 2024. The underlying facts in the Report are extensively referenced, primarily to Meta's discovery responses and documents produced. My first two opinions are not even about Meta—they are about ████████████████████████ generally.[1] My third and fourth opinions are about ████████ ████████████████████████████████████, both of which rely on technical facts from discovery. My final opinion follows from the facts in the prior sections of the Report.

---

[1] ████████ ████████████████████████.
████████████████████████████████████████████████.
████████████████████████████████████████████████████████.

DECLARATION OF RITA SINGH, PH.D.
IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION TO DISQUALIFY EXPERT RITA SINGH
CASE NO. 3:23-CV-04181-SI

30.     I am a research professor at the Language Technologies Institute within the School of Computer Science at Carnegie Mellon University and I have expertise and over 27 years of experience in the specialty of voice processing technology. My CV is attached to the Report. As a research professor, I am knowledgeable about other leading experts in the specialty of voice processing technology. There are few other persons of whom I am aware who I believe would be qualified to provide the analysis and opinions I have prepared for this case. Moreover, subject-matter experts in voice processing technology often are hired by Meta and competitors to Meta.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 17th day of November, 2025.

/s/ Rita Singh
Rita Singh, Ph.D.

-6-

# EXHIBIT 1

# FILED UNDER SEAL