LATHAM & WATKINS LLP
SEAN M. BERKOWITZ (admitted *pro hac vice*)
GARY S. FEINERMAN (admitted *pro hac vice*)
KATHRYN K. GEORGE (admitted *pro hac vice*)
330 N. Wabash Ave., Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
sean.berkowitz@lw.com
gary.feinerman@lw.com
katie.george@lw.com

GIBSON, DUNN & CRUTCHER LLP
LAUREN R. GOLDMAN (admitted *pro hac vice*)
MICHAEL BRANDON (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
lgoldman@gibsondunn.com
mbrandon@gibsondunn.com

CHRISTOPHER CHORBA, SBN 216692
DIANA FEINSTEIN, SBN 302626
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7396
cchorba@gibsondunn.com
dfeinstein@gibsondunn.com

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| NATALIE DELGADO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.<br><br>     Defendant. | Case No. 3:23-cv-04181-SI<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Hearing:  May 15, 2026<br>Time:     10:00 a.m.<br>Location: Courtroom 1—17th Floor<br>Judge: Hon. Susan Illston |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on May 15, 2026 at 10:00 a.m., or as soon thereafter as the matter may be heard, in the United States District Court for the Northern District of California, Courtroom 1, located at 450 Golden Gate Avenue, San Francisco, California, Defendant Meta Platforms, Inc. ("Meta"), through its undersigned counsel, will, and hereby does, move this Court for an order, pursuant to Federal Rule of Civil Procedure 56, for summary judgment in Meta's favor. Meta respectfully requests oral argument.

Meta's Motion is based on this Notice of Motion and Motion for Summary Judgment, the following Memorandum of Points and Authorities, and Declaration of Gary S. Feinerman filed concurrently herewith, the complete files and records in this action, and any other material and arguments as may be considered by the Court. Through this Motion, Meta seeks an order for summary judgment.

Dated: February 20, 2026

Respectfully submitted,
LATHAM & WATKINS LLP

By  */s/ Gary S. Feinerman*
    Gary S. Feinerman

*Attorney for Defendant Meta Platforms, Inc.*

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................................................... 1

II.   FACTS ....................................................................................................................... 1

    A.   Standard Audio Files and Speaker Identification Technologies ........................... 1

    B.   Plaintiff's Facebook and Messenger Video and Audio Files ............................... 5

    C.   Meta's Speech-Processing Technologies .............................................................. 6

III.   LEGAL STANDARD ................................................................................................ 7

IV.   ARGUMENT ............................................................................................................. 7

    A.   BIPA Does Not Apply to Mere Voice Recordings ............................................... 9

        1.   *BIPA's Text and Controlling Precedent Confirm that Voice Recordings, Standing Alone, Are Not a "Biometric Identifier" or "Biometric Information"* ................................................. 9

        2.   *Other Courts Have Rejected Similarly Broad Interpretations of BIPA in the Context of Voice Data* ........................... 13

        3.   *Plaintiff's Theory And Its Implications Cannot Be Squared With BIPA's Legislative Intent* .................................................... 14

    B.   BIPA Does Not Apply to Plaintiff's Voice Recordings Because Those Recordings Do Not Enable Meta to Identify Her ................................... 17

        1.   *BIPA Does Not Apply To Data That Is Unlinked To An Identity* .............................................................................................. 17

        2.   *Meta Lacks The Data Needed To Link Any Output Representations To Plaintiff's Identity* ................................................. 20

V.   CONCLUSION ........................................................................................................ 23

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................ 7

*Bank of New York Mellon v. Laskowski*,
104 N.E.3d 1145 (Ill. 2018) ................................................................................ 16

*Barnett v. Apple Inc.*,
225 N.E.3d 602 (Ill. App. 2022) ........................................................................... 8

*Burris v. White*,
901 N.E.2d 895 (Ill. 2009) .................................................................................. 13

*Castelaz v. The Estee Lauder Cos., Inc.*,
2024 WL 136872 (N.D. Ill. Jan. 10, 2024) ........................................................ 19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)............................................................................................... 7

*Clarke v. Aveda Corp.*,
704 F. Supp. 3d 863 (N.D. Ill. 2023) ................................................................. 19

*Cothron v. White Castle Sys., Inc.*,
216 N.E.3d 918 (Ill. 2023) .................................................................................... 8

*Daichendt v. CVS Pharmacy, Inc.*,
2022 WL 17404488 (N.D. Ill. Dec, 2, 2022)..................................................... 19

*G.T. v. Samsung Electronics America*,
742 F. Supp. 3d 788 (N.D. Ill. 2024) ............................................ 18, 20, 22, 23

*Ji v. Naver Corp.*,
2023 WL 6466211 (N.D. Cal. 2023) ........................................................... passim

*Martell v. X Corp.*,
2024 WL 3011353 (N.D. Ill. June 13, 2024)..................................................... 19

*McGoveran v. Amazon Web Servs., Inc.*,
2023 WL 2683553 (D. Del. Mar. 29, 2023) ................................................. 1, 13

*McGoveran v. Amazon Web Servs., Inc.*,
2024 WL 4626253 (D. Del. Oct. 30, 2024) ......................................................... 8

*Patel v. Facebook*,
932 F.3d 1264 (9th Cir. 2019) ............................................................................ 12

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
Case No. 3:23-cv-04181-SI

*Patterson v. Respondus, Inc.*,
   593 F. Supp. 3d 783 (N.D. Ill. 2022) ...................................................................... 14

*Rivera v. Google Inc.*,
   238 F. Supp. 3d 1088 (N.D. Ill. 2017) .............................................................. 13, 14

*Rodriguez v. ByteDance, Inc.*,
   2025 WL 672951 (N.D. Ill. Mar. 3, 2025).......................................................... 13, 14

*Tibbs v. Arlo Techs., Inc.*,
   2024 WL 3218650 (N.D. Cal. June 27, 2024)........................................................ 14

*Watson v. Legacy Healthcare*,
   196 N.E.3d 571 (Ill. App. 2021) ........................................................................... 16

*Zellmer v. Meta Platforms, Inc.*,
   104 F.4th 1117 (9th Cir. 2024) ...................................................................... passim

**STATUTES**

740 ILCS 14/1 ............................................................................................................. 7

740 ILCS 14/10 ....................................................................................... 7, 18, 22, 23

740 ILCS 14/15 ...................................................................................................... 7, 8

740 ILCS 14/5 ...................................................................................................... 1, 16

**RULES**

Fed. R. Civ. P. 56(a) .................................................................................................. 7

**OTHER AUTHORITIES**

Jonathan Bilyk, *Reforms sliced BIPA class actions in 2025, new report says*,
   Legal Newsline (Jan 9, 2026) ............................................................................. 13

Public Access Opinion, 2017 WL 10084298
   (Ill. A.G. Aug. 14, 2017)...................................................................................... 13

ReDimNet, https://github.com/IDRnD/redimnet........................................................ 15

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

iii

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
Case No. 3:23-cv-04181-SI

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff's boundless and unprecedented understanding of BIPA would impose liability on anybody who (i) possesses a recording of someone else's voice—whether a voicemail, a podcast, or a home video—and (ii) has internet access.  That is not hyperbole.  Plaintiff claims that Meta unlawfully "collected" her "voiceprint" under BIPA simply by receiving and storing the standard video and audio files that she uploaded to Facebook and Messenger.  But the undisputed record shows that Meta never processed those files to create anything remotely resembling a voiceprint.  Plaintiff nonetheless insists that liability attaches because Meta could, in theory, transform the files into different data using technologies freely available to anybody with an internet connection.

That is not the law.  BIPA creates liability for entities who possess *voiceprints*, not entities who merely possess *voice recordings* that could, in theory, be used to create voiceprints using any number of widely available, free internet technologies.  *See McGoveran v. Amazon Web Servs., Inc.*, 2023 WL 2683553 (D. Del. Mar. 29, 2023).  Moreover, Plaintiff submits that Meta's ability to create such data gives rise to BIPA liability even though Meta indisputably lacks the additional information necessary to link that (hypothetical) data to her identity—meaning that it cannot use that (hypothetical) data to identify her.  That is not what the Illinois legislature intended when acting to protect "biologically unique" "identifiers" against "identity theft," 740 ILCS 14/5(c)—and it is not what BIPA says.  No court has ever adopted the view that a standard audio or video recording is itself "biometric" data subject to BIPA—even when possessed by someone with access to the internet and thus to speaker identification software.  This Court should decline Plaintiff's invitation to be the first.

## II.    FACTS

### A.    Standard Audio Files and Speaker Identification Technologies

Meta's Facebook and Messenger services allow users to upload and share content containing audio, including by posting videos on Facebook and sending video or audio attachments through Messenger.  Ex. 1 (Meta's Verified Supp. Resps. & Objs. to Pl.'s First Interrogs. (Interrog. No. 12) (Nov. 18, 2024)) at 4–5.  Meta receives and stores this content in standard formats (e.g.,

.wav or .mp4) commonly used for a wide variety of other audio content, like voicemails and podcasts. *Id.* at 5–6. These standard formats enable playback of the captured sound. Ex. 2 (Singh Rep.) at 32. For example, a Meta user might record audio (and video) at a friend's wedding and upload the file to their Facebook account so that other users can watch the video and hear the audio captured in the recording. Meta processes each audio and video file for storage and playback. Ex. 3 (Meta's Resps. & Objs. to Pl.'s First Interrogs. (Interrog. No. 9) (Mar. 7, 2024)) at 19; Ex. 4 (Wang Dep.) 48:3–13, 69:16–72:19, 79:14–82:25, 89:10–90:14; Ex. 1 (Meta's Verified Supp. Resps. & Objs. to Pl.'s First Interrogs. (Interrog. No. 12) (Nov. 18, 2024)), at 11.

In addition to being used for playback—as Facebook and Messenger use them—audio files may be processed by various speech-processing technologies. One example is "speech-to-text" technology, which powers basic closed captioning or transcription features. Ex. 5 (Traynor Rep.) ¶ 44. To transcribe an audio file, a speech-to-text computer program (or "model") analyzes the file for audio patterns that match known sounds and words. *Id.* When the model identifies a particular audio pattern that matches a known word, it transcribes that word. *Id.* Another example is "diarization" technology, which allows closed captioning or other transcription features that reflect when a different person has started speaking. *Id.* ¶ 45. To perform that function, a diarization model analyzes an audio file to look for, for example, changes in volume (*e.g.*, if one speaker speaks more loudly than another and/or is closer to the microphone) or in tone or pitch (*e.g.*, if one speaker is male and the other is female or a child). *Id.* ¶¶ 44–45, 282, 301, 307. If the model detects such changes, it can conclude that a different person has started speaking and reflect that in the transcript or closed captioning. *Id.*

Another category of speech-processing technology is speaker identification technology, which involves different steps than the technologies described above. A speaker identification model analyzes a recording of a particular speaker's voice and uses it to create an entirely new output representing unique characteristics of that speaker's voice (a "speaker embedding" or "Output Representation"). *Id.* ¶ 42; Ex. 2 (Singh Rep.) at 20; Ex. 6 (Singh Dep.) 173:3–24. That Output Representation takes the form of a series of numbers representing those voice characteristics—a fundamentally different kind of data with different form and content than the

standard input audio file. Ex. 5 (Traynor Rep.) ¶¶ 40–42; Ex. 6 (Singh Dep.) 166:4–14. Those numbers do not reveal what the speaker's voice sounds like, nor can they be reverse engineered to discern the speaker's voice characteristics or identity. Ex. 5 (Traynor Rep.) ¶ 306.

The speaker identification model can then store the Output Representation it created for that speaker, along with Output Representations it created for other speakers. *Id.* ¶¶ 41, 53. Having been armed with these Output Representations, the model can try to match the same speakers' voices in a subsequent audio recording. *Id.* ¶ 54. To do so, the model uses the voice in a subsequent audio recording to create a new Output Representation. *Id.* ¶¶ 54, 71. The model then compares the Output Representation created from the new recording against the previously created Output Representations. *Id.* ¶ 54. If there is a sufficient match between the new Output Representation and one of the earlier Output Representations, the model determines that they were likely created from recordings of the same speaker's voice. *Id.*

This matching process determines only that the new Output Representation may come from the *same person* as the earlier Output Representation that it matched—crucially, the process does not determine that person's actual *identity*. Rather, to actually identify the person whose voice is reflected in the matched Output Representations—that is, in order to use an Output Representation for speaker identification—another piece is required: the model must have data that links the Output Representation to the identity of the speaker. *Id.* ¶ 61; Ex. 6 (Singh Dep.) 145:20–146:2, 148:1–11.

This necessary linking information often comes through a process called "enrollment." Ex. 5 (Traynor Rep.) ¶ 41. In an enrollment process, individuals submit their voice recordings under their own name. *Id.* ¶ 53. That is, Albert logs in as Albert, and he submits his own voice recording, and Bob and Carlos do the same. The model then creates an Output Representation for each voice recording and labels—or links—the Output Representation to the person to whom it belongs. *Id.* This teaches the model what Bob's Output Representation looks like and confirms that Bob is the speaker to whom that Output Representation belongs. *Id.* Then, when a new audio file is submitted, and the Output Representation generated from one of the voices in that new file

sufficiently matches the Output Representation previously saved for Bob, the model determines that the voice in the new file likely also belongs to Bob. *Id.* ¶ 54.

That identification step is possible only because the model has information that links Bob's Output Representation to his identity. Without that information, the model cannot determine that Bob is the speaker in the new recording; it could determine, at most, only that the Output Representation from the new recording matches an Output Representation that the system had previously generated for an unknown speaker. *Id.* ¶¶ 42, 61, 93.

Plaintiff's expert, Dr. Rita Singh, agrees with these fundamental propositions. Ex. 6 (Singh Dep.) 145:20–146:2, 148:1–11. Specifically, Dr. Singh agrees that it is not possible to identify a speaker simply by comparing two audio files (e.g., two .wav files). *Id.* at 173:3–24. She also agrees that for speaker identification to be possible, the program first must analyze standard input audio recordings—what she calls "digital voice data"—and create Output Representations—what she calls "derivative digital voice data"—representing unique characteristics of the voice(s) in the input audio files, and then compare the Output Representations created from different recordings to see if they match. *Id.* at 173:3–24; *accord*, Ex. 5 (Traynor Rep.) ¶¶ 70–71. Dr. Singh further agrees the standard input recordings (digital voice data) and Output Representations (derivative digital voice data) are fundamentally distinct, with different content and form. Ex. 6 (Singh Dep.) 166:4–14 ("Q. The derivative digital voice data is represented in a different form than the stored digital voice data; correct? A. Yes. Q. The derivative digital voice data has different content than the digital voice data? A. Yes."), 173:3–24 ("Q. And you draw a distinction between derivative digital voice data and digital voice data in your report; correct? A. Yes.")). Finally, she agrees that a speaker identification system can identify a speaker using an Output Representation *only* if it knows the identity of the speaker whose voice is reflected in that Output Representation. *Id.* at 145:20–146:2, 148:1–11.[1]

---

[1] There are many other requirements for a speaker identification program to work—for example, the program must be specifically trained in the task of speaker identification, the audio input files must be of sufficiently high quality, and the files must be gathered over time. Ex. 5 (Traynor Rep.) ¶¶ 34, 65, 68. Some of these additional requirements are the subject of factual disputes between the parties, but they are immaterial for purposes of this Motion, which relates only to the undisputed characteristics of speaker identification discussed herein.

### B.      Plaintiff's Facebook and Messenger Video and Audio Files

Meta stores standard video and audio files from Facebook and Messenger in a manner that allows it to associate the files with the Facebook or Messenger account to which they were uploaded. Ex. 7 (Wang Decl.) ¶¶ 5–6; Ex. 8 (Dong Decl.) ¶¶ 5–6. Those video and audio files do not contain any labels, metadata, or other file-related information that would allow Meta to determine who is speaking in the files. Ex. 7 (Wang Decl.) ¶¶ 6–7; Ex. 8 (Dong Decl.) ¶¶ 6–7; Ex. 9 (Wyatt Decl.) ¶ 4; Ex. 10 (Meta's Resps. & Objs. to Pl.'s Second Interrogs. (Interrog. No. 21) (Sept. 22, 2025)) at 7–8; Ex. 5 (Traynor Rep.) ¶ 62. That is, Meta retains information about the account of the user who *uploaded* a video or audio file but has no way to determine from the contents of the file who is *speaking*. Ex. 7 (Wang Decl.) ¶¶ 6–7; Ex. 8 (Dong Decl.) ¶¶ 6–7; Ex. 9 (Wyatt Decl.) ¶ 4; Ex. 5 (Traynor Rep.) ¶ 62. There is no feature to "tag" a voice within a video or audio file with the speaker's identity—as with tagging faces in photos. Ex. 7 (Wang Decl.) ¶¶ 3–4; Ex. 8 (Dong Decl.) ¶¶ 3–4; Ex. 11 (Help Center Article). Further, users are not limited to sharing files containing only their own voices; to the contrary, users can—and do—upload files containing another person's voice, multiple voices, or no human voices at all. Ex. 7 (Wang Decl.) ¶ 2; Ex. 8 (Dong Decl.) ¶ 2; Ex. 12 (Meta-Delgado_00004991 and Meta-Delgado_00006690).

Plaintiff's video and audio uploads to Facebook and Messenger illustrate these facts. Her files include (1) Facebook videos, (2) Messenger video attachments, and (3) Messenger audio attachments. Ex. 12 (Meta-Delgado_00004991 and Meta-Delgado_00006690); Ex. 13 (Delgado Dep.) 122:18–20, 159:13–15; 161:19–24. Those video and audio uploads contain a variety of noises and voices, including (without limitation): football stadium crowd noise; a young girl telling a dog to "sit"; a Carly Rae Jepsen song; airplane cabin noise with no speech; multiple unseen speakers; and white noise. Ex. 12 (Meta-Delgado_00004991 and Meta-Delgado_00006690); Ex. 5 (Traynor Rep.) ¶ 63.

Plaintiff's deposition testimony confirms that the vast majority of her audio and video uploads contain (1) only a voice other than her own, (2) multiple voices, or (3) no voices at all. Ex. 13 (Delgado Dep.) 134:22–135:4, 167:24–168:7; Ex. 5 (Traynor Rep.) ¶ 63. Critically, Meta's understanding of which of Plaintiff's files (if any) contain her voice and which voice within those

files belongs to Plaintiff is based entirely on her deposition testimony. Ex. 13 (Delgado Dep.) 140:2–141:1 ("Q. Any words spoken in this video that indicate you are the speaker? A. Based on what was just played I said mom … [t]hat would indicate me."). Meta could not determine the identities of the speaker(s) in Plaintiff's recordings based on the files alone. Ex. 7 (Wang Decl. ¶¶) 6–7; Ex. 8 (Dong Decl.) ¶¶ 6–7.

### C.    Meta's Speech-Processing Technologies

Over the past several years, Meta has developed and/or used speech-processing technologies—proprietary and third-party—for purposes such as diarization, speaker-change detection, translation, and speaker verification. Ex. 14 (Meta's Am. Supp. Resps. & Objs. to Pl.'s First Interrogs. (Interrog. No. 4) (Sept. 23, 2025)) at 5–15. Many of these technologies remain at various stages of development.[2]

Meta has maintained controls to ensure that no known Illinois Facebook or Messenger user's audio or video files are processed to create Output Representations as defined here without consent. *Id.* at 4–14.[3] Indeed, there is no evidence that any known Illinois Facebook or Messenger user's files have been processed to create such Output Representations. And importantly, given this remains a single-plaintiff case, there is no evidence that *Plaintiff's* files have been processed to create Output Representations. *Id.*; Ex. 5 (Traynor Rep.) ¶¶ 28–29; Ex. 6 (Singh Dep.) 19:8–15, 36:3–12 (expressly disavowing having any opinions or evidence that Facebook or Messenger files from any Illinois user, including Plaintiff, were ever used to create Output Representations). In short, it is undisputed that Meta has never used Plaintiff's files to create Output Representations

---

[2] Notably, Meta does not possess, has not developed, and has never practiced the voice-processing technology described in the patent that is central to Plaintiff's complaint in this case. Ex. 3 (Meta's Verified Resp. & Objs. to Pl.'s First Interrogs. (Interrog. No. 11) (Mar. 7, 2024)) at 22; Ex. 5 (Traynor Rep.) ¶ 108; *see* Compl. ¶¶ 7, 52–74.

[3] *See also* Exs. 15-27 (Meta-Delgado_00009648 (LaMa - L420190PRV) at 9650; Meta-Delgado_00008343 (LaMa - L1072622PRV) at 8344; Meta-Delgado_00009654 (LaMa - L977597PRV) at 9657; Meta-Delgado_00008360 (WorkPlace Group Post) at 8360; Meta-Delgado_00008434 (LaMa - L1187221PRV) at 8435; Meta-Delgado_00008450 (LaMa - L1173350PRV) at 8451; Meta-Delgado_00008836 (Audiobox Supplemental Terms of Service) at 8839; Meta-Delgado_00008829 (Seamless Demo Supplemental Terms of Service) at 8829; Meta-Delgado_00008601 (LaMa - L1221595PRV) at 8607; Meta-Delgado_00008550 (LaMa - L1246174PRV) at 8556; Meta-Delgado_00008865 (LaMa - L1292567PRV) at 8870; Meta-Delgado_00008846 (LaMa - L1272314PRV) at 8846; Meta-Delgado_00008883 (LaMa - L1280031PRV) at 8887).

at all, much less ones that could possibly be used to identify her. Ex. 5 (Traynor Rep.) ¶ 106; Ex. 6 (Singh Dep.) 34:15–24 (conceding that she had no opinion on whether Meta created or possessed derivative digital voice data for any Illinois Facebook or Messenger users). Further, nothing in the record reflects that Plaintiff has ever created, or that Meta has ever obtained, the linking data that would need to be paired with such Output Representations in order to identify Plaintiff based on her voice. *See supra* Section II.B.

## III. LEGAL STANDARD

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if a reasonable trier of fact could resolve the issue in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" only if it could "affect the outcome of the suit under the governing law." *Id*. Thus, where a plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment should be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. ARGUMENT

The Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq*., regulates the possession and collection of "biometric identifiers" and "biometric information" by "private entities," a term that includes individuals and businesses. *Id.* 14/10, 15. "Biometric identifier" is defined as six specific types of data that can be used for biometric identification: retina scans, iris scans, scans of hand geometry, scans of face geometry, fingerprints, and (the one relevant here) voiceprints. *Id.* 14/10. BIPA does not further define any of those terms, including "voiceprint." *Id*. BIPA defines "biometric information" as data "based on a biometric identifier" that could be "used to identify an individual." *Id.* As the Ninth Circuit has explained, data can qualify as either a "biometric identifier" or "biometric information" only if it "could be used to identify" an individual. *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1124–25 (9th Cir. 2024) (citation and emphasis omitted).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DEFENDANT'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
Case No. 3:23-cv-04181-SI

Plaintiff's surviving claims arise under Sections 15(a) and 15(b). Dkt. 55 (Mot. to Dismiss Order) at 16. Plaintiff alleges under Section 15(a) that Meta "possess[ed]" her voiceprint without developing and complying with a retention schedule for that data. 740 ILCS 14/15(a). She alleges under Section 15(b) that Meta has "collect[ed], capture[d], … or otherwise obtain[ed]" her voiceprint without first obtaining her informed consent. *Id*. 14/15(b). To survive summary judgment, Plaintiff must adduce evidence that Meta "collected" or "possess[ed]" her "voiceprint"—for if not, Meta did not take any action covered by BIPA.[4] *Id*. 14/15(a), (b). Plaintiff cannot meet her burden for two independent reasons.[5]

*First*, there is no dispute that Meta has collected only the standard video and audio files Plaintiff uploaded to Facebook and Messenger. That is, Meta collected *only* input files that may contain recordings of Plaintiff's voice and *not* any Output Representations—or, using Dr. Singh's terminology, Meta collected only digital voice data and not derivative digital voice data. That undisputed fact is dispositive here, as BIPA liability attaches only where the defendant has collected a "biometric identifier" or "biometric information"—data that can itself identify a person—and Plaintiff's voice recordings, themselves, cannot identify her. *See Zellmer*, 104 F.4th at 1124. Plaintiff's contrary view—that BIPA applies to anybody who collects a person's voice recording and has *access* to speaker identification technology that, *if* used on that recording, could create an entirely new type of data that, in turn, could be used to identify that person—is unprecedented and defies common sense. Accepting Plaintiff's theory would expose to BIPA liability any person or company with (1) a voice recording, even a voicemail, and (2) access to

---

[4] Under BIPA, to "collect" is to "receive, gather, or exact," *Cothron v. White Castle Sys., Inc.*, 216 N.E.3d 918, 924 (Ill. 2023), and to "possess" is "the act of having or taking into control," *Barnett v. Apple Inc.*, 225 N.E.3d 602, 609 (Ill. App. 2022). Thus, "[a]ll the verbs in the statute require the [defendant] to have gotten a biometric identifier or information." *McGoveran v. Amazon Web Servs., Inc.*, 2024 WL 4626253, at *6 (D. Del. Oct. 30, 2024). For ease of reference, Meta hereafter uses only the term "collect" in discussing Plaintiff's claims.

[5] In its Rule 12(b)(6) ruling, which predated *Zellmer*, this Court deferred resolving whether a "voiceprint" is something more than a "voice recording" given that Plaintiff had plausibly alleged "more than simply the collection of her voice recording." Dkt. 55 at 12. In later resolving the parties' December 2024 discovery dispute, this Court noted that *Zellmer* was decided after fact discovery ended there and that Meta's position in that dispute raised a legal issue—whether voice recordings that Meta collects qualify as "voiceprints" under BIPA—better suited for resolution at summary judgment. Dkt. 80 at 3–4 ("[W]hether the data at issue is capable of being used to identify a person is a fundamental issue to be explored in discovery."). That issue is now ripe for resolution.

speaker identification technology freely available on the internet.[6]  In other words, simply having a voice recording and internet access—something virtually every person or company has—would implicate BIPA.  This is not and never has been the law.  *See infra* Section IV.A.

*Second*, even if BIPA did apply to anybody with standard input voice recordings and the mere *ability* to create Output Representations that could potentially identify the speaker, it still would not apply here because Meta could not use Plaintiff's voice recordings to create Output Representations that could identify *her*.  That is because Meta does not have data linking Plaintiff's voice in her recordings to her identity, meaning any Output Representations that Meta *could* create from those recordings would likewise not be linked to Plaintiff's identity.  And it is undisputed that an Output Representation unlinked to a speaker's identity could not be used to identify that speaker.  *See supra* Section II.A.  Accordingly, even accepting Plaintiff's theory that Meta's collection of a voice recording is equivalent under BIPA to its collection of an Output Representation because Meta has access to speaker identification technology that can create Output Representations from voice recordings—a theory disproved *infra* Section IV.A—Meta did not collect her "biometric" data under BIPA because, absent linking data, it could not use that (theoretical) Output Representation to identify her.  *See Zellmer*, 104 F.4th at 1124; *infra* Section IV.B.

### A.      BIPA Does Not Apply to Mere Voice Recordings

1. *BIPA's Text and Controlling Precedent Confirm that Voice Recordings, Standing Alone, Are Not a "Biometric Identifier" or "Biometric Information"*

It is undisputed that Meta has collected only standard video and audio files, some containing voice recordings, that Plaintiff uploaded to Facebook and Messenger.  *See supra* Section II.B.  It is further undisputed that Meta cannot use these recordings themselves to identify Plaintiff by her voice.  *See supra* Section II.B, C.  Instead, as Dr. Singh concedes, in order to be used for speaker identification, voice recordings would have to be transformed into *different* data—what Meta calls Output Representations, and what she calls derivative digital voice data,

---

[6] Plaintiff's expert Dr. Singh characterizes several publicly available models as speaker identification technology that could be used to identify individuals based on their voice.  Ex. 2 (Singh Rep.) at 85–86.

*supra* Section II.A—and it is that *different* data that could potentially (if Meta had linking data) be used for speaker identification. Ex. 2 (Singh Rep.) at 20 ("The *derived* data is the data used to identify or verify identity") (emphasis added), 24–25 (voice recordings "can be mathematically transformed into data used to identify the speaker (Derivative Digital Voice Data) … [D]ata used to identify a person is Derivative Digital Voice Data"); Ex. 6 (Singh Dep.) 173:10–13 ("Q. So the data that is used to identify speakers is the derivative digital voice data, as defined in your report; correct? A. Yes.").

It is impossible to overstate the importance of the distinction between mere voice recordings, on the one hand, and Output Representations that can be used with linking information to identify the speaker, on the other. To produce an Output Representation, a person must take a standard input audio file containing a voice recording and transform it into an entirely new type of data using speaker identification technology. *See supra* Section II.A. Unlike an input audio file, which exists in .wav or .mp4 format, an Output Representation is a numerical vector with fundamentally distinct content and form. *Id.*

There is no evidence that Meta ever used any voice recordings uploaded to Plaintiff's Facebook or Messenger account to create an Output Representation (or, as Dr. Singh calls it, derivative digital voice data).[7] Therefore, Meta cannot possibly have "collected" the data that Dr. Singh admitted is necessary to identify a speaker in a voice recording. This alone ends the inquiry, and summary judgment is warranted.

Plaintiff nevertheless posits that a standard voice recording—as Dr. Singh calls it, digital voice data—is a "voiceprint" under BIPA if the person that collected the recording has *access* to technology that can create from the recording an Output Representation that *could then* be used together with *other* (linking) data to identify the speaker, even if the technology never created such an Output Representation. That is wrong as a matter of law. Nowhere does BIPA suggest, let alone state, that data incapable of identifying someone is a biometric identifier or biometric

---

[7] This is no coincidence. The undisputed evidence demonstrates that Meta has maintained controls to ensure that no known Illinois Facebook or Messenger user's audio or video files are processed to create Output Representations as defined here without consent. *See supra* Section II.C.

information simply because it is capable of being transformed into new data capable of such identification.

The Ninth Circuit in *Zellmer* confirmed this fundamental point. *Zellmer* holds that the ordinary meaning of "identifier … is one that identifies." 104 F.4th at 1124 (internal quotation marks omitted). Thus, whether data is a "biometric identifier" or "biometric information" "turn[s] on the ability to identify a person," and data that cannot itself be used to identify a person cannot be "either form of biometric data." *Id.* at 1123–24 (rejecting the argument that biometric identifiers and biometric information are distinct in this regard and noting the statute refers to "both identifiers and information" as data "that can be used to uniquely identify a person" (cleaned up)). As the Ninth Circuit put it, there is a "broad consensus" that data is not covered by BIPA if it is not "able to identify" a person. *Id.* at 1125.

The facts of *Zellmer* leave no doubt on this point. *Zellmer* arose from Meta's use of facial recognition technology to identify Facebook users in photos uploaded to Facebook. 104 F.4th at 1120–21. The technology analyzed the faces in photos and attempted to create for each one a "face signature"—data similar to an Output Representation created from a standard audio recording. *Id.* If a face signature matched a Facebook user's stored "face template"—data previously created from a series of a user's face signatures and associated with the user's account name—the technology would suggest that the uploader "tag" the photo with that user's account name. *Id.* Meta did not, however, create face templates for people who were *not* Facebook users. *Id.*

The plaintiff in *Zellmer*, a Facebook *non*-user who appeared in uploaded photos and for whom the technology briefly created face signatures, claimed that Meta thereby collected a "scan of [his] face geometry"—a type of "biometric identifier" under BIPA. *Id.* at 1119–20. The Ninth Circuit rejected that claim, reasoning that Meta had not collected the plaintiff's biometric identifier because the face signatures could not be used to identify him, given that Meta had not previously created a face template that it could match to those face signatures to determine his identity. *Id.* at 1123–27. Thus, it did not matter that Meta undisputedly had (1) photos of the plaintiff's face and face signatures created from those photos; and (2) facial recognition technology it *could* have applied to those photos and face signatures to create new data in the form of a face template that

then *could* have been used to identify him. *Id.* at 1121. [8] That is because Meta had not *used* the facial recognition technology it had to actually *create* that identifying data. *See id.* at 1127 (distinguishing a prior case brought by Facebook users for whom Meta had actually "created a 'face template'"). Rather, the record reflected that "a face signature, which is *all that was ever created* for [the plaintiff]," could not itself be used to "identify him," and that meant that Meta had not collected either a "biometric identifier" or "biometric information" under BIPA, entitling Meta to summary judgment. *Id.* (emphasis added).

In short, *Zellmer* forecloses Plaintiff's expansive reading of BIPA by making clear that the statute does not regulate data that could not itself be used to identify an individual (such as a face signature or a voice recording), regardless of whether it *could* be turned into *new* data that could *then* be used to identify someone (such as a face template or Output Representation).

The theory underlying Plaintiff's claim misunderstands BIPA and cannot be reconciled with *Zellmer*. In Plaintiff's view, data can be a "biometric identifier"—here, a "voiceprint"—even if it could not itself be used to identify a person, so long as it *could* be used to create "biometric information," a type of data that *could* itself be used to identify a person (assuming the presence of linking data). Dkt. 78 at 3-4. But, as shown above, *Zellmer* holds that data can be either a "biometric identifier" or "biometric information" only if the data *itself* can be used to identify a person. Data that could not itself be used to identify a person (like a voice recording) is neither type of biometric data under BIPA (including a voiceprint). *See Zellmer*, 104 F.4th at 1126 (stating that if data "cannot identify, they are not biometric identifiers or biometric information as defined by BIPA"). Holding otherwise, as Plaintiff urges this Court to do, would "write the term 'identifier' out of BIPA." *Id*. at 1123.

---

[8] The undisputed fact that Meta used face signatures to create face templates for users—and simply chose not to do so as to non-users—was reflected in the declaration of a Meta employee that the Ninth Circuit "independently reviewed" in reaching its holding that non-user face signatures could not be used to identify someone, *id.* at 1125 (Dkt. 25 at 108–12, Case No. 22-16925 (9th Cir.)), as well as in the court's prior opinion in *Patel v. Facebook*, 932 F.3d 1264, 1268 (9th Cir. 2019), on which the court in *Zellmer* based its summary of Meta's technology, 104 F.4th at 1120–21.

### 2. *Other Courts Have Rejected Similarly Broad Interpretations of BIPA in the Context of Voice Data*

Roughly 2,000 cases have been filed under BIPA,[9] and Meta is unaware of any court holding that a mere standard voice recording—whether contained in a video recording or an audio-only recording—is itself a biometric identifier or biometric information under BIPA. Plaintiff asks this Court to be the first.

Meanwhile, the Illinois Attorney General has recognized that "someone who records a person's voice without" applying technology to that recording to "generat[e]" different data that could then be used to identify the speaker does not collect "biometric" data and thus is not subject to BIPA. Public Access Opinion, 2017 WL 10084298, at *3 (Ill. A.G. Aug. 14, 2017) (quoting *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088 (N.D. Ill. 2017)); *see Burris v. White*, 901 N.E.2d 895, 899 (Ill. 2009) ("[A] well-reasoned opinion of the Attorney General is entitled to considerable weight, especially in a matter of first impression in Illinois."). And all courts to have considered the issue have recognized the same.

In *McGoveran v. Amazon Web Services*, 2023 WL 2683553 (D. Del. Mar. 29, 2023) (Bibas, J.), for example, the plaintiffs alleged that Amazon had violated Section 15(d) by sharing their recorded "voice audio" with third parties. *Id*. at *1–2. But as Judge Bibas explained, "under [BIPA's] terms, voice audio alone is neither a biometric identifier (a voiceprint) nor biometric information (information derived from a voiceprint)." *Id.* at *10. This was true even though Amazon had allegedly used speaker identification technology "to extract" data from the plaintiffs' voice audio that it then used to "confirm [the plaintiffs'] identities." *Id.* Because the plaintiffs' Section 15(d) claim concerned only the data Amazon had shared with others, because Amazon had shared *only* the voice audio itself and not the extracted data, and because the voice audio itself was not "biometric" data, Judge Bibas dismissed the Section 15(d) claim. *Id.* at *10–11.

Similarly, in *Rodriguez v. ByteDance, Inc.*, 2025 WL 672951 (N.D. Ill. Mar. 3, 2025), the court dismissed the plaintiff's claim that TikTok parent ByteDance had traded "voiceprints" in

---

[9] *See* Jonathan Bilyk, *Reforms sliced BIPA class actions in 2025, new report says*, Legal Newsline (Jan 9, 2026), https://www.legalnewsline.com/cook-county-record/reforms-sliced-bipa-class-actions-in-2025-new-report-says/article_49ce0cf3-db9f-482a-b2eb-4c6084a65f96.html.

violation of Section 15(c) simply by trading videos containing voice recordings that the plaintiffs had uploaded. *Id*. at *18–19. Notwithstanding allegations that ByteDance had "speaker identification" technology and had in fact "generate[d]" identifying data from the videos, the court held that "videos are not themselves biometric identifiers," thus defeating the plaintiff's Section 15(c) claim, which rested solely on the trading of the videos themselves, not trading of the identifying data created from the videos. *Id.* Put another way, the videos—which were the only material that ByteDance allegedly traded—were merely the "underlying medium" from which "biometric" data subject to BIPA could be created, not biometric data subject to BIPA themselves.

As these cases recognize, biometric data "is not the underlying medium"—such as a photo, video, or audio recording—but instead is a set of measurements of a specified physical component reflected in the underlying medium (such as a face or voice) that could be "used to identify a person." *Rivera*, 238 F. Supp. 3d at 1096 ("record[ing] [of] a person's voice" was the "underlying medium" and not itself a "voiceprint"); *see also, e.g.*, *Patterson v. Respondus, Inc.*, 593 F. Supp. 3d 783, 799, 817 (N.D. Ill. 2022) (video with audio recorded through a "webcam and microphone" was the "underlying medium" and not itself a "voiceprint"); *Tibbs v. Arlo Techs., Inc.*, 2024 WL 3218650, at *8 (N.D. Cal. June 27, 2024) (video was the "underlying medium" and not itself a "scan of … face geometry"). Thus, as a matter of law, an entity that does not collect "anything but the 'underlying medium'"—regardless of its technical *ability* to create something else—has not collected anything covered by BIPA. *Rodriguez*, 2025 WL 672951, at *18. It follows that Meta's possession of the underlying medium (here, recordings of Plaintiff's voice), on the one hand, and access to technology that *could* create new data from that medium (here, speaker identification technology), on the other, does not render the recordings biometric identifiers or biometric information.

3. *Plaintiff's Theory And Its Implications Cannot Be Squared With BIPA's Legislative Intent*

Plaintiff's theory—that a voice recording in a standard video or audio file of the sort she uploaded to Facebook and Messenger is itself a voiceprint in the hands of someone with access to speaker identification technology that *could* transform it into an Output Representation—would

impose sweeping, unintended liability. Indeed, Plaintiff's theory would subject to BIPA liability *all* persons and businesses in possession of videos and audio recordings, because speaker identification technology is publicly available and easily accessible on the internet. Dr. Singh confirmed this point: In seeking to demonstrate that Meta could use Plaintiff's standard video and audio files to create Output Representations, she relied on the fact that Meta *could* access ReDimNet—a technology that there is no evidence Meta has ever accessed but that is accessible to anybody with an internet connection—and use it to create Output Representations. Ex. 6 (Singh Dep.) 26:21–29:18, 63:11–64:5, 176:7–12 (agreeing that ReDimNet is publicly available and can be used to create "derivative digital voice data"); *see also* ReDimNet, https://github.com/IDRnD/redimnet (publicly available code for ReDimNet). Indeed, Dr. Singh freely accessed and utilized ReDimNet to create Output Representations from certain of Plaintiff's Messenger audio files. Ex. 28 (Singh Rebuttal Rep.) at 27.

Thus, under Plaintiff's own theory and pursuant to her own evidence, BIPA liability would attach to any person who records a video on their cellphone, downloads a podcast, or maintains a digital music library, and to any business that hosts videos on its website, records customer service calls, or passively receives voicemails—simply because the combination of those "voice recordings" (which exist in the same standard formats as Plaintiff's Facebook and Messenger files, *supra* Section II.B) and the existence of the internet (where ReDimNet is publicly available) would render those voice recordings "voiceprints." Dr. Singh confirmed as much: she testified that counsel receiving a voicemail from an Illinois caller would constitute a voiceprint,[10] which

_____

[10] Ex. 6 (Singh Dep.) 174:14–175:22 ("Q. Could you remind me what was your understanding of the scientific definition of a voiceprint is? A. The scientific definition of a voiceprint is the following. A voiceprint is any of the analog voice signal, produced by the human vocal tract. Q. So I'm an Illinois resident, and if I were to get a call from my wife and didn't answer because I'm in a deposition, and she left me a voicemail, saying, hi, Sean, I hope your deposition is going well, love you all, I'll see you later, would that voicemail qualify as a voiceprint, under the scientific definition you have just stated? A. A recorded voice signal is an imprint of the analog voice system. So by the scientific definition, it would qualify. Q. And that is the definition that you use as well; correct? A. That is the definition that is conventionally used in the speech and audio processing community. Q. So under that definition, the voicemail to me would be a voiceprint; correct? A The digital audio signal that comprises the voicemail would be a voiceprint, by its scientific definition. Q. And with that voicemail, according to you, I would have data inherently unique to the individual that left the voicemail, that would be capable of using to identify someone; correct? A. Yes, sir.").

necessarily means that under Plaintiff's theory, counsel (unless he somehow gave the caller notice and received her written consent to receive her voicemail) would have violated BIPA. Plainly, that is not what the Illinois legislature intended in enacting a law to regulate access to "biologically unique" "identifiers," rather than access to "videos" and "audio recordings." *See Bank of New York Mellon v. Laskowski*, 104 N.E.3d 1145, 1147 (Ill. 2018) ("The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent. The most reliable indicator of legislative intent is the language of the statute, [and] a court also will presume that the legislature did not intend absurd, inconvenient, or unjust results.").

On the contrary, as Plaintiff correctly observed, the legislature enacted BIPA to protect against the "serious threat" of "identity theft" posed when "companies and governments that collect and store" "*the most personal of all identification information*" get "hacked." Dkt. 56 at 25–26 (emphasis added); *see* 740 ILCS 14/5(c) (expressing legislature's intent to protect against risk of "identity theft" arising when "biometrics" are "compromised"). The risk addressed by the statute does not arise when a person voluntarily provides another person with mere videos and audio recordings—even if the recipient *could* but *does not* create identifying data from them. Only once such identifying data is actually created does that risk—of a "hack" and "identity theft"— exist. That Plaintiff's videos and audio recordings are not *themselves* "the most personal of all identification information" likely accounts for why she chose to disseminate them to Meta and others over social media to begin with. And that is likely why the legislature, which enacted BIPA in 2008 in direct response to a company's sale of fingerprints, *see Watson v. Legacy Healthcare*, 196 N.E.3d 571, 581–82 (Ill. App. 2021), chose not to include in the statute's list of covered data "videos" and "audio recordings," which have long been widely disseminated, including as movies, songs, and voicemails.

Any other reading of BIPA would render unlawful everyday conduct and commerce, contrary to the legislature's intent. This is particularly so given the legislature's recognition of the need to balance the protection of biometric data with the interests of the business sector. *See* 740 ILCS 14/5(a) ("The use of biometrics is growing in the business … sector[] and appears to promise streamlined financial transactions and security screenings."). Understanding this, the Ninth Circuit

in *Zellmer* cautioned that BIPA's text must be read in light of its ordinary meaning to prevent overreach and, in particular, to "ensure that [a business] is not forced to abandon key services that it offers its customers or risk perpetual liability." 104 F.4th at 1123–24. Accepting Plaintiff's theory would do just that, by making it practically impossible for persons and businesses with internet access—virtually everybody—to access videos and audio recordings without risking liability under BIPA. No court has adopted Plaintiff's absurdly far-reaching theory of BIPA liability, and this Court should not be the first.

**B.    BIPA Does Not Apply to Plaintiff's Voice Recordings Because Those Recordings Do Not Enable Meta to Identify Her**

Even if BIPA applied to standard voice recordings that *could* be used to create Output Representations that *could* in turn be used to identify the speaker, BIPA still would not apply here. That is because Meta could not use *Plaintiff's* Facebook and Messenger recordings to create Output Representations that could be used to identify *her*. The reason is simple: Meta does not have data linking Plaintiff's voice within her recordings to her identity, meaning that any Output Representations that Meta could create from those recordings would likewise not be linked to her identity. It is undisputed that an Output Representation unlinked to a speaker's identity could not be used to identify that speaker. *See supra* Section II.A. All it could be used to do—at most—is match to the voice of the same anonymous speaker in subsequent recordings. Thus, even accepting Plaintiff's liability theory, her claims fail on the merits as a matter of undisputed fact.

1.    *BIPA Does Not Apply To Data That Is Unlinked To An Identity*

Governing precedent confirms that BIPA applies only to data that is linked to a person's identity, as that linkage is necessary for that data to subsequently be used to identify that person. The Ninth Circuit addressed materially similar facts in the face recognition context in *Zellmer*. *See* 104 F.4th at 1120–21, 1123–27. *Zellmer* clearly differentiates between (i) face templates that *were* linked to the identity of the person to whom the face belongs and thus could potentially be used to identify that person, and (ii) face signatures that were *not* linked to the identity of the person to whom the face belongs and thus could not be used to identify that person. *See id.* at 1126–27. The court confirmed that the latter were not subject to BIPA because they lacked the

feature—being able to identify a person—essential to what it means to be a "biometric identifier" or "biometric information" under BIPA. *See id.* That analysis follows from BIPA's text and purpose, as output data (such as a face signature in *Zellmer* or an Output Representation here) that is functionally anonymous and unlinked to the identity of the person depicted cannot be used to "uniquely identify an individual." 740 ILCS 14/10.

Other decisions are in accord. In *G.T. v. Samsung Electronics America*, 742 F. Supp. 3d 788 (N.D. Ill. 2024), the facial recognition software in Samsung's "Gallery" App analyzed the faces in the photos taken by users on their Samsung phones and, for each face, "create[d] a unique digital representation" converted "into numerical 'vectors' based on the facial feature[s]." *Id.* at 793. Using a process called "face clustering," the software then "compare[d] the vectors" to group together photos of the same face. *Id.* The plaintiffs claimed that this facial recognition data amounted to a biometric identifier (a "scan of face geometry") because it made the App "capable of recognizing faces," including the phone user's face. *Id.* at 799.

The court disagreed, holding as a matter of law that the data was not covered by BIPA because "the App [could not]—either through the creation of the [data] or in combination with other information on the Device—ascertain an individual's identity." *Id.* at 800. In other words, while the App could determine whether two faces were the same or whether a given face appeared in many of the photos on a user's device, it did not have data linking any such face to a person's identity. *See id.* at 793, 801. And without linking data connecting a person's facial recognition data to that person's identity, the plaintiffs failed to allege "the App's technology [was] capable of identifying [the] person's identity." *Id.* at 801. In dismissing the plaintiff's BIPA claims on this ground, the court expressly followed *Zellmer* in concluding that biometric data must be "capable of recognizing an individual's *identity*, not simply an individual's feature," such as their face or voice. *Id.* at 800–01 (emphasis added).

Likewise, in *Ji v. Naver Corp.*, 2023 WL 6466211 (N.D. Cal. 2023), the court dismissed a BIPA claim on the ground that the facial recognition data that the defendant's image-editing and image-messaging apps had created from images of faces was not "biometric." Although the defendant there could use the data to "detect a person's face out of a crowd"—and could connect

the data to the "user ID" number of the user who uploaded and/or sent the underlying image—that was not the same as "pairing the face with an identity." *Id.* at *12. Significant here, while acknowledging that because the plaintiffs were users of the defendant's apps, the defendant "could ostensibly access their name, address, or contact information" in addition to the facial recognition data it had created from images of their faces—just as Meta could ostensibly access Plaintiff's account information here—the court dismissed the plaintiffs' claims because the defendant could not link the plaintiffs' identities to that facial recognition data. *Id.* (citation omitted).

Other courts are in accord, routinely dismissing BIPA claims where the defendant lacks information linking any output data it created to the plaintiffs' identities, given that unlinked output data does not make the defendant "capable of determining [the plaintiffs'] identities," which is "the most foundational aspect of a BIPA claim." *Castelaz v. The Estee Lauder Cos., Inc.*, 2024 WL 136872, at *6–7 (N.D. Ill. Jan. 10, 2024) (dismissing claim where defendant lacked "identifying information … connected to the" facial scans that defendant had generated from plaintiffs' photos and video feeds because that meant defendant could not identify the plaintiffs "using the collected facial scans … in conjunction with other methods or sources of information available"); *Clarke v. Aveda Corp.*, 704 F. Supp. 3d 863, 866–67 (N.D. Ill. 2023) (dismissing claim where defendant "scanned and collected, and then stored … digital copies of each [plaintiff's] facial geometry" but was not "capable of identifying them from this data" because it was unlinked to "their identities"); *Daichendt v. CVS Pharmacy, Inc.*, 2022 WL 17404488, at *5 (N.D. Ill. Dec, 2, 2022) (dismissing claim where defendant "could [not] connect the … scans of face geometry with [plaintiffs'] identities," meaning plaintiffs could not show that the "collection of their biometric data made defendant capable of determining their identities"); *see also Martell v. X Corp.*, 2024 WL 3011353, at *3 (N.D. Ill. June 13, 2024) ("[I]f the Court were to read BIPA as applying to any retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry without those items actually identifying an individual, it would contravene the very purpose of BIPA.").

In short, the cases confirm that BIPA does not categorically reach output data such as face signatures or Output Representations—even if data of the same type could be used to identify a specific person *if* linked to that person's identity. BIPA instead applies only to output data that

actually *is* linked in that manner and accordingly could be used to identify that person. *See Zellmer*, 104 F.4th at 1123–27; *Samsung*, 742 F. Supp. 3d at 801; *Ji*, 2023 WL 6466211, at *12.

### 2. Meta Lacks The Data Needed To Link Any Output Representations To Plaintiff's Identity

Plaintiff's claims fail for the same reason. Indeed, Dr. Singh opines that the Meta facial recognition system at issue in *Zellmer* "parallel[s]" the way linking data would work in the speaker identification context. Ex. 28 (Singh Rebuttal Rep.) at 23–24. And the specific details of that facial recognition system illustrate why no such linking data exists here.

The system at issue in *Zellmer* was able to identify a Facebook user in photos only because Meta had previously created a "face template"—i.e., output data that it had linked to the user's identity. 104 F.4th at 1120–21. To create face templates, the system used photos within which the user's face had been specifically "tagged"—either by the user themself or by another user—with the user's account name. Ex. 11 (Help Center doc) ("If you've never been tagged in a photo on Facebook … then [a template] hasn't been created or stored for you."). The "tagging" provided the linking data that enabled Meta's system to link the face signatures it created from the photos of the user's face to the user's account name so as to create the face template. *See id.; Zellmer,* 104 F.4th at 1120–21. In the absence of such linking data, any face signature created from a photo of a face was entirely anonymous and, accordingly, could not be used to identify the person. *See Zellmer*, 104 F.4th at 1125–26.

Speaker identification systems operate in materially the same way. It is undisputed that a speaker identification system can use an Output Representation to identify the speaker in a subsequent voice recording only if the system has information external to the recording itself confirming the identity of the speaker whose voice is reflected in the Output Representation. *See supra* Section II.A; Ex. 5 (Traynor Rep.) ¶ 61; Ex. 29 (Seltzer Dep.) 22:2–13; Ex. 6 (Singh Dep.) 145:20–146:2, 148:1–11. That external information may be provided by the speaker as part of a formal enrollment process or through a different mechanism—for example, a manually assigned label confirming the speaker whose voice should be associated with the Output Representation. *See supra* Section II.A; Ex. 5 (Traynor Rep.) ¶ 41; Ex. 6 (Singh Dep.) 146:3–15. But there is no

technology that can obtain the necessary linking information simply from the voice in the recording itself.  Ex. 30 (Traynor Sur-Rebuttal Rep.) ¶ 16; Ex. 29 (Seltzer Dep.) 22:2–13; Ex. 9 (Wyatt Decl.) ¶¶ 3–6; Ex. 6 (Singh Dep.) 148:1-11.  In short, without the external information confirming the identity of the speaker whose voice is in a voice recording, any Output Representation generated from that recording cannot be used for speaker identification.  Ex. 30 (Traynor Sur-Rebuttal Rep.) ¶ 19; Ex. 6 (Singh Dep.) 145:20–146:2, 148:1–11; Ex. 5 (Traynor Rep.) ¶¶ 61–62.

Crucially, there is no evidence that Meta has—or even has a mechanism by which it could obtain—such linking information with respect to video and audio files uploaded by Plaintiff or other Facebook or Messenger users.  Just as Facebook users can upload photos containing the faces of one or more people other than themselves, Facebook and Messenger users can upload videos or audio recordings containing the voices of one or more other speakers.  *See supra* Section II.B. Plaintiff's own data demonstrates as much, given that the vast majority of her audio and video uploads contain only a voice other than her own, multiple voices, or no voices at all.  Ex. 5 (Traynor Rep.) ¶ 63.  But unlike the face tags on Facebook that provided requisite linking information for Meta's facial recognition system, there is no feature or functionality by which Facebook and/or Messenger users can tag or designate a voice within a given video or audio recording as belonging to a specific, identified speaker.  *See supra* Section II.B.  Nor is there metadata or similar file information that Meta receives with such video and audio recordings that would allow it to determine the identity of a given speaker within a particular audio file.  *See supra* Section II.B.  At most, the information Meta receives with such files allows it to determine the account holder who uploaded them—but as Plaintiff's own video and audio recordings demonstrate, Meta cannot simply assume that a particular audio file reflects the voice of the user who uploaded it.  *See supra* Section II.B; Ex. 5 (Traynor Rep.) ¶ 61; Ex. 30 (Traynor Sur-Rebuttal Rep.) ¶¶ 16–17.

Plaintiff has no evidence to the contrary.  Dr. Singh cites extensive evidence that Meta can link files (video, audio, or other) to the account holder, but that information is immaterial because it goes only to the identity of the account that *uploaded* the audio or video, providing no

information about the identity of *the speaker(s)*, if any, in the file. Ex. 6 (Singh Dep.) 79:1–11, 84:17–23, 86:23–88:4, 91:15–20; *Ji*, 2023 WL 6466211, at \*12.

Dr. Singh also asserts that it would be possible for Meta to use a model it does not have to conduct an analysis to determine the "dominant voice" in a certain subset of Plaintiff's Messenger audio recordings by creating, comparing, and "clustering" similar speaker embeddings. Ex. 28 (Singh Rebuttal Rep.) at 29. Putting aside for present purposes the flaws in this "dominant voice" analysis,[11] that exercise simply attempts to detect the voice that appears most often in the recordings—it does not and cannot answer the question of *who* the speaker is. *Id*.; Ex. 30 (Traynor Sur-Rebuttal Rep.) ¶¶ 16–17. Dr. Singh confirmed as much during her deposition, testifying that she had no evidence that the dominant voice in a set of files is the voice of the account holder who uploaded the files. Ex. 6 (Singh Dep.) 88:3–18. When pressed on that critical point, Dr. Singh conceded that she had no empirical studies or other evidence and had instead relied only on an "expectation" from her "real world experience and common sense." *Id.* 88:19–89:8, 90:14–91:20. In fact, as to Messenger audio uploads, Dr. Singh was unable to point to any evidence or studies "to support that the primary speaker on Messenger uploads is highly likely to be the holder or user of the account." *Id.* 84:17–23. And as to Facebook or Messenger video uploads, Dr. Singh conceded that "inherently, the video uploads are expected to contain content of interest to the uploader *and not their own voice*." *Id.* 89:16–18.

Because the results of Dr. Singh's "dominant voice" analysis do not provide information on who the speaker is—even accepting for present purposes that the analysis is hypothetically possible and technically sound—it does not and cannot serve as the linking data necessary to "uniquely identify an individual." 740 ILCS 14/10; *see Zellmer*, 104 F.4th at 1123–27; *Samsung*, 742 F. Supp. 3d at 793, 800–01 (data that can "cluster" images of the same person's face but not uniquely identify the person is not subject to BIPA under *Zellmer*).

---

[11] Independent of the issues noted here, there are fundamental scientific problems with Dr. Singh's "dominant voice" analysis, rendering the results unreliable. But because the analysis does not supply the linking data that is undisputedly necessary for speaker identification even if the results of that analysis are taken at face value, the Court need not reach those issues for purposes of resolving this Motion. If necessary, Meta will raise its objections to Dr. Singh's "dominant voice" analysis at the appropriate juncture.

The expert discovery and all other record evidence accordingly confirm that Meta could not "uniquely identify" Plaintiff using her Facebook or Messenger video or audio recordings, or even from any Output Representations that it could hypothetically create using those recordings, 740 ILCS 14/10, because there is no data confirming who the speakers are in any of those recordings, as would be necessary to link the data to her identity.  Ex. 30 (Traynor Sur-Rebuttal) Rep. ¶¶ 16–17, 19.  Accordingly, even accepting as true Plaintiff's contention that BIPA applies to voice recordings that could be used to create Output Representations that could then be used to identify a person—a contention defeated in Section IV.A, *supra*—the record nevertheless entitles Meta to summary judgment because Plaintiff's Facebook and Messenger recordings could not be used to identify her and thus are not subject to BIPA.  *See Zellmer*, 104 F.4th at 1123–27; *Samsung*, 742 F. Supp. 3d at 801; *Ji*, 2023 WL 6466211, at *12.

## V.    CONCLUSION

For these reasons, the Court should grant summary judgment to Meta.

Dated: February 20, 2026                    Respectfully submitted,

                                            LATHAM & WATKINS LLP

                                            By  */s/ Gary S. Feinerman*
                                                 Gary S. Feinerman

                                            GIBSON, DUNN & CRUTCHER LLP

                                            By  */s/ Lauren R. Goldman*
                                                 Lauren R. Goldman

                                            *Attorneys for Defendant Meta Platforms, Inc.*

## CIVIL L.R. 5-1(i)(3) ATTESTATION

Pursuant to Civil Local Rule 5-1(i)(3), I, Gary Feinerman, hereby attest under penalty of perjury that concurrence in the filing of this document has been obtained from all signatories.

Dated: February 20, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By  */s/ Gary S. Feinerman*
        Gary S. Feinerman