**ARIAS SANGUINETTI WANG & TEAM LLP**
Mike Arias (CSB #115385)
Elise R. Sanguinetti (CSB #191389)
Arnold C. Wang (CSB #204431)
Craig S. Momita (CSB #163347)
M. Anthony Jenkins (CSB #171958)
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: (310) 844-9696
mike@aswtlawyers.com
elise@aswtlawyers.com
arnold@aswtlawyers.com
craig@aswtlawyers.com
anthony@aswtlawyers.com

**GOLDENBERG HELLER & ANTOGNOLI, P.C.**
Thomas P. Rosenfeld (admitted *pro hac vice*)
Kevin P. Green (admitted *pro hac vice*)
Thomas C. Horscroft (admitted *pro hac vice*)
Daniel S. Levy (admitted *pro hac vice*)
2227 South State Route 157
Edwardsville, Illinois 62025
Telephone: (618) 656-5150
tom@ghalaw.com
kevin@ghalaw.com
thorscroft@ghalaw.com
daniel@ghalaw.com

*Attorneys for Plaintiff Natalie Delgado*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

NATALIE DELGADO, individually and on behalf of all others similarly situated,

Plaintiff,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 3:23-cv-04181-SI

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Hearing: December 18, 2026
Time: 10:00 a.m.
Location: Courtroom 1—17th Floor
Judge: Hon. Susan Illston

**REDACTED**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

**PLEASE TAKE NOTICE** that on December 18, 2026, at 10:00 a.m., or as soon thereafter as the matter may be heard, in the United States District Court for the Northern District of California, Courtroom 1, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiff Natalie Delgado, through her undersigned counsel, will, and hereby does, move this Court for an order for class certification pursuant to Federal Rule of Civil Procedure 23.

The issue to be decided is whether class certification is proper pursuant to Rule 23.

Plaintiff's Motion is based on this Notice of Motion and Motion for Class Certification, the following Memorandum of Points and Authorities, declarations and exhibits filed herewith and incorporated herein, the complete files and records in this action, and any other material and arguments as may be considered by the Court. Through this Motion, Plaintiff seeks an order certifying the Class; appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel, and for such further relief as the Court deems just and proper.

Dated: August 21, 2026

Respectfully submitted,

**GOLDENBERG HELLER & ANTOGNOLI, P.C.**

By: *<u>/s/ Kevin P. Green</u>*
Kevin P. Green

*Attorneys for Plaintiff Natalie Delgado*

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1
II. BACKGROUND .......... 2
A. How Digital Voice Data and Speaker ID Technology Work .......... 3
B. Meta's Collection and Storage of Digital Voice Data .......... 3
C. Meta's [redacted] .......... 4
D. Meta's [redacted] .......... 6
E. Meta's [redacted] .......... 6
F. Plaintiff's Claims .......... 8
III. LEGAL STANDARD .......... 9
IV. ARGUMENT .......... 10
A. The Proposed Class .......... 10
B. The Class is Sufficiently Numerous .......... 11
C. Common Questions of Law and Fact Predominate Over Individual Issues .......... 12
1. Questions of Law and Fact are Common to the Class .......... 12
2. The Common Issues Predominate .......... 16
D. Plaintiff is Typical of the Class .......... 23
E. Plaintiff and Counsel Will Continue to Adequately Represent the Class .......... 26
F. A Class Action is the Superior Method for Resolving the Controversy .......... 28
V. CONCLUSION .......... 30

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Akaosugi v. Benihana Nat'l Corp.,*
282 F.R.D. 241 (N.D. Cal. 2012) ........ 11

*Alcantar v. Hobart Service*,
800 F.3d 1047 (9th Cir. 2015) ........ 13

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013) ........ 2, 9, 13, 16

*Bayeg v. Admiral at the Lake*,
No. 19 CH 8828 (Cir. Ct. Cook Cnty., May 25, 2023) ........ 13

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ........ 10

*C.H. v. Google LLC*,
2026 U.S. Dist. LEXIS 6790 (N.D. Cal. Jan. 13, 2026) ........ 10

*Carnegie v. Household Int'l, Inc.,*
376 F.3d 656 (7th Cir. 2004) ........ 29

*Clay v. Union Pac. R.R. Co.*,
171 F.4th 975 (7th Cir. 2026) ........ 18

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ........ 18

*Corcoran v. CVS Health*,
2019 U.S. Dist. LEXIS 204509 (N.D. Cal. Nov. 22, 2019) ........ 26

*Culver v. City of Milwaukee,*
277 F.3d 908 (7th Cir. 2002) ........ 27

*Doe v. Apple Inc.*, (formerly captioned as *Hazlitt v. Apple*, No. 3:20-cv-421-NJR)
2026 U.S. Dist. LEXIS 125406 (S.D. Ill. June 5, 2026) ........ *passim*

*DZ Reserve. v. Meta Platforms, Inc.*,
96 F.4th 1223 (9th Cir. 2024) ........ 26

*Fox v. Dakkota Integrated Sys., LLC*,
980 F.3d 1146 (7th Cir. 2020) ........ 13

*Gaertner v. Commemorative Brands, Inc.*,
351 F.R.D. 201 (S.D. Ill. 2026) ........ *passim*

*Gen. Tel. Co. of the Sw. v. Falcon*,
457 U.S. 147 (1982) ........ 22

*Gold v. Lumber Liquidators, Inc.*,
2017 U.S. Dist. LEXIS 96724 (N.D. Cal. June 22, 2017) ........ 10

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) .... 17

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .... 26

*Howe v. Speedway LLC*, 2024 U.S. Dist. LEXIS 176263 (N.D. Ill. Sep. 29, 2024) .... 2, 17, 23

*In re Facebook Biometric Info. Privacy Litig.*, 326 F.R.D. 535 (N.D. Cal. 2018) .... *passim*

*In re Facebook Biometric Info. Privacy Litig.*, 522 F. Supp. 3d 617 (N.D. Cal. 2021) .... 30

*In re Google Generative AI Copyright Litig.*, 2025 U.S. Dist. LEXIS 75740 (N.D. Cal. Apr. 21, 2025) .... 10

*In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005) .... 12

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007) .... 11

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 895 F.3d 597 (9th Cir. 2018) .... 28

*In re Yahoo Mail Litig.*, 308 F.R.D. 577 (N.D. Cal. 2015) .... 12

*Just Film, Inc. v. Buono*, 847 F.3d 1108 (9th Cir. 2017) .... 12, 17, 18, 24

*Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164 (N.D. Cal. 2015) .... 23

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) .... 9

*Morris v. Wow Bao, LLC*, No. 17-L-12029 (Cir. Ct. Cook Cnty., Dec. 14, 2021) .... 13

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) .... 9, 12, 16, 17

*Pardi v. Tricida, Inc.*, 2024 U.S. Dist. LEXIS 175947 (N.D. Cal. Sep. 27, 2024) .... 12

*Parris v. Meta Platforms Inc.*, No. 2023LA000672 (DuPage Cnty, Ill.) .... 28

*Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) .... 2, 12, 13

*Patel v. Facebook, Inc.*,
932 F.3d 1264 (9th Cir. 2019) .......... 2, 13, 18, 22

*Rogers v. BNSF Ry. Co.*,
2022 U.S. Dist. LEXIS 50847 (N.D. Ill. Mar. 22, 2022) .......... 13

*Romo v. GMRI, Inc.*,
2013 U.S. Dist. LEXIS 56898 (C.D. Cal. Feb. 16, 2013) .......... 26

*Rosenbach v. Six Flags Entm't Corp.*,
129 N.E.3d 1197 (Ill. 2019) .......... 18

*Ross v. US Bank Nat'l Ass'n*,
2009 U.S. Dist. LEXIS 116875 (N.D. Cal. Nov. 25, 2009) .......... 29

*Roy v. Cnty. of L.A.*,
2018 U.S. Dist. LEXIS 122410 (C.D. Cal. July 11, 2018) .......... 22

*Ruffin v. Entm't of the E. Panhandle*,
2012 U.S. Dist. LEXIS 161420 (N.D.W. Va. Nov. 9, 2012) .......... 26

*Ruiz Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016) .......... 16

*Saggio v. Medicredit, Inc.*,
351 F.R.D. 141 (E.D. Mo. 2026) .......... 11

*Sharpe v. GT'S Living Foods, LLC*,
2024 U.S. Dist. LEXIS 242424 (C.D. Cal. Dec. 17, 2024) .......... 28

*Svoboda v. Amazon.com Inc.*,
168 F.4th 956 (7th Cir. 2025) .......... *passim*

*Svoboda v. Amazon.com, Inc.*,
2024 U.S. Dist. LEXIS 58867 (N.D. Ill. Mar. 30, 2024) .......... 13, 16

*Tapia-Rendon v. United Tape & Finishing Co.*,
2023 U.S. Dist. LEXIS 142773 (N.D. Ill. Aug. 15, 2023) .......... 17, 29

*Tapia-Rendon v. Workeasy Software, LLC*,
2025 U.S. Dist. LEXIS 153241 (N.D. Ill. Aug. 8, 2025) .......... 22, 23

*Torliatt v. Ocwen Loan Servicing*,
570 F. Supp. 3d 781 (N.D. Cal. 2021) .......... 27

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) .......... 17, 23

*Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011) .......... 2, 12, 19

*Woods v. Google LLC*,
2018 U.S. Dist. LEXIS 143879 (N.D. Cal. 2018) .......... 28

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
594 F.3d 1087 (9th Cir. 2010) .......... 18

*Zaluda v. Apple Inc.*,
2019 CH 11771 (Ill. Cir. Ct. Cook Cty. Jan. 29, 2026) .......... 19

*Zellmer v. Meta Platforms, Inc.*,
104 F.4th 1117 (9th Cir. 2024) .......... 14

**Statutes**

740 ILCS 14/10 .......... 15

740 ILCS 14/15(a) .......... *passim*

740 ILCS 14/15(b) .......... *passim*

740 ILCS 14/15(b)(1) .......... 14, 15

740 ILCS 14/15(b)(2) .......... 14, 15

740 ILCS 14/15(b)(3) .......... 14, 15

740 ILCS 14/15(d) .......... 17

740 ILCS 14/20(1) .......... 16

740 ILCS 14/20(2) .......... 16

**Rules**

Fed. R. Civ. P. 23 .......... 2, 9, 10

Fed. R. Civ. P. 23(a) .......... 9

Fed. R. Civ. P. 23(a)(1) .......... 11

Fed. R. Civ. P. 23(a)(2) .......... 12

Fed. R. Civ. P. 23(a)(3) .......... 23

Fed. R. Civ. P. 23(a)(4) .......... 26, 28

Fed. R. Civ. P. 23(b)(3) .......... *passim*

Fed. R. Civ. P. 23(c)(1)(B) .......... 10

Fed. R. Civ. P. 23(c)(1)(C) .......... 10

Fed. R. Civ. P. 23(c)(2)(B) .......... 11

Fed. R. Civ. P. 23(c)(4) .......... 23

Fed. R. Civ. P. 23(g) .......... 26, 28

# I. INTRODUCTION

An issue at the heart of this case is whether the Digital Voice Data Meta receives from Illinois Facebook and Messenger users is a "biometric identifier" or "voiceprint" under Illinois' Biometric Information Privacy Act ("BIPA"). In April 2025, Meta sought early summary judgment, arguing it only collects "mere voice recordings" that categorically cannot be voiceprints and further claiming Meta could not use Digital Voice Data to identify people. The Court found genuine issues of fact prevented summary judgment. For class certification, the Court need not (and should not) decide the merits. But Meta's own filings confirm that whether Digital Voice Data is a "mere voice recording" or voiceprint is a "controlling," "core, dispositive" and "threshold legal issue . . . that could resolve the litigation," and "materially affect the outcome of [the] litigation." Dkt. 94 at 3, 7; Dkt. 173 at 3, 5.

This common issue thus predominates the case and is addressed in one stroke with common evidence focused on expert testimony and Meta's conduct, technology, and capabilities, including that:

- Meta receives Digital Voice Data when Facebook and Messenger users post videos or send video and audio messages, [redacted];
- [redacted];
- Meta [redacted];
- [redacted]; and
- a Facebook ID [redacted].

Other predominating common issues that will be resolved in one stroke include whether Meta's uniform disclosures and practices constituted a failure to develop and publish a data retention or destruction policy, disclose the information required by BIPA, and obtain signed written releases from users in violation of BIPA sections 15(a) and (b). Common issues also predominate for damages because BIPA provides liquidated statutory damages of $1,000 for negligent violations and $5,000 for intentional or reckless violations. Whether Meta's violations were negligent, intentional, or reckless will be answered based on common evidence concerning Meta's conduct and state of mind.

Thus, the entire Class will "prevail or fail in unison" on common questions involving common evidence of Meta's capabilities and conduct, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013), and certification is warranted precisely because several single issues can resolve the litigation with common evidence "in one stroke." *See Parsons v. Ryan,* 754 F.3d 657, 675 (9th Cir. 2014) (certification proper where "'determination of [a common contention's] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke. What matters . . . [is] the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation'") (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011)). Indeed, the bases for class certification here echo the successful certification of numerous BIPA cases. *See, e.g.*, *Patel v. Facebook, Inc.*, 932 F.3d 1264 (9th Cir. 2019) (affirming certification in *In re Facebook Biometric Info. Privacy Litig. ("In re Facebook")*, 326 F.R.D. 535 (N.D. Cal. 2018) and noting "threshold questions of BIPA's applicability can be decided on a class-wide basis"); *Svoboda v. Amazon.com Inc.*, 168 F.4th 956 (7th Cir. 2025) (common predominating questions included: whether data collected constituted biometric identifiers within BIPA's meaning; whether Amazon violated BIPA by failing to develop and publish a retention/destruction policy, disclose information required by BIPA, or obtain signed written releases from users); *Doe v. Apple Inc.*, 2026 U.S. Dist. LEXIS 125406 (S.D. Ill. June 5, 2026) (formerly captioned as *Hazlitt v. Apple*); *Gaertner v. Commemorative Brands, Inc.*, 351 F.R.D. 201 (S.D. Ill. 2026); *Howe v. Speedway LLC*, 2024 U.S. Dist. LEXIS 176263 (N.D. Ill. Sep. 29, 2024).

Because Rule 23 is satisfied, Plaintiff's motion for class certification should be granted.

## II. BACKGROUND[1]

BIPA regulates the collection and use of "biometric identifiers," including "voiceprints." Plaintiff contends (1) the Digital Voice Data Meta obtains from Facebook and Messenger users constitutes "voiceprints" under BIPA because Meta is capable of using it to identify people; and (2) Meta obtained users' voiceprints in violation of BIPA's notice and consent requirements. The factual record is summarized below, and Plaintiff further incorporates herein by reference the statement of facts from her Response to Meta's Motion for Summary Judgment and the summary judgment record.

[1] "SOF" refers to the Statement of Facts from Dkt. 157 (Pl. Resp. to Mot. for Summ. J.). New Exhibits 1-23 are attached to the declaration of Kevin Green filed herewith. "MD" indicates Bates stamp "Meta-Delgado." "Singh" refers to Ex. 1 and "Singh Reb." to Ex. 2 of Dr. Singh's declaration filed herewith.

### A. How Digital Voice Data and Speaker ID Technology Work

A human voice is an acoustic pressure wave (or "voice signal") created in the vocal tract carrying distinctive information about the speaker's unique identity. A digital (*i.e.*, mathematically measured) imprint of the voice signal is "Digital Voice Data." SOF ¶ 8. Digital Voice Data is the input for speaker ID systems. SOF ¶ 9. To identify someone, a speaker ID "model uses the voice in . . . [an] audio recording" as the "standard input audio file." Dkt. 146, Def. MSJ at 3; Dkt. 157-11, Pl. MSJ Ex. 10, Meta Dep. (Pino) 43:23-25 ("The input data is the voice clip."). All biometric identification is probabilistic. Biometric technology "identifies" by calculating probabilities of a match, determining "a sufficient" or "likely" match between voices in Digital Voice Data by calculating similarity scores and confidence scores for candidates against a desired threshold. SOF ¶ 13; Dkt. 146, Def. MSJ at 3.

### B. Meta's Collection and Storage of Digital Voice Data

Meta requires Facebook users "to create one account using the name they go by in everyday life that represents their authentic identity," prohibits accounts from being "used by more than one person," and prohibits users from "impersonat[ing] another person." SOF ¶ 5. Every Facebook or Messenger accountholder has a Facebook User ID ("FBID") connected to [redacted], including, *inter alia*, [redacted] Meta [redacted]." SOF ¶ 6.

Meta receives audio when users post videos to Facebook and send audio or video clips via Messenger. When the audio contains a voice, it is Digital Voice Data. The Digital Voice Data Meta receives preserves the vocal characteristics necessary for identification and is compatible with speaker ID technologies. SOF ¶ 17. During the Class Period, Meta obtained Plaintiff's Digital Voice Data when she posted videos and sent audio containing her voice via Facebook and Messenger. *Id.*; Dkt. 146-13; Ex. 17, Delgado Decl. ¶¶ 3-5. Large majorities of Illinois users who posted videos or sent video or audio messages during the Class Period likewise included their own voice in them: [redacted] Decl. Robert Klein Ex. 1 ("Klein") ¶ 11. These high percentages make sense because the functions that collect Digital Voice Data are easily accessible on the Facebook

and Messenger apps via cell phones. For example, to use the audio message feature, the Messenger user opens a chat with another person, clicks to record, starts speaking an audio message, clicks to stop, and then presses a button to send the audio message to Meta and eventually the recipient. Ex. 8.

Meta does not [redacted]. SOF ¶ 18. [redacted]." SOF ¶¶ 19, 28.

**C. Meta's [redacted]**

Meta applied for a voiceprint patent in 2016, and, [redacted]. SOF ¶¶ 20-25. Meta's [redacted]. SOF ¶ 21. Meta [redacted]." SOF ¶ 22. Meta [redacted]. *Id.* Meta also [redacted]. SOF ¶¶ 23, 35. [redacted]. SOF ¶ 35.

Meta has numerous other speech technologies that process Digital Voice Data, including [redacted]

[redacted]. SOF ¶ 24. In fact, [redacted] Ex. 9, MD_9817. Thus, Meta [redacted]." *Id.* at MD_9814-15. Meta [redacted] SOF ¶ 24. Meta [redacted]. SOF ¶¶ 24, 29; *see also* Ex. 10, MD_9806-07 [redacted]). Meta's [redacted]. *Id.* at MD_9809.

The Digital Voice Data Meta obtains from Facebook and Messenger users is [redacted]." SOF ¶ 26. And Meta [redacted]. SOF ¶ 28. [redacted]. *Id.*; Dkt. 157-12, Pl. MSJ Ex. 11, Meta Dep. (Seltzer) 123:5-124:7 ([redacted]"). [redacted]:

[redacted]. SOF ¶ 28.

**D. Meta's** [redacted]

Meta [redacted]" Ex. 10, MD_9804. But [redacted]. *See* Dkt. 157-12, Pl. MSJ Ex. 11, Meta Dep. (Seltzer) 38:19-24 ("[redacted]"). In 2019, [redacted]. SOF ¶ 27. Meta [redacted]. SOF ¶ 27.

**E. Meta's** [redacted]

Meta's [redacted]." SOF ¶ 30; Dkt. 157-12 at 164:5-7. [redacted]" *Id.* [redacted]." SOF ¶¶ 5, 18, 31. Because [redacted]. SOF ¶ 31.

[redacted]. SOF ¶¶ 1-3, 6-7, 15-19, 30-35. Meta's business model revolves around inference and predictive analysis. SOF ¶¶ 4-7. Meta [redacted]" SOF ¶ 32. Further [redacted]

[redacted]. SOF ¶¶ 32-37. "[redacted]." SOF ¶ 34. Meta's voiceprint Patent describes [redacted]. *Id.*

Meta [redacted]. SOF ¶ 35; *see also* Dkt. 146-15 at 14-15 ([redacted]); Ex. 9, MD_9813 ([redacted]"); *Id.* at MD_9822 ("[redacted]); Dkt. 157-26, Pl. MSJ Ex. 25, MD_8343 ([redacted]); Dkt. 157-27, Pl. MSJ Ex. 26, MD_8411-12 ([redacted]"); Ex. 9, MD_9824 ([redacted]"); Dkt. 157-25, Pl. MSJ Ex. 24, MD_8339 ([redacted]"); *id.*("[[redacted]").

Meta [redacted] SOF ¶ 7. And Meta [redacted]

[redacted]. *See, e.g.*, Ex. 15, MD_5141-42 ("[W]e collect information from and about the computers, phones, connected TVs and other web-connected devices you use that integrate with our Products, and we combine this information across different devices you use," including "to better personalize the content (including ads) or features you see . . . . We use location-related information-such as your current location, where you live, the places you like to go, and the business and people you're near-to provide, personalize and improve our Products."). This data Meta gathers includes, *inter alia*, "device attributes," "information about operations and behaviors performed on the device," "unique identifiers," "device signals," "data from device settings" including "access to your GPS location," and the user's "mobile phone number," "information about other devices that are nearby or on your network," "precise device location," "IP addresses," and "information from your and others' use of Meta Products." *Id. See also* Ex. 12, MD_5376, 5383 n.16 ("Device information we collect and receive includes: . . . Signals from your device. . . . Device signals include GPS, Bluetooth signals, nearby Wi-Fi access points, beacons and cell towers."). Thus, Meta [redacted] Ex. 20, Def. Resp. Pl. 3rd RFP p. 4 & No. 70; Ex. 21, Def. Am. Supp. Resp. Pl. 1st Int. No. 15; Green Decl. ¶ 9.

Accordingly, [redacted]." SOF ¶ 3. And Meta itself states that Digital Voice Data it collects "could reasonably be linked with you, directly or indirectly" and "may be used to identify you." SOF ¶ 2.

**F. Plaintiff's Claims**

Plaintiff contends that when users submit their voices via Facebook and Messenger voice features, Meta collects mathematically measured digital representations of their voice signal that preserve essential acoustic information, carry data unique to them, and which Meta is capable of using

to identify them. Dkt. 157, Pl. MSJ § IV. That makes them "voiceprints" under BIPA. The Court has already held "that there is a dispute of material fact regarding whether Meta has collected biometric data that is capable of identifying an individual using technology Meta possesses." Dkt. 174 at 11.

Meta categorically denies that Digital Voice Data is a voiceprint. None of its form agreements inform users that Digital Voice Data is a voiceprint or disclose the specific purpose and retention period for which it is collected, stored, and used. Indeed, Meta's retention policy is to keep such information "as long as we need it" including "to protect our . . . interests," and "[w]e decide how long we need information on a case-by-case basis." Dkt. 157-8 at 53 (June 15, 2023 Privacy Policy); Dkt. 35-3 at 66 & Exs. 12-14 at MD_5418, 5349, 5229, (same in prior Privacy Policies).[2] Nor does Meta seek or obtain BIPA-compliant written releases before collection. Plaintiff thus alleges that Meta: (1) failed to develop and comply with a written retention and destruction policy in accordance with BIPA section 15(a); and (2) collected, captured, and/or otherwise obtained voiceprints of the Class without providing the disclosures and obtaining the written consent required by BIPA section 15(b). Compl. ¶¶ 165-183.

## III. LEGAL STANDARD

Class certification involves a two-part analysis. First, the movant must show by a preponderance of the evidence that the proposed class satisfies Rule 23(a)'s requirements: numerosity, commonality, typicality and adequacy. Fed. R. Civ. P. 23(a). Second, movants must show questions of law or fact common among class members predominate over individual ones, and that a class action is superior to other methods of fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 & n.6 (9th Cir. 2022) (citing *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) (plaintiff "need not make [Rule 23] showing to a degree of absolute certainty")). Courts are "limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial," because "'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.'" *Id.* at 666, 667 (quoting *Amgen*, 568 U.S. at 466).

[2] Prior to Meta's 2023 Privacy Policy, Meta had a form "Data Policy" that, back to 2018, similarly stated Meta could retain data "[w]hen we have a good-faith belief it is necessary to . . . protect ourselves." Exs. 15-19 at MD_5146, 5190, 5180, 5172, 5163.

## IV. ARGUMENT

### A. The Proposed Class

Plaintiff seeks to certify the following class (the "Class"):

> All persons who during the Class Period and while Illinois residents: (a) posted to their Facebook account a video that contained their voice; and/or (b) sent from their Messenger account a non-encrypted video and/or audio message that contained their voice.[3]

The Class Period begins August 16, 2018, and continues until the date the Class is certified.

The class definition is appropriate because it is clearly defined, based on objective criteria, not overbroad, and membership is not tied to success on the merits of the case. *See, e.g.*, *In re Google Generative AI Copyright Litig.*, 2025 U.S. Dist. LEXIS 75740, *9 (N.D. Cal. Apr. 21, 2025) ("A proper class is defined by objective criteria. For example, in a false advertising case, the class might be defined as all persons who purchased a certain product during a certain time period.") (citing *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123-24 (9th Cir. 2017)); *C.H. v. Google LLC*, 2026 U.S. Dist. LEXIS 6790, *11 (N.D. Cal. Jan. 13, 2026) (noting class definition "aligns with the operative facts and claims, and makes it easy for all settlement class members to self-identify").

Moreover, the Ninth Circuit has "never interpreted Rule 23 to require" that plaintiffs "proffer a reliable way to identify members of the certified classes." *Briseno*, 844 F.3d at 1123. Nonetheless, Meta [redacted]. Ex. 21, Def. Supp. & Am. Supp. Resp. Int. No. 15; Green Decl. ¶ 8. Meta [redacted]. But Plaintiff's common evidence shows high percentages of Illinois users who posted videos or sent messages during the Class Period included their voice: [redacted]. *Supra* § II.B.

Certification is also not hindered if Meta contends its data is insufficient to identify every Class

[3] Excluded from the Class is Defendant, its parents, subsidiaries, affiliates, predecessors, successors, officers, directors, and the immediate family members of such persons, any trial judge who may preside over this action, court personnel and their family members, and any juror assigned to the action. The minor differences between the proposed class definition and the Complaint's definition narrow the definition and clarify for Class members the ways in which Meta obtained Digital Voice Data. *See* Def. Resp., Supp. Resp., & 2d Supp. Resp. to Pl. Int. No. 2; *Gold v. Lumber Liquidators, Inc.*, 2017 U.S. Dist. LEXIS 96724, *12-14 (N.D. Cal. June 22, 2017) (plaintiffs may seek certification of narrower class than in complaint without seeking leave to amend) (citing cases); Fed. R. Civ. P. 23(c)(1)(B), (C).

member for *notice* purposes. Given the high percentages of Illinois users whose posts or messages had their voice, and given [redacted],[4] Class members can be effectively notified and given the chance to opt out by sending notice directly to all Illinois Facebook and Messenger users known via Meta's data to [redacted]. A notice administrator can update outdated contact information, and publication notice can supplement direct notice to reach users with deficient contact information. This approach is reasonably calculated to reach Class members and consistent with Rule 23(c)(2)(B)'s requirement for "best notice that is practicable under the circumstances," which includes providing direct notice to class members "who can be identified through reasonable effort," and can include publication notice that may reach people outside the class. *See In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (publication notice reasonable "[b]ecause defendants do not have a list of potential class members"); *Saggio v. Medicredit, Inc.*, 351 F.R.D. 141, 149 (E.D. Mo. 2026) ("The class definition itself is not overbroad. The fact that [the] notice plan may initially reach some non-members is not fatal to certification."). Following a certification order, Plaintiff will promptly consult with Meta and seek Court approval for a notice plan in-line with that outlined above. *See also infra*, § IV.F.

**B. The Class is Sufficiently Numerous**

Rule 23(a)(1) requires a class "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). That standard is generally met when the proposed class contains at least 40 members. *Akaosugi v. Benihana Nat'l Corp.,* 282 F.R.D. 241, 253 (N.D. Cal. 2012). "Plaintiffs do not

[4] For example, [redacted]. Green Decl. ¶ 8. Plaintiff's expert [redacted]. Klein ¶¶ 38, 45.

need to state the exact number of potential class members," *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005), and "[i]n determining whether numerosity is satisfied, the Court may consider reasonable inferences drawn from the facts before it," *In re Yahoo Mail Litig.,* 308 F.R.D. 577, 589-90 (N.D. Cal. 2015). *See also Pardi v. Tricida, Inc.*, 2024 U.S. Dist. LEXIS 175947, *12 (N.D. Cal. Sep. 27, 2024) (numerosity satisfied where "the exact size of the proposed class is unknown, but general knowledge and common sense indicate it is large") (citation omitted). Here, using the data Meta produced [redacted], and Plaintiff's survey results showing high percentages who included their own voice in such content, Plaintiff reasonably and conservatively estimates the Class contains [redacted] people. Klein ¶¶ 10, 32-43. The reasonable inference is that the Class is so numerous that joinder is impracticable.

### C. Common Questions of Law and Fact Predominate Over Individual Issues

Rule 23(a)(2) requires "questions of law or fact common to the class"; Rule 23(b)(3) requires them to "predominate" over individual ones. Fed. R. Civ. P. 23(a)(2), (b)(3). "[T]he line separating the commonality inquiry under Rule 23(a)(2) and the predominance assessment under Rule 23(b)(3) can be elusive," but "[a]s a practical matter, commonality and predominance can be assessed in tandem, with a careful eye toward ensuring that the specific requirements of each are fully satisfied." *In re Facebook*, 326 F.R.D. at 544 (citing *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120-21 (9th Cir. 2017)).

#### 1. Questions of Law and Fact are Common to the Class

Commonality requires that a class's claims "depend upon a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. The questions common to the class should generate answers common to the class. *Id.* A common question relates to a central issue when "essential elements of the cause of action . . . are capable of being established through a common body of evidence, applicable to the whole class." *Olean*, 31 F.4th at 666.

"Plaintiffs need not show, however, that every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (citations and internal quotation marks omitted). Moreover, Plaintiff "need

only show that there is a common contention capable of classwide resolution—not that there is a common contention that 'will be answered, on the merits, in favor of the class.'" *Alcantar v. Hobart Service*, 800 F.3d 1047, 1053 (9th Cir. 2015) (quoting *Amgen*, 568 U.S. at 459).

"Courts have routinely found commonality in BIPA class actions." *Gaertner*, 351 F.R.D. at 215 (citing cases); *see also Svoboda v. Amazon.com, Inc.*, 2024 U.S. Dist. LEXIS 58867, *23-24 (N.D. Ill. Mar. 30, 2024), *aff'd* 168 F.4th 956 (7th Cir. 2025) (citing *In re Facebook*, 326 F.R.D. at 545, *aff'd sub nom.* 932 F.3d 1264 (9th Cir. 2019); *Rogers v. BNSF Ry. Co.*, 2022 U.S. Dist. LEXIS 50847, *8 (N.D. Ill. Mar. 22, 2022) ("[T]he questions of law and fact underlying the class members' BIPA claims are essentially identical and will be premised on common proof."); *Bayeg v. Admiral at the Lake*, No. 19 CH 8828 (Cir. Ct. Cook Cnty., May 25, 2023); *Morris v. Wow Bao, LLC,* No. 17-L-12029 (Cir. Ct. Cook Cnty., Dec. 14, 2021)). Here too commonality is satisfied.

The elements of Plaintiff's BIPA claims are straightforward and involve common questions of law and fact capable of producing single answers for all Class members. Under BIPA section 15(b), a private entity that "collect[s], capture[s], purchase[s], receive[s] through trade, or otherwise obtain[s] a person's or a customer's biometric identifier" must first inform that person that the data is being collected and stored, provide the specific purpose and length of term for which the biometric identifier is collected, stored, and used, and receive a "written release" from the subject of the information. 740 ILCS 14/15(b). Section 15(a) requires a private entity "in possession of biometric identifiers" to develop and comply with a publicly available retention schedule and guidelines for permanently destroying biometric identifiers by the earlier of when the initial purpose of obtaining them is satisfied or within 3 years of the individual's last interaction with the private entity. *Id.* § 14/15(a); *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1150 (7th Cir. 2020).

Each element of Plaintiff's and the Class's BIPA claims presents common questions that depend upon the same contention and alleged course of conduct: Meta's obtaining biometric identifiers of voiceprints through Facebook videos and Messenger audio and video messages without first making disclosures, obtaining signed written consent, and developing and complying with a BIPA-compliant written retention and destruction policy. The underlying questions are central to the Class's claims and rest upon a "common core of factual or legal issues," *Parsons*, 754 F.3d at 675, including: (A) whether

Meta *possessed*, *captured*, *collected*, and/or *otherwise obtained* the Digital Voice Data per BIPA sections 15(a) and (b); (B) whether Digital Voice Data is a "biometric identifier" under BIPA; (C) if so, whether Meta disclosed the information specified in BIPA sections 15(b)(1) and (b)(2); (D) whether Meta obtained written releases per BIPA section 15(b)(3); (E) whether Meta developed and complied with a publicly available retention and destruction policy related to Digital Voice Data per BIPA section 15(a); and (F) if Meta violated 15(a) or (b), whether Meta acted negligently, intentionally, or recklessly.

"These 'statutory requirements' quite obviously 'present common questions.'" *Doe*, 2026 U.S. Dist. LEXIS 125406 at *11 (quoting *Svoboda,* 168 F.4th at 963), and are all capable of classwide resolution using common evidence focused on Meta's conduct, technology, abilities, and disclosures.

First, whether Meta *possessed* and/or *otherwise obtained* the data is non-controversial, evidenced by Meta's common method of processing and storing Digital Voice Data. *Supra* § II.B.

Second, as this Court has explained, to determine whether the Digital Voice Data obtained by Meta is a biometric identifier, "the salient question is not whether Meta *in fact* used" voice data to identify people; "'BIPA applies if it *could*.'" Dkt. 174 at 7 (quoting *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1125 (9th Cir. 2024). As exemplified in *Zellmer*, and as shown at the summary judgment phase in this case, the common facts to make this "could use" showing focus on Meta's conduct and capabilities including: how Digital Voice Data is received, [redacted] (*supra* § II.A, B); how Digital Voice Data is stored in Meta's [redacted] (*supra* § II.B, E); Meta's [redacted] (*supra* § II.C); how Meta has numerous other technological capabilities [redacted], including by [redacted] (*supra* § II.C); how a Facebook ID [redacted]

[redacted] (*supra* § II.B, E); and how Digital Voice Data from Facebook and Messenger users [redacted] (*supra* § II.A-D). Classwide proof for this common question also includes expert testimony about Meta's capabilities:

> In concluding that the digital voice data Meta collects from Facebook and Messenger is data unique to an individual that could be used to identify someone, Dr. Singh points to Meta's in-house capabilities, prior research projects, and success rates of its speaker identification features. She opines that Meta "has gone beyond theoretical capability to actual implementation." . . . Plaintiff has come forward with admissible evidence that Meta has its own proprietary technologies and a wealth of internal systems in place to process a voice recording and link it to a user account and to all of the personally identifiable data (e.g., name, date of birth, address, IP address, etc.) that Meta associated with that account.

Dkt. 174 at 10, 11 (quoting Singh at 7, 8).

Relatedly, Meta categorically contends that all Digital Voice Data received via Facebook and Messenger constitutes "mere voice recordings" and that "BIPA does not apply to mere voice recordings." Dkt. 146, Meta MSJ at 9-17. Meta's defense that Digital Voice Data *cannot* be a voiceprint applies uniformly to the class as a whole and further highlights that commonality is satisfied. So too for Meta's related contention that to have obtained a voiceprint it had to "create an entirely new type of data" and did not. Dkt. 173 at 3; *see also In re Facebook*, 326 F.R.D. at 545 (common questions included whether Facebook obtained "biometric identifiers as contemplated under BIPA").

Third, Meta's form disclosures, documents, and publicly stated retention policy—including that it can keep Digital Voice Data "as long as we need it"—are uniform for all Class members, as is whether Meta's uniform statements and Meta's conduct comply with BIPA sections 15(a), (b)(1), and (b)(2). Likewise, Meta's contention that Digital Voice Data is not a biometric identifier is further common evidence that Meta has not made or obtained the required BIPA disclosures and "informed written consent." 740 ILCS 14/10, 15(b)(3); *see also* Ex. 22, Def. Resp. to Pl. Req. for Prod. Nos. 55, 56 ([redacted]). Where a defendant makes standard disclosures, the determination of whether those disclosures comply with the law is resolved for all

Class members in one stroke. That makes the question of whether Meta complied with the requirements of sections 15(a) and (b) ideal for class treatment. *See, e.g.*, *Doe*, 2026 U.S. Dist. LEXIS 125406 at *13 ("[W]hether Apple gave adequate notice and obtained informed, written consent as required by BIPA is a question that can be resolved on a classwide basis."); *In re Facebook*, 326 F.R.D. at 545 (same).

Finally, there are common issues regarding damages subject to common proof. BIPA provides statutory damages: $1,000 "for each violation" that is negligent and $5,000 "for each violation" when the private entity "intentionally or recklessly violates a provision of this Act." 740 ILCS 14/20(1)-(2). Thus, the common question for damages is whether Meta's BIPA violations were negligent, intentional, or reckless, and the answer focuses on common evidence concerning *Meta*'s conduct and state of mind.

Accordingly, the Class members "plainly share common factual questions" about Meta's capabilities, disclosures made, and written consents obtained, and, as in most BIPA cases, "[a]nswering these questions will resolve issues that are central to the validity of each one of the claims in one stroke." *Svoboda*, 2024 U.S. Dist. LEXIS 58867 at *23-24.

**2. The Common Issues Predominate**

"The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Olean*, 31 F.4th at 664 (citation and internal quotation marks omitted). The inquiry "begins, of course, with the elements of the underlying cause of action." *Id.* at 665 (citations and internal quotation marks omitted). But "[e]ach element of a claim need not be susceptible to classwide proof." *In re Facebook*, 326 F.R.D. at 544 (citing *Amgen*, 568 U.S. at 468-69). Rather, "the 'important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class.'" *Id.* (quoting *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016)).

Moreover, "a district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue." *Olean*, 31 F.4th at 667. "Nor can a district court decline to certify a class that will require determination of some individualized questions at trial, so long as such questions do not predominate over the common questions." *Id.* at 668. "'When one or more of the

central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) (that defendants at trial might rebut a presumption of reliance as to some plaintiffs did not raise individual questions sufficient to defeat predominance)).

Here, as set forth above, the elements of the Class members' claims are identical under BIPA and resolution of each is based on the same common proof focused on Meta's conduct, technologies, capabilities, and form disclosures, and heavily reliant on expert testimony. That common evidence provides the method by which Plaintiff will prove the central liability questions for the entire Class in one stroke. Indeed, in seeking summary judgment and an appeal, Meta recognized that the key issue of "whether the data Meta actually collected constitutes a 'voiceprint'" was "a core, dispositive" and "threshold legal issue . . . that could resolve the litigation," Dkt. 94 at 3, 7, and a "controlling question" that will "materially affect the outcome of [the] litigation," Dkt. 173 at 3, 5. In other words, whether Digital Voice Data constitutes "mere voice recordings" or BIPA-regulated "voiceprints" is a central question, the answer to which will be decided for the Class in one stroke. So too for the issue of whether Meta's form disclosures satisfied BIPA's notice and consent requirement. Courts in BIPA cases often find these are predominating common issues. *See, e.g.*, *Howe*, 2024 U.S. Dist. LEXIS 176263 at *53 ("Every element . . . will be the same across the class: (1) whether [defendant] collected their biometric data; and (2) if it did, whether [it] complied with the notice, policy, and consent requirements under BIPA Sections 15(a), (b) and (d). Predominance is satisfied."); *Svoboda*, 168 F.4th at 962-64 (predominating common issue was whether data obtained was BIPA biometric identifier); *Tapia-Rendon v. United Tape & Finishing Co.*, 2023 U.S. Dist. LEXIS 142773, *22 (N.D. Ill. Aug. 15, 2023) ("[T]he common issue of demonstrating [defendant] collected and stored biometric information in violation of the BIPA will predominate over any potential individualized issues.").

Further, "plaintiffs must show that 'damages are capable of measurement on a classwide basis,' in the sense that the whole class suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory." *Just Film*, 847 F.3d at 1120 (quoting *Comcast Corp. v.*

*Behrend*, 569 U.S. 27, 34 (2013)). "However, 'damage calculations alone cannot defeat certification.'" *Id.* (quoting *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)). Thus, "Plaintiffs need to be able to allege that their damages arise from a course of conduct that impacted the class. But they need not show that each members' damages from that conduct are identical." *Id.* Here, the Class's damages arise from a course of conduct that impacted the Class, and they are measurable in a uniform way via BIPA's statutory damage provision. *See Gaertner*, 351 F.R.D. at 223 ("*Comcast* requires that damages be tied to a theory of liability, not that damages be calculable on a perfectly uniform, class-wide basis at the certification stage. . . . Here, BIPA expressly provides for *statutory* damages tied to the alleged violations.") (citing *Comcast*, 569 U.S. at 34).

BIPA's statutory damages are warranted for "each violation," and violations of sections 15(a) and 15(b) constitute separate violations. *See Rosenbach v. Six Flags Entm't Corp.*, 129 N.E.3d 1197, 1206 (Ill. 2019) (a violation occurs "when a private entity fails to comply with one of section 15's requirements"). Furthermore, an individual need not show actual damages "beyond violation of his or her rights under the statute" to recover liquidated statutory damages. *Rosenbach*, 129 N.E.3d at 1200, 1206; *see also Patel*, 932 F.3d at 1277 n.8. Nor does it matter how many voiceprints Meta obtained from each Class member.[5] BIPA's 2024 amendment provides that a person may obtain only one recovery of statutory damages under section 15(b) when an entity uses the same method to obtain the same biometric identifier from the same person, and the Seventh Circuit has applied the amendment retroactively. *Clay v. Union Pac. R.R. Co.*, 171 F.4th 975, 979 (7th Cir. 2026). Thus, the damage calculation Plaintiff seeks here involves determining whether Meta's conduct constituted zero, one, or two violations of BIPA; it does not differ per Class member if Meta obtained one voiceprint from one person and one hundred voiceprints from another. And once Plaintiff establishes Meta's violation of section 15(a) and/or (b) with common proof, no additional evidence of individualized damage is needed to award each Class member liquidated statutory damages; the calculation will be formulaic: for each Class member, the number of BIPA violations determined (1 or 2) will be multiplied by either $1,000 (negligent violation) or $5,000 (intentional/reckless violation). *See also Doe*, 2026 U.S. Dist. LEXIS

[5] Indeed, Meta can segment a single upload of Digital Voice Data into multiple ones, each capable of being used in its speaker ID models (*supra* § II.C); so even "one" upload of Digital Voice Data is an imprecise misnomer, as a single clip could itself constitute many separate voiceprints.

125406 at *33-34 ("[T]he amount of damages available [under BIPA] depends on the defendant's state of mind. . . . '[T]he damages calculation will be formulaic, and no individual issues need be considered.'") (quoting *Zaluda v. Apple Inc.*, 2019 CH 11771 (Ill. Cir. Ct. Cook Cty. Jan. 29, 2026)).

Accordingly, numerous central questions relating to liability and damages can be adjudicated on a classwide basis with common proof, including expert testimony and evidence of Meta's conduct, capabilities, technologies, form disclosures, and state of mind. These issues predominate because answering each common question is "apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350; *see also Gaertner*, 351 F.R.D. at 221 ("[C]ourts have found predominance where these same essential common questions were present in BIPA class actions.") (citing cases).

Meta's arguments against liability further emphasize the predominating common issues. As set forth above, Meta argued at summary judgment that Digital Voice Data are "mere voice recordings" that are *categorically* not "biometric identifiers" and incapable of being used to identify. Such merits arguments highlight common issues central to the case that will be resolved for the Class in one stroke.

Meta also suggested at summary judgment that it does not associate voices with speakers, but that too does not hinder certification. In *Doe*, Apple collected facial-feature data that could be used to match to similar faces, but argued it did "not associate a name with the face" and that determining if the face data was capable of identifying anyone could not be answered without examining each photo or "whether each person labeled their [data] with personal identifying information ('PII')." 2026 U.S. Dist. LEXIS 125406 at *11-12. The court disagreed: it was "undisputed that Apple knows the identities of its device users, including their names and email addresses, which are associated with their Apple IDs. Thus, whether Apple can identify users from their faceprints, alone or in combination with users' personal information, is an issue that can be resolved on a classwide basis." *Id.* at *12.

The same is true here. Meta collects data of vocal features that could be used to match to similar voices, users, and identities. *Supra* § II.A-D, E. It says it does not associate a name with the voice. But, as in *Doe*, it is undisputed Meta knows the identities of its device users, including "all of the personally identifiable data (e.g., name, date of birth, address, IP address, etc.) that Meta associated with" their Facebook IDs. Dkt. 174 at 11. Indeed, Meta [redacted]

[redacted] *Supra* § II.B, D-E. Thus, as in *Doe*, whether Meta can identify users from Digital Voice Data, alone or in combination with users' personal information, is an issue that can be resolved on a classwide basis. *See also Doe*, 2026 U.S. Dist. LEXIS 125406 at *28 ("[I]f Apple is correct that it does not collect or possess scans of face geometry, meaning there is no BIPA violation, then such a finding would apply to the entire class. Likewise, if Plaintiffs present evidence proving that Apple collects biometric data that is capable of identifying an individual, regardless of whether the person used PII, then that also affects the entire class. In asking this Court to find that individual questions regarding putative class members' use of PII predominate over questions that are common to the class, Apple is essentially asking the Court to rule on the merits of Plaintiffs' BIPA claim. The Court will not do so.").

Plaintiff also expects that Meta will try to suggest there are individual issues regarding the nature of Digital Voice Data based on arguments like varying sound quality of audio clips, multiple voices contained in audio clips, no voices contained in audio clips, or its contention that it cannot determine if media contains a voice. Such arguments should not derail certification; otherwise no BIPA cases would be certified because scans of face geometry, irises, hands, and the like *could* always be of poor quality. But more importantly, here, common evidence will show these purported quality issues do not hinder Meta's ability to identify speakers from Digital Voice Data it obtains. [redacted]." Singh at 17. Further, Meta [redacted]. For instance, [redacted]. *Supra* § II.C, E.

Indeed, Dr. Singh [redacted]

[redacted]. *See, e.g.*, Singh Reb. at 34-35 ([redacted]"); *id.* at 35 ([redacted]); Singh at 42-46, 81-82 ([redacted]").

And Meta's [redacted]. Singh Reb. at 34. Thus, Dr. Singh [redacted]." *Id.* at 35. Accordingly, whether any purported "quality" factors even affect Meta's capabilities to identify from Digital Voice Data is itself subject to common proof and a common answer for all Class members.

Moreover, Meta admits that Digital Voice Data is always the "standard input" for its speaker ID models, which "analyze[] a recording . . . and use[] it" to "determine[] that the voice in the new file likely also belongs to [a person]." Dkt. 146, Def. MSJ at 2, 4; *supra* § II.A. Thus, Meta's claims about sound quality actually strike at how *accurate* Meta's systems are, not whether Meta is capable of using Digital Voice Data to identify. As the Court explained: "Dr. Singh explains that speaker identification models work on probability: just because they do not accurately identify the individual 100% of the time doesn't mean they aren't capable of identifying." Dkt. 174 at 9. [redacted]. *See id.*; Singh at 5-7, 44-46, 71-72; *Tapia-*

*Rendon v. Workeasy Software, LLC*, 2025 U.S. Dist. LEXIS 153241, *20 (N.D. Ill. Aug. 8, 2025) (BIPA applied even if system "in some instances mistakenly identified an individual").[6]

Similarly, none of Meta's affirmative defenses defeat predominance. Like many defendants in BIPA cases, Meta asserts an extraterritoriality defense. In *Patel v. Facebook, Inc.*, the Ninth Circuit found it "reasonable to infer that the General Assembly contemplated BIPA's application to individuals who are located in Illinois, even if some relevant activities occur outside the state. These threshold questions of BIPA's applicability can be decided on a class-wide basis." 932 F.3d at 1276. So too here.

In *Svoboda*, Amazon argued that the user's location was an individualized issue that should defeat certification. The Seventh Circuit, however, without accepting that the user's location was relevant to liability, disagreed. The court acknowledged that, based on Amazon's data, "common proof of location including billing address and geolocation information will be available for some claimants." 168 F.4th at 963. Likewise, here, Meta collects and maintains [redacted]. *Supra* § II.B, E. Thus, to the extent relevant, common proof regarding location is available for Meta's users, and Meta "can turn to common proof within its own data to determine where the relevant activities occurred." *Doe*, 2026 U.S. Dist. LEXIS 125406 at *31; *see also id.* at *32 ("Apple's slew of questions about each putative class member's location when they used Apple's technology is a sleight of hand meant to distract from the common questions that connect all plaintiffs: whether Apple collected or possessed Illinois citizens' biometric identifiers and information through the People album feature of the Photos app without first complying with BIPA.").

Finally, Meta's remaining common law defenses such as waiver, comparative fault, and failure

[6] If a factfinder determines from the common evidence that Meta can identify users from Digital Voice Data [redacted], the Court could subsequently modify the Class definition to conform to that finding. *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation."); *Roy v. Cnty. of L.A.*, 2018 U.S. Dist. LEXIS 122410, *15 (C.D. Cal. July 11, 2018) (it is "appropriate to modify the class definition to conform to the liability determination"). A "user's voice only" finding, for instance, would still involve over [redacted] users. *See* Klein App'x I.

to mitigate do not impede certification. First, BIPA imposes strict liability, making common law defenses unavailable. *Tapia-Rendon*, 2025 U.S. Dist. LEXIS 153241 at *40 ("There is a significant amount of caselaw that establishes BIPA is a strict liability statute. . . . The Court agrees . . . [and] concludes that plaintiffs are entitled to summary judgment on [defendant's] remaining common-law affirmative defenses.") (citing cases). Even if Meta contests that threshold conclusion, whether these defenses are available at all is itself a common predominating issue applicable to the entire class.

Second, even assuming these defenses can apply, any individualized issues do not predominate. "[D]efenses of waiver and consent are inconsistent with BIPA's informed, written consent requirements, and it is unclear how a class member can mitigate statutory liquidated damages. This is particularly true now that each collection of the same biometric data from the same person, using the same method of collection, constitutes only a single violation of [15(b)]." *Doe*, 2026 U.S. Dist. LEXIS 125406 at *33. Thus, "whether [defendant] gave adequate notice and obtained informed, written consent as required by BIPA is a question that can be resolved on a classwide basis. A class member cannot consent to or waive any objection to the collection of his or her [biometric identifier] without first being presented with notice that [defendant] is obtaining such data." *Id.* at *13-14. Accordingly, "[c]onsent presents a common question" where form disclosures are involved, *Svoboda,* 168 F.4th at 965, and "courts should not recognize a way to waive a statutory right that is *broader* than that provided by the express terms of the statute," *Howe*, 2024 U.S. Dist. LEXIS 176263 at *38. "Even if there are individual questions about waiver or failure to mitigate, these defenses 'do not defeat class certification, particularly where other common questions predominate.'" *Doe*, 2026 U.S. Dist. LEXIS 125406 at *20-21 (quoting *Svoboda,* 168 F.4th at 966 (citing *Tyson Foods*, 577 U.S. at 453-54)).

Accordingly, common issues predominate over any individual issues.[7]

**D. Plaintiff is Typical of the Class**

Typicality requires that the claims of the representative party be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). "Typicality focuses on the class representative's claim—but not the

[7] Alternatively, certification pursuant to Fed. R. Civ. P. 23(c)(4) is also warranted where, as here, the action may be maintained "with respect to particular issues," namely, those dispositive issues affecting all Class members described above. *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 175-76 (N.D. Cal. 2015) (where predominance not met, district court may still "isolate the common issues" per Rule 23(c)(4) "and proceed with class treatment of these particular issues") (citation omitted).

specific facts from which the claim arose—and ensures that the interest of the class representative aligns with the interests of the class." *Just Film*, 847 F.3d at 1116 (citation and internal quotation marks omitted). "The requirement is permissive, such that representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Id.* (citations and internal quotation marks omitted). "Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (citations and internal quotation marks omitted). "[T]ypicality is frequently established in BIPA class actions." *Gaertner*, 351 F.R.D. at 216 (citing cases).

Delgado is typical of the Class. She is a Class member because during the Class Period and while an Illinois resident she: (a) posted to her Facebook account a video that contained her voice; and/or (b) sent from her Messenger account a non-encrypted video and/or audio message that contained her voice. That Meta may have obtained more or fewer voiceprints from Delgado than from other Class members does not create atypicality. As described above, "one" upload of Digital Voice Data is a misnomer because Meta can divide a voice clip into multiple segments, [redacted]. And under the section 15(b) amendment, Plaintiff and the Class are entitled to the same statutory damages regardless of how many voiceprints Meta obtained from any of them. Meta presented Delgado and Class members with the same form agreements, processed and stored their data in the same way, and subjected them to its uniform view that "[redacted]." Ex. 22. Meta's conduct was not unique to Delgado, and from Meta's common conduct she and all Class members, experienced an invasion of the privacy rights BIPA was designed to protect. Delgado thus suffered the same injury arising from the same course of conduct as other Class members, making her typical of the Class. *See In re Facebook*, 326 F.R.D. at 543 ("no serious doubt that typicality is satisfied" by Illinois Facebook users from whom Meta collected biometric data).

Further, courts routinely reject arguments that typicality is defeated by purported individualized defenses such as whether plaintiffs did or did not label data or are subject to common law defenses such as waiver, consent, and failure to mitigate. *See, e.g.*, *Doe*, 2026 U.S. Dist. LEXIS 125406 at *16.

The same result follows here as to such defenses for the same reasons discussed above. *Supra* § IV.C.2.

During discovery, Meta has tried to manufacture a credibility issue out of Delgado's use of the Messenger audio feature in August 2023—insinuating she used it to generate data for Dr. Singh. But Plaintiff's counsel had no interactions with Dr. Singh before February 2025, *see* Dkt. 154-1, ¶ 11, so any suggestion Plaintiff wanted to enable her analysis necessarily fails. Nor did Dr. Singh utilize Plaintiff's voice messages until her January 2026 *rebuttal* report, to respond to assertions by Meta's expert. And the record shows Plaintiff sent other audio messages, and posted Facebook videos, with her voice in years prior to 2023. *Supra* § II.B. In any event, liability turns on Meta's disclosures and obtaining of written consent, not on Plaintiff's knowledge, number of uses, or failure to stop using voice features. *See supra* § IV.C.2; *Doe*, 2026 U.S. Dist. LEXIS 125406 at *16-18 (plaintiffs who continued using photo app after BIPA lawsuit was filed were not atypical or subject to unique defenses).

As to Dr. Singh's rebuttal analysis, a cosine-similarity clustering of the dominant voice in non-preprocessed data combined with a probabilistic association is *one* simple method Meta could utilize to identify, as shown by both Dr. Singh's and Dr. Traynor's experiments. SOF ¶¶ 36-37. That method applies regardless of the "number" of audio clips (which can always be segmented into smaller ones). But, as discussed above, common evidence shows Meta can easily [redacted], and further, that the predominance of a user's voice in audio is not the only method Meta can use to identify. *See, e.g.*, Dkt. 157-19, Patent at 3:15-21 (a "candidate user and the probability may be identified by" using location and other data about user and users connected to candidate); *id.* at 25:63-66 (system narrows candidates via "threshold degree of separation of a known user"); *id.* at 26:20-32 (narrowing with behavioral data); *id.* at 24:63-66 (if Carl and unknown speaker say "how is Jill doing?", system assigns probability score by looking to Carl's friends who also have friend named Jill). [redacted]." Singh Reb. at 30. *See also* SOF ¶¶ 3, 7, 17, 32-36 & p. 24 (example of contextual signals, such as "I sent you a voice message," in same thread as audio message, a signal Meta's infrastructure is built to capture, to assign

high probability score for candidate). Meta's [redacted]. *See, e.g.*, Dkt. 157-25 at MD_8339 ([redacted]"). And similar methods can be applied to similar voices clustered together into the future. Dkt. 157-19, Patent at 23:56-62 (example where "Julian" opens app that "captures audio input that consistently matches," and "system may assign a relatively high (e.g., 85%, 90%, 95%, or the like) probability" that voice in audio "corresponds to Julian"); Dkt. 146-15 at 14-15 ([redacted]).

Thus, attacks on Plaintiff's credibility by speculative implication are simply a distraction. *See DZ Reserve. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1239 (9th Cir. 2024) ("Even if [plaintiff] faced credibility questions, those issues would not destroy typicality" because "[c]redibility issues only destroy typicality in unique situation[s] where it is predictable that a major focus of the litigation will be on a defense unique to the named plaintiff.") (citation omitted); *Romo v. GMRI, Inc.*, 2013 U.S. Dist. LEXIS 56898, *6 (C.D. Cal. Feb. 16, 2013) ("Credibility is not a requirement of a class representative."); *Ruffin v. Entm't of the E. Panhandle*, 2012 U.S. Dist. LEXIS 161420, *24 (N.D.W. Va. Nov. 9, 2012) ("[A]llegations regarding the Plaintiff's lack of personal credibility [are] of limited relevance to the Court's determination . . . . Rather, the question in this matter is whether the Defendants' admitted policies and practices are lawful under the circumstances.") (citations omitted).

**E. Plaintiff and Counsel Will Continue to Adequately Represent the Class**

The adequacy requirement is satisfied where "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4), (g). Adequacy involves a two-part inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "[C]ourts have reviewed numerous factors, including the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Corcoran v. CVS Health*, 2019 U.S. Dist. LEXIS 204509, *21 (N.D. Cal. Nov. 22, 2019) (citations and internal quotation marks omitted). The requirements are satisfied here.

First, Delgado is an adequate representative. She has no conflicts with the Class. Her and the Class's claims are predicated on an identical course of conduct and Meta's capabilities to use collected Digital Voice Data to identify. The same type of biometric identifiers (voiceprints) were collected from Delgado and the Class. And she seeks the same statutory damages as the Class. Her interests are thus aligned with absent Class members. Delgado has also demonstrated her commitment to vigorously prosecuting the action. She has been willing to prosecute this action since it was filed, and is appropriately relying upon the guidance of counsel and experts. Plaintiff has been fully engaged in the prosecution of the case, including by meeting and working with counsel on numerous occasions, generally understanding the claims and her duties as a class representative, answering discovery, and being deposed. Green Decl. ¶ 4; Ex. 23, Delgado Dep. 40:15-41:24, 74:11-20 (Plaintiff describing her "layman's understanding" of a voiceprint as "where voice data is taken . . . that could identify me," belief that Meta obtained voiceprints from Illinois Facebook and Messenger users, understanding of how, and understanding of common issue that "Meta broke the law regarding consent and disclosure"); *id*. at 30:14-15 ("The purpose [of filing the lawsuit] is to ensure that the class is protected under the law."); *id.* at 67:15-23 ("I'm representing a group of people and I'm providing my time, representation, my availability, being active in the case and performing any functions within the lawsuit that I'm required for on their behalf."); *id.* at 75:5-15 (Plaintiff explaining she could take off work to attend trial in California, even for weeks if needed); *see also In re Facebook*, 326 F.R.D. at 543 ("[Objections to adequacy based on a named representative's alleged ignorance are disfavored. Even if the named plaintiffs have relied heavily on the advice of attorneys and others, it is hardly a badge of inadequacy to seek help from those with relevant expertise, particularly in a complex case like this one.") (citations omitted); *Torliatt v. Ocwen Loan Servicing*, 570 F. Supp. 3d 781, 796 (N.D. Cal. 2021) (not necessary that representatives know every fact and legal issue); *Doe*, 2026 U.S. Dist. LEXIS 125406 at *22 ("'[I]t is important not to overstate the burden placed on the class representative.'. . . [F]rom a practical and functional standpoint, 'it is counsel for the class representative and not the named parties[] who direct and manage these actions. Every experienced federal judge knows that any statements to the contrary [are] sheer sophistry.'") (quoting *Culver v. City of Milwaukee,* 277 F.3d 908, 913 (7th Cir. 2002)).

Second, proposed Class Counsel are adequate, with resources and extensive experience

representing plaintiffs in class action and complex litigation, including in other BIPA litigation. *See* Green Decl. ¶¶ 1-7; Arias Decl. ¶¶ 1-6. Counsel have relied on this experience to advance the Class's interests for the last three years, leading the litigation in an effective and efficient manner through pleadings, motion practice, significant discovery, including extensive expert discovery, and Meta's summary judgment motion. To date, counsel have prosecuted the litigation with minimal unnecessary conflict between the parties, while effectively pursuing the rights of Plaintiff and the Class.

Additionally, in 2023, Meta attempted to settle a different BIPA case, *Parris v. Meta Platforms Inc.*, which involved face-geometry of Instagram users. The settlement sought to release all BIPA claims against Meta, potentially sweeping in the Class's unrelated claims here. Plaintiff's counsel, representing Delgado and a separate objector seeking to reduce the scope of the release, filed briefs and argued at the final approval hearing over all parties' opposition. The court denied final approval, finding the release too broad, and the parties thereafter narrowed the scope of the release, undoing any impact on the Class here. Green Decl. ¶ 7. As Meta explained: "The Court expressed its concern that the original release covered other Meta products and platforms used by the Settlement Class, and so the Court advised the parties to consider narrowing the release 'to Instagram and Instagram alone'. . . . The parties have now done just that. . . . [T]he Revised Settlement Agreement represents a material improvement for Settlement Class Members on the original Settlement Agreement." Ex. 2, Meta Supp. Final App. Br. at 1. Plaintiff and her counsel are thus adequate under Rule 23(a)(4) and (g).[8]

**F. A Class Action is the Superior Method for Resolving the Controversy**

Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy," considering: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation

[8] If the Court concludes that a representative-specific issue concerning typicality or adequacy precludes certification, Plaintiff respectfully requests that any denial be without prejudice to renewal after Plaintiff has had an opportunity to cure that issue, including, if necessary, by seeking leave to add or substitute an additional class representative. *See, e.g.*, *Sharpe v. GT'S Living Foods, LLC*, 2024 U.S. Dist. LEXIS 242424, *3-4 (C.D. Cal. Dec. 17, 2024) (noting certification denied without prejudice due to "procedural issues" and "concern regarding the named plaintiffs" and allowing leave to amend after certification order) (citing *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 895 F.3d 597, 610 (9th Cir. 2018) (district courts have "a fiduciary duty to look after the interests of absent class members[.]"); *Woods v. Google LLC*, 2018 U.S. Dist. LEXIS 143879, *24-33 (N.D. Cal. 2018) (permitting amended complaint to add additional plaintiff after denial of certification motion).

concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). As for the first three, here: (A) a class action is the most efficient means for Class members to adjudicate their claims, particularly given the need for extensive, costly expert proof and Class members' uniform statutory damages; (B) Plaintiff's counsel are not aware of other related litigation; and (C) concentrating litigation in this forum makes sense given that Meta is located here, years of litigation and discovery have occurred here, and Meta writes in its Terms of Service that this is where claims against it are to be litigated. *See, e.g.*, Dkt. 35-5 at 10-11; *see also* Green Decl. ¶ 6; Arias Decl. ¶ 6; *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir. 2004) ("The more claimants there are, the more likely a class action is to yield substantial economies in litigation."); *Svoboda*, 168 F.4th at 967 (users may be unwilling or unable to undertake costly litigation where plaintiffs incurred over $100,000 on expert discovery on common issues and there was no related BIPA litigation); *Ross v. US Bank Nat'l Ass'n*, 2009 U.S. Dist. LEXIS 116875, *32 (N.D. Cal. Nov. 25, 2009) ("potential loss of access to the courts also supports" superiority).

Finally, the class action is manageable. "[T]he superiority analysis—which includes assessing possible class-management issues—involves *balancing* manageability issues with the benefits to be gained from resolving claims on a class-wide basis." *Tapia-Rendon,* 2023 U.S. Dist. LEXIS 142773 at *18 (finding a BIPA class action superior). This class action has been managed effectively for the past several years through discovery, expert discovery, and Meta's summary judgment motion, and discovery is nearly completed. As described above, Class members can be easily notified and provided an opportunity to opt-out following certification given Meta's user data. Moreover, "[g]iven that key common questions related to [defendant's] liability predominate and will streamline this litigation, superiority is less likely to present a barrier to class certification." *Svoboda*, 168 F.4th at 966. Further, that claims procedures might be needed down the road does not hinder certification, and there are "tools available to courts during the claims administration process, including 'claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court to take into account the size of the claims, the cost of the techniques, and an empirical assessment of the likelihood of fraud or inaccuracy.'" *Doe*, 2026

U.S. Dist. LEXIS 125406 at *35 (quoting *Mullins*, 795 F.3d at 667). This Court has found such tools and procedures sufficient to administer BIPA claims involving Meta. *See In re Facebook Biometric Info. Privacy Litig.*, 522 F. Supp. 3d 617, 629 (N.D. Cal. 2021) (approving class action settlement with self-identifying claim forms and claims process where Meta "acknowledged that it 'does not possess data that would allow it to precisely determine the number of people actually in the class'").

A class action thus provides gains in efficiency. And the practical effect of denying certification could be individual actions where millions of people are involved—and even a small fraction of millions of cases would impose a strain on the judicial system. Hence, "[c]ourts evaluating BIPA claims have routinely found the superiority requirement satisfied." *Gaertner*, 351 F.R.D. at 224 (citing cases); *see also In re Facebook*, 326 F.R.D. at 548 ("A class action is clearly superior to individual proceedings here."); *Svoboda*, 168 F.4th at 967 (7th Cir. 2025) (class action "will ensure uniform resolution of complex issues[,] . . . preserve judicial resources, and promote efficiency"); *Doe*, 2026 U.S. Dist. LEXIS 125406 at *36 ("[E]ach class member would be eligible for only one recovery of either $1,000 or $5,000. Practically speaking, the small statutory recovery available means Plaintiffs have little to no incentive to initiate individual lawsuits against one of the world's largest companies. Even if Plaintiffs had some incentive to litigate their claims separately, a class action is the more efficient device and the superior method for adjudicating potentially millions of claims.").

## V. CONCLUSION

Based on the foregoing, Plaintiff respectfully requests the Court enter an Order certifying the Class, appointing Natalie Delgado as Class Representative and Kevin P. Green, Thomas P. Rosenfeld, Daniel S. Levy, and Thomas C. Horscroft of Goldenberg Heller & Antognoli, P.C., and Mike Arias, Elise R. Sanguinetti, Arnold C. Wang, Craig S. Momita, and M. Anthony Jenkins of Arias Sanguinetti Wang & Team LLP as Class Counsel, and for such further relief as the Court deems just and proper.

Dated: August 21, 2026

Respectfully submitted,

**GOLDENBERG HELLER & ANTOGNOLI, P.C.**

By: */s/ Kevin P. Green*
Kevin P. Green

*Attorneys for Plaintiff Natalie Delgado*

## CIVIL L.R. 5-1(i)(3) ATTESTATION

Pursuant to Civil Local Rule 5-1(i)(3), I, Kevin Green, hereby attest under penalty of perjury that concurrence in the filing of this document has been obtained from all signatories.

Dated: August 21, 2026

Respectfully submitted,

**GOLDENBERG HELLER & ANTOGNOLI, P.C.**

By: *<u>/s/ Kevin P. Green</u>*
Kevin P. Green