**GIBSON, DUNN & CRUTCHER LLP**
DIANA FEINSTEIN, SBN 302626
THOMAS FU, SBN 325209
2000 Avenue of the Stars, Suite 1200N
Los Angeles, CA 90067
Telephone: (310) 552-8500
Facsimile: (213) 229-6396
dfeinstein@gibsondunn.com
tfu@gibsondunn.com

LAUREN R. GOLDMAN (admitted *pro hac vice*)
MICHAEL BRANDON (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
lgoldman@gibsondunn.com
mbrandon@gibsondunn.com

AMANDA STERLING (admitted *pro hac vice*)
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
asterling@gibsondunn.com

**LATHAM & WATKINS LLP**
SEAN M. BERKOWITZ (admitted *pro hac vice*)
GARY S. FEINERMAN (admitted *pro hac vice*)
KATHRYN K. GEORGE (admitted *pro hac vice*)
330 N. Wabash Ave., Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
sean.berkowitz@lw.com
gary.feinerman@lw.com
katie.george@lw.com

*Attorneys for Defendant Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| NATALIE DELGADO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 3:23-cv-04181-SI<br><br>**DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Hearing: December 18, 2026<br>Time: 10:00 a.m.<br>Location: Courtroom 1—17th Floor<br>Judge: Hon. Susan Illston |

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 3

A. Relevant Facts ..... 3

B. Procedural History ..... 7

LEGAL STANDARD ..... 10

ARGUMENT ..... 11

I. Plaintiff has not met her burden of proving that common issues predominate. ..... 11

A. Whether each class member's recordings could be used to identify that class member is an individualized question. ..... 12

1. Each class member must prove that Meta collected or possessed data that could be used to identify that class member, which will require individualized analysis by class member and by recording. ..... 12

2. The dominant-voice analysis that plaintiff relied on to survive summary judgment cannot provide classwide proof that Meta could identify class members from their recordings. ..... 13

3. None of plaintiff's remaining evidence can provide classwide proof that Meta could identify class members from their recordings. ..... 16

4. Plaintiff cannot defer individualized inquiries on liability issues to claims administration processes. ..... 22

B. Plaintiff cannot obtain statutory damages on a classwide basis. ..... 24

C. At most, any class must be limited to users who sent unencrypted audio recordings via Messenger. ..... 26

II. A class action is not superior to individual suits. ..... 28

III. Plaintiff is neither a typical nor an adequate class representative. ..... 28

A. Plaintiff fails to establish that she has Article III standing. ..... 28

B. Plaintiff is atypical and inadequate because she is subject to unique defenses. ..... 30

CONCLUSION ..... 30

# TABLE OF AUTHORITIES

## Cases

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ... 10

*Ambrosio v. Progressive Preferred Ins. Co.*,
154 F.4th 1107 (9th Cir. 2025) ... 11, 13, 16, 22

*Bliss v. CoreCivic, Inc.*,
711 F. Supp. 3d 1233 (D. Nev. 2024) ... 24, 25, 26

*Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*,
62 F. App'x 672 (7th Cir. 2003) ... 24

*C.H. v. Google LLC*,
2026 WL 92063 (N.D. Cal. Jan. 13, 2026) ... 24

*Cahen v. Toyota Motor Corp.*,
717 F. App'x 720 (9th Cir. 2017) ... 22

*Campbell v. Facebook Inc.*,
315 F.R.D. 250 (N.D. Cal. 2016) ... 2, 24, 25, 26

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ... 29

*Clay v. Union Pac. R.R. Co.*,
171 F.4th 975 (7th Cir. 2026) ... 2, 24

*Cole v. Gene by Gene, Ltd.*,
322 F.R.D. 500 (D. Alaska 2017) ... 26

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ... 11, 25, 26

*Cothron v. White Castle Sys., Inc.*,
216 N.E.3d 918 (Ill. 2023) ... 2

*Doe v. Apple Inc.*,
2026 WL 1615260 (S.D. Ill. June 5, 2026) ... 21, 24

*Ellis v. Costco*,
657 F.3d 970 (9th Cir. 2011) ... 17

*In re Facebook Biometric Info. Privacy Litig.*,
326 F.R.D. 535 (N.D. Cal. 2018) ... 5, 21

*In re Facebook Biometric Info. Privacy Litig.*,
522 F. Supp. 3d 617 (N.D. Cal. 2021) ... 24

*Gaertner v. Commemorative Brands, Inc.*,
351 F.R.D. 201 (S.D. Ill. 2026) .......... 21

*Gershzon v. Meta Platforms, Inc.*,
2026 WL 2970373 (N.D. Cal. Sept. 30, 2026) .......... 30

*Griffith v. TikTok, Inc.*,
2024 WL 4308813 (C.D. Cal. Sept. 9, 2024) .......... 16

*Gunderson v. Amazon.com, Inc.*,
350 F.R.D. 376 (N.D. Ill. 2025) .......... 30

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
579 U.S. 93 (2016) .......... 25

*Hanni v. Am. Airlines, Inc.*,
2010 WL 289297 (N.D. Cal. Jan. 15, 2010) .......... 28

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) .......... 30

*Heiting v. FKA Distrib. Co.*,
2025 WL 736594 (C.D. Cal. 2025) .......... 22

*Herrera v. Benefit Tr. Life Ins. Co.*,
466 N.E.2d 1172 (Ill. App. 1984) .......... 24

*Hinton v. Planned Parenthood Fed. of Am.*,
2026 WL 2959993 (N.D. Cal. Sept. 30, 2026) .......... 16

*Howe v. Speedway LLC*,
2024 WL 4346631 (N.D. Ill. Sept. 29, 2024) .......... 21

*Ji v. Naver Corp.*,
2022 WL 4624898 (N.D. Cal. Sept. 30, 2022) .......... 29

*Krautsack v. Anderson*,
861 N.E.2d 633 (Ill. 2006) .......... 24

*Lara v. First Nat'l Ins. Co. of Am.*,
25 F.4th 1134 (9th Cir. 2022) .......... 28

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013) .......... 25

*Lindsey v. Normet*,
405 U.S. 56 (1972) .......... 10

*Lineberry v. AddShoppers, Inc.*,
2025 WL 1533136 (N.D. Cal. May 29, 2025) .......... 30

*Mendia v. Garcia*,
768 F.3d 1009 (9th Cir. 2014) .......... 30

*Miles v. Kirkland's Stores Inc.*,
89 F.4th 1217 (9th Cir. 2024) ....................22, 28

*Mobile Emergency Hous. Corp. v. HP, Inc.*,
2023 WL 9550942 (N.D. Cal. Dec. 8, 2023) ....................23

*Mullins v. Direct Digit., LLC*,
795 F.3d 654 (7th Cir. 2015) ....................26

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ....................1, 10, 11, 13, 16, 20

*Patel v. Facebook, Inc.*,
932 F.3d 1264 (9th Cir. 2019) ....................29

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ....................29

*Rodriguez v. Autotrader.com, Inc.*,
2025 WL 1085787 (C.D. Cal. Apr. 4, 2025) ....................30

*Rogers v. BNSF Ry. Co.*,
2022 WL 854348 (N.D. Ill. Mar. 22, 2022) ....................21

*Rusoff v. Happy Grp., Inc.*,
187 F.4th 1182 (9th Cir. 2026) ....................11, 22

*Sanchez v. Wal-Mart Stores, Inc.*,
2009 WL 1514435 (E.D. Cal. May 28, 2009) ....................30

*Stillmock v. Weis Markets, Inc.*,
385 F. App'x 267 (4th Cir. 2010) ....................25

*Svoboda v. Amazon.com, Inc.*,
2024 WL 1363718 (N.D. Ill. Mar. 30, 2024) ....................21, 24

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) ....................26

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ....................10, 13, 23

*White v. Symetra Assigned Benefits Serv. Co.*,
104 F.4th 1182 (9th Cir. 2024) ....................10, 22

*Williams v. Country Mut. Ins. Co.*,
2015 IL App (1st) 142534-U ....................24

*Zellmer v. Facebook, Inc.*,
2022 WL 16924098 (N.D. Cal. Nov. 14, 2022) ....................29

*Zellmer v. Meta Platforms, Inc.*,
104 F.4th 1117 (9th Cir. 2024) ....................1, 5, 7, 12, 13, 17, 22

**Statutes**

740 ILCS 14/10 .......... 12

740 ILCS 14/15 .......... 12

740 ILCS 14/20 .......... 24

**Rules**

Fed. R. Civ. P. 23 .......... 1, 10, 11, 13, 16, 19, 20, 23, 24, 28, 30

**Constitutional Provisions**

U.S. Const. art. III .......... 3, 22, 28, 29

## INTRODUCTION

Plaintiff Natalie Delgado alleges that Meta violates the Illinois Biometric Information Privacy Act ("BIPA") every time an Illinois user uploads an ordinary audio or video recording to Facebook or Messenger. BIPA prohibits collection without consent of "biometric identifiers" or "biometric information," including "voiceprints," that "could be used to identify" a person. *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1124–25 (9th Cir. 2024). Plaintiff acknowledges that a mere voice recording is not a voiceprint. Her theory is that Meta violates the statute by receiving audio and video from its users, because it *could* apply speaker identification technology to those recordings to *create* a voiceprint that could then be combined with other tools and information to allow Meta to identify those users. Plaintiff does not allege that Meta has *actually* used such technology to create such data with respect to her or anyone else in the proposed class.

Plaintiff asks this Court to certify a class of every Illinois resident who posted a video to Facebook, or sent an unencrypted video or audio message via Messenger, containing their own voice over a period of eight-plus years. Unlike the plaintiffs in other BIPA cases that have received class treatment, plaintiff does not target a specific technology *actually* used by the defendant to create a specific type of data allegedly regulated by the statute. Quite the contrary: this case rests on allegations about Meta's *hypothetical* ability to process multiple kinds of recordings, with dramatically varying content, using a host of different potential technologies both singly and in combination. Plaintiff's approach creates insurmountable obstacles for class certification, which requires plaintiff to "actually prove—not simply plead" that the class satisfies each requirement of Rule 23. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc) (citation omitted). She has not come close.

*First*, individualized liability issues will predominate. To establish liability, each class member will need to prove that Meta could identify them using the particular recordings they uploaded. It is undisputed that Meta has no information as to who is speaking in recordings uploaded to Facebook and Messenger; the fact that a particular user uploaded the recording doesn't mean that the voice in that recording belongs to that user. And even with the application of the technologies and resources plaintiff

has identified, Meta's ability to determine who is speaking in a given recording would turn on numerous individualized issues. Plaintiff's expert asserts that if a Messenger user named John Doe uploads several audio recordings, each of which contains only his voice and begins with "hi, this is John," Meta may be able to use its technologies to identify the voice in those messages as belonging to Mr. Doe. But even assuming arguendo that plaintiff's expert is correct, it is undisputed that many other recordings that fall within plaintiff's class definition present far more difficult analyses. If Mary Smith is watching a music concert and sends her friend a Messenger recording in which she and others in the crowd are singing along, plaintiff has provided no evidence that Meta would be able to associate her voice with her identity, particularly if Meta has no other recordings containing her voice. The essential point is that determining whether each class member's recordings are more like John's or Mary's will require extensive individualized analysis, including analysis of both (1) the particular details of the recordings uploaded by that class member and (2) whatever other information Meta may happen to have about them. This individualized issue will alone predominate over any common ones.

*Second*, individualized issues will predominate as to damages. BIPA's statutory damages are discretionary as to both entitlement and amount. *See Clay v. Union Pac. R.R. Co.*, 171 F.4th 975, 982–83 (7th Cir. 2026); *Cothron v. White Castle Sys., Inc.*, 216 N.E.3d 918, 929 (Ill. 2023). That discretion, courts have made clear, must account for (among other things) the specific degree of harm suffered by each class member. *See Campbell v. Facebook Inc.*, 315 F.R.D. 250, 268–69 (N.D. Cal. 2016). Accordingly, any statutory damages award would require an individualized inquiry into each class member's circumstances, including whether and to what extent each class member values their biometric privacy, independently defeating predominance. *See id.*

*Third*, and at a minimum, the Court should reject out of hand the sweeping class plaintiff proposes on the ground that it includes people whose uploaded recordings were limited to videos; indeed, such people make up approximately half of the proposed class. The above examples demonstrate why a class of people who sent unencrypted Messenger *audio* recordings containing their own voice would present insurmountably individualized issues. Including people who only sent *videos* containing their own voice would multiply those issues significantly, because it is undisputed that video

recordings are far less likely than private audio messages to prominently feature the uploading user's voice. Consider a Facebook user named Joanne Martin who is watching a baseball game at Wrigley Field and posts a video clip of a play at home plate, with the entire crowd cheering. The notion that Meta would be able to pluck Joanne's voice out of that cacophony and use it to identify her is fanciful.

*Fourth*, a class action is not superior to individual suits. There is no manageable way to try millions of class-member-specific liability and damages questions in a single proceeding. And plaintiff points to no mechanism that would avoid the need for individualized, technically intensive mini-trials.

*Fifth*, plaintiff is neither an adequate nor a typical class representative. First of all, she lacks Article III standing, because her injury is purely hypothetical. Unlike the plaintiffs in BIPA cases where Article III standing has been upheld, Ms. Delgado claims only that Meta *could* use her recordings to create other data that could in turn be used to identify her—not that it *has* created such data for her or any other member of the proposed class. Second, her unusual conduct exposes her to equitable defenses that do not apply to the rest of the proposed class. Prior to the week she filed her complaint, plaintiff sent only three Messenger audio recordings. On August 11, 2023, plaintiff first spoke to her counsel about this case. Ex. 14 (Pl.'s Supp. Resp. to Interrog. No. 14) at 2. Two days later, she sent seven more Messenger audio recordings. Three days after that, she filed this suit. Those recordings formed the basis of the expert opinion that plaintiff relied on to oppose Meta's motion for summary judgment.

The Court should deny plaintiff's motion for class certification.

## BACKGROUND

### A. Relevant Facts

#### 1. Facebook users post videos, and Messenger users send video and audio messages.

This case concerns video and audio recordings uploaded to Facebook and Messenger. On Facebook, users can share video recordings using a video posting feature; on Messenger, users can send each other messages with video and audio recordings. Dkt. 146-2 (Meta's Supp. Resp. to Interrog. No. 2) at 4–5; *see* Ex. 7 (Wang Dep.) at 33:10–34:20.

Facebook and Messenger users utilize these features to share a wide variety of content, subject to Meta's Terms of Service and Community Standards. Users upload a broad range of recordings for

varying purposes. A recording may contain a user's voice, the voices of other people, the voices of both the user and other people, indistinguishable voices from a crowd, or no sounds at all. *See* Ex. 3 (Kirk Fair Rep.) ¶¶ 73–79 & Exs. 3–5; Dkt. 146-8 (Wang Decl.) ¶ 2; Dkt. 146-9 (Dong Decl.) ¶ 2; Ex. 1 (Traynor Rep.) ¶ 62; Ex. 6 (Seltzer Dep.) at 164:21–165:3. Facebook and Messenger recordings reflect that variability, as users frequently post and send recordings that primarily or exclusively contain other people's voices. *See* Ex. 3 (Kirk Fair Rep.) ¶¶ 54, 74, 79; Dkt. 193-16 (Klein Rep.) (plaintiff's expert finding that between 40% and 64% of users had never uploaded their voice alone); *see also* Ex. 9 (Delgado Dep.) at 154:10–156:7 (plaintiff's Facebook video contained voices of a crowd in a football stadium, including her own); *id.* at 144:5–147:24 (plaintiff's Facebook video contained someone else's voice); *id.* at 172:20–173:8 (plaintiff's Messenger audio recording contained only plaintiff's voice).

It is undisputed that Meta does not apply its technologies to identify speakers from audio and video uploaded to Facebook and Messenger. When a user sends or posts a recording on these services, Meta uploads the recording through its intake pipeline, then stores it with certain metadata so that the user and recipients can later view or listen to it. *See* Ex. 7 (Wang Dep.) at 33:18–34:20; Dkt. 146-2 (Meta's Supp. Resp. to Interrog. No. 12) at 11; Ex. 11 (Wang Decl.) ¶¶ 7–8. The intake pipeline notes certain information about the recording, such as its size and format, Dkt. 146-2 (Meta's Resp. to Interrog. No. 3) at 6, as well as the account number of the user who uploaded the recording, Dkt. 146-8 (Wang Decl.) ¶ 5; Dkt. 146-9 (Dong Decl.) ¶ 5. Meta also processes Facebook videos to support product and safety functions, such as captioning and screening against Meta's Community Standards. Ex. 12 (Seltzer Decl.) ¶¶ 32–33; Ex. 8 (Traynor Dep.) 63:16–67:22; Ex. 1 (Traynor Rep.) ¶¶ 313–316.

No step in this intake pipeline attempts to determine who the speakers are, nor do the recordings have any metadata that would allow Meta to make that determination. Ex. 1 (Traynor Rep.) ¶ 334; Ex. 11 (Wang Decl.) ¶¶ 6, 8–9; Dkt. 146-8 (Wang Decl.) ¶¶ 4–6; Dkt. 146-9 (Dong Decl.) ¶¶ 4–6. There is no feature within Facebook or Messenger that asks a user to confirm who is speaking in a given recording. Dkt. 146-8 (Wang Decl.) ¶¶ 2–3; Dkt. 146-9 (Dong Decl.) ¶¶ 2–3. Nor does Facebook or Messenger involve any form of voice enrollment, voice-based login, or any other feature that allows a user to submit a sample of their own voice so that Meta can learn what the user sounds like. Dkt. 146-8

(Wang Decl.) ¶¶ 2–6; Dkt. 146-9 (Dong Decl.) ¶¶ 2–6. And, when a recording contains a voice, no feature of either service identifies or predicts whose voice it is.[1] *Id.*

The only personally identifying information systematically associated with a Facebook or Messenger recording is the account number (or "FBID") of the uploading user. Dkt. 154-2 at 18–19. Because users commonly upload recordings with other people's voices, even to the exclusion of their own, Ex. 3 (Kirk Fair Rep.) ¶¶ 73–85; *see* Ex. 2 (Traynor Sur-Reb. Rep.) ¶ 17, the FBID does not indicate who the *speaker* is in any recording.[2] Ex. 11 (Wang Decl.) ¶ 5; Ex. 6 (Seltzer Dep.) at 164:9–165:3. Meta has no information on whether the speaker and uploading user are the same person; or which voice, if any, in a recording with multiple voices is the user's. Ex. 1 (Traynor Rep.) ¶¶ 92–93.

**2. Speaker identification technology requires a known voice linked to the speaker's identity.**

Plaintiff does not contend that either Facebook or Messenger employs speaker identification technologies. She instead points to *other* technologies that Meta has developed or researched. She contends that, in theory, Meta could use these technologies along with other tools at its disposal to create identifying biometric data for people who upload video and audio to Facebook and Messenger. Ex. 15 (Pl.'s Resp. to Interrog. No. 5) at 17–18; Mot. 4–5, 19–20. She focuses, for instance, on voice verification and speaker identification technologies developed for wearable devices and other commercial products. Mot. 4–6; *see* Dkt. 147-11 (Meta's Supp. Resps. to Interrogs. 4–7) at 5–14. She also invokes a 2016 patent for a speaker recognition technology that Meta never built. Dkt. 147-5 (Meta's Resp. to Interrog. No. 11) at 21–22; Ex. 1 (Traynor Rep.) ¶¶ 108–109. It is undisputed that Meta has never used any of these technologies to identify any individual from a Facebook or Messenger

---

[1] There is no equivalent to the facial recognition system at issue in prior BIPA cases against Meta, which created face templates from faces in Facebook photos and linked those templates to the identity of the Facebook user pictured. *See Zellmer*, 104 F.4th at 1121; *In re Facebook Biometric Info. Privacy Litig.*, 326 F.R.D. 535, 541 (N.D. Cal. 2018). Nothing in Meta's systems generates any analogous data from a voice in a Facebook or Messenger recording and links the data to the identity of the speaker.

[2] [redacted] *See* Ex. 11 (Wang Decl.) ¶ 3. [redacted] *See id.*; Ex. 1 (Traynor Rep.) ¶ 335. [redacted] *See* Ex. 11 (Wang Decl.) ¶ 3–4.

recording, and that Meta does not in fact have the technology described in the 2016 patent. Ex. 1 (Traynor Rep.) ¶¶ 108–109; Dkt. 147-11 (Meta's Resp. to Interrog. No. 7) at 22–23; Ex. 5 (Singh Dep.) at 34:15–24, 127:2–18.

The speaker identification systems that Meta *does* have—like all speaker identification technologies—are capable of identifying a person by voice only when certain prerequisites are met. It is undisputed that Meta cannot identify a person based simply on a voice recording, standing alone. Ex. 5 (Singh Dep.) at 145:20–146:9, 148:1–11. Rather, to identify a person speaking in a recording, the technology must be able to match that voice with a recording of a voice already known to belong to that person. *Id.* at 145:20–146:9, 148:1–11; Ex. 1 (Traynor Rep.) ¶ 61; Ex. 6 (Seltzer Dep.) at 22:2–13; Ex. 13 (Scaria Decl.) ¶¶ 4, 10; Ex. 12 (Seltzer Decl.) ¶¶ 8, 12, 22, 30–31. Without that known voice, a system can determine that two anonymous voices might belong to the same person, but it cannot determine *who* the person is. Ex. 5 (Singh Dep.) at 148:1–11; Ex. 1 (Traynor Rep.) ¶¶ 61–63.

A known voice recording can come from different sources, depending on the specific speaker identification system. One method is an enrollment process in which a person creates and submits recordings containing only their own voice linked to their identity so that the system can learn what that identified person's voice sounds like. Ex. 5 (Singh Dep.) at 146:3–15. Another method is to label a single-voice recording with the name of the person who is speaking, such that the name is subsequently linked with the recorded voice. Ex. 1 (Traynor Rep.) ¶ 239. In yet other cases, the spoken content of the recording itself could supply the requisite information, at least under certain circumstances—for example, if the person speaking says "This is John Doe," assuming the system is capable of interpreting those words and linking the voice to the John Doe in question. But regardless of the methodology, the principle is the same: the system requires something more than the existence of a voice recording. It must have information linking a specific voice in the recording to the identity of the person speaking. Ex. 5 (Singh Dep.) at 146:3–9; Ex. 1 (Traynor Rep.) ¶¶ 61–63. Without that linking information—which no technology can derive solely from the sound of a voice—a voice in a recording is anonymous and can't be used to identify anyone. Ex. 1 (Traynor Rep.) ¶¶ 61–63.

In addition, even when a system has a known voice recording linked to a specific speaker, it

will not necessarily be able to identify that person as a speaker in other recordings. Recording-specific factors like levels of background noise, audio quality, or a multiplicity of speakers may all work to prevent the system from identifying a speaker in a recording depending on the circumstances. Ex. 1 (Traynor Rep.) ¶¶ 62–63, 65, 68.

## B. Procedural History

### 1. Plaintiff alleges that Meta "collected" her "voiceprint" by storing her Facebook and Messenger recordings.

Plaintiff is an Illinois resident who asserts that Meta collected her "biometric identifiers," and specifically her "voiceprint," by receiving recordings containing her voice that she uploaded to Facebook and Messenger. Plaintiff acknowledges that under Ninth Circuit law, data qualifies as a biometric identifier under BIPA only if it "could be used to identify" the person in question. *Zellmer*, 104 F.4th at 1125–26. Plaintiff does not allege that Meta applied speaker identification technology to her recordings to create new data that could be considered a voiceprint. But she contends that each of her recordings *qualifies* as a "voiceprint" and a biometric identifier under BIPA because Meta could hypothetically use its speaker identification technologies to process those recordings to create such data and identify her as the speaker. On that basis, plaintiff seeks statutory damages of up to $1,000 for each negligent violation and up to $5,000 for each intentional or reckless violation.

As of the date plaintiff filed her complaint—August 16, 2023—she had uploaded a total of ten audio recordings to Messenger, as well as various videos to Facebook and Messenger. Dkt. 1. She sent seven of those ten audio recordings on August 13, 2023—just two days after she first spoke with her counsel about this case and three days before filing suit. Ex. 2 (Traynor Sur-Reb. Rep.) ¶¶ 7–8; Ex. 14 (Pl.'s Supp. Resp. to Interrog. No. 14) at 2. The other three recordings were: (a) a recording with no voices, sent in November 2018; (b) a recording with multiple voices, including plaintiff's, sent in December 2018; and (c) a recording with only plaintiff's voice, sent in March 2021. Ex. 2 (Traynor Sur-Reb. Rep.) ¶ 8 & n.13. Plaintiff's opposition to Meta's summary judgment motion rested on her expert's analysis of all ten recordings. *See infra* Background B.2.

The only recordings in the record are plaintiff's. She has not introduced any Facebook or Messenger video or audio recordings from any other member of the putative class she now asks the

Court to certify. Plaintiff has offered evidence from a survey expert purporting to estimate the number or percentage of Illinois Facebook and Messenger users who have uploaded at least one recording containing their own voice during an eight-year period. That evidence does not analyze how frequently class members' recordings contained their own voice, how common other voices were within those recordings, or any other characteristics of the recordings in question. Plaintiff has offered no way to differentiate, for example, among a user who has uploaded a single recording in which their voice is one among thousands in a cheering crowd; a user who has uploaded a single recording containing their voice and a dozen recordings containing a friend's voice; and a user who has uploaded only recordings containing their own voice.

**2. On Meta's early motion for summary judgment, the Court found a triable issue as to whether Meta could identify plaintiff from her recordings.**

Meta moved for early summary judgment on two grounds. First, Meta argued that as a matter of law the "voiceprints" regulated by BIPA are limited to specific forms of data that can be created from voice recordings; the term "voiceprint" does not extend to standard audio and video recordings that would serve as inputs into the type of technologies that could create such data. Second, Meta contended that plaintiff's recordings could not be any type of biometric identifier under *Zellmer* because Meta had no information linking plaintiff's voice within those recordings to her identity. Dkt. 146 at 7–9; MSJ Order 7.

In her opposition, plaintiff relied on the report of her technical expert, Dr. Rita Singh. Dkt. 157 at 1–2. Dr. Singh opined in generalized terms that Meta "possesses and has utilized technologies capable of using" video and audio recordings containing Facebook and Messenger users' voices "to identify individuals." Dkt. 193-14 (Singh Rep.) at 7. Dr. Singh did not opine that Meta's technologies can use *all* Facebook and Messenger recordings to identify speakers, nor did she address the prerequisites that any particular recording or set of recordings would need to satisfy in order to be able to identify a speaker. *See id.*

In response to Meta's second argument, plaintiff relied on an "experiment" that Dr. Singh conducted on the ten private audio messages plaintiff sent via Messenger. MSJ Order 9. Dr. Singh processed those recordings with a publicly available technology (not a technology created or used by

Meta) to generate output data called "speaker embeddings" for each voice in each recording. Dkt. 193-15 (Singh Reb. Rep.) at 25–27. She then processed the embeddings to create "clusters" to find the voice that appeared most often across all ten recordings, which she called the "dominant voice." *Id.* at 25–29. She then opined that the dominant voice could be inferred to belong to plaintiff, because plaintiff was the user who uploaded the recordings. *Id.*; MSJ Order 9. Notably, plaintiff had to separately submit a declaration to confirm which of her recordings contained her voice. Dkts. 157-18, 192-9.

Dr. Singh's analysis of the ten recordings relied on various assumptions and premises, including that the dominant voice in any group of audio recordings likely belongs to the user who uploaded them. Ex. 5 (Singh Dep.) at 88:3–18. But she conceded under oath that these assumptions and premises are not necessarily applicable to all the recordings at issue in this case. For example, she conceded that Facebook and Messenger videos are less likely than audio recordings to be dominated by "the voice of the user of the account," as people often record videos of things other than themselves. *Id.* at 85:5–16. Dr. Singh further conceded that if she only had "very small numbers of files" to analyze, her conclusions about the identity of the speaker could be "unreliable." *Id.* at 71:20–72:3. She opined that "there is no universal threshold" as to how similar recordings must be for her methodology to be able to identify speakers with certainty. *Id.* at 68:14–69:3. To the contrary, Dr. Singh stated that the number of recordings needed to identify a speaker "depends on the model," "the context," "the channel through which the recording has been sent, and many other factors." *Id.* at 72:4–13. She confirmed that her analysis was limited to only plaintiff's Messenger audio recordings, from which she derived the dominant voice, notwithstanding that plaintiff had uploaded dozens of videos to Facebook and Messenger; in fact, she did not analyze any videos *at all*, nor did she opine that the assumptions underlying her methodology could even be applied to videos.[3] *Id.* at 57:23–58:6, 86:17–21, 90:14–22.

The Court denied Meta's summary judgment motion. It held that "[l]argely" due to "the work

[3] Dr. Singh could identify no study supporting that premise; she was "not aware of Messenger specific studies," and for videos relied only on "real world experience and common sense." *Id.* at 84:17–23, 90:4–91:20. Meta's expert, Dr. Patrick Traynor, applied that same methodology to plaintiff's video and audio recordings combined, and confirmed that the inclusion of video recordings caused the result to change—such that the dominant cluster created by the technology consisted primarily of recordings that did not contain plaintiff's voice. Ex. 2 (Traynor Sur-Reb. Rep.) ¶ 9 & App. A, Ex. 1. Dr. Singh has not critiqued Dr. Traynor's conclusions. Ex. 5 (Singh Dep.) at 6:23–7:3.

of Dr. Singh," there was a dispute as to "whether Meta has collected plaintiff's voice recordings in a manner that is capable of identifying plaintiff." MSJ Order 11. The Court left open the more general question of when "voice data transforms from a 'mere voice recording'" into a "voiceprint" subject to BIPA, *id.*, since plaintiff had "raised a disputed question of fact as to whether Meta has the capabilities to identify *plaintiff* using *her* uploaded voice recordings," *id.* at 10 (emphasis added).

**3. Plaintiff seeks certification of a class of every Illinois resident who uploaded a Facebook or Messenger recording containing their voice.**

Plaintiff now seeks certification of a class of "[a]ll persons who during the Class Period and while Illinois residents: (a) posted to their Facebook account a video that contained their voice; and/or (b) sent from their Messenger account a non-encrypted video and/or audio message that contained their voice." Mot. 10. The proposed class period runs from August 16, 2018, until the date a class is certified and draws no distinction based on the types or quality of voice recordings a putative class member may have posted, or the prevalence of the user's voice within their own uploaded recordings. *Id.*

## LEGAL STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted). Under the Rules Enabling Act and as a matter of due process, a member of a class is subject to the same burdens as an individual plaintiff: before a class member may recover, she must establish every element of her claim and the defendant must be afforded the opportunity to present all available defenses. *Lindsey v. Normet*, 405 U.S. 56, 66 (1972). As a result, Rule 23 "imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). A plaintiff "must affirmatively demonstrate [her] compliance with the Rule," and certification is proper only if the Court is satisfied, "after a rigorous analysis," that she has done so. *Dukes*, 564 U.S. at 350–51. That analysis must rest on evidence, not pleadings, attorney supposition, or speculation. *Olean*, 31 F.4th at 665; *see White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1192, 1201 (9th Cir. 2024) (reversing certification).

A plaintiff seeking certification of a damages class must "actually prove—not simply plead" that the proposed class satisfies each requirement of Rule 23(b)(3). *Olean*, 31 F.4th at 664. She must

show that common issues, meaning issues "susceptible to generalized, class-wide proof," predominate over individual ones. *Ambrosio v. Progressive Preferred Ins. Co.*, 154 F.4th 1107, 1109–10 (9th Cir. 2025). The Court "must evaluate" how the plaintiff proposes to use her class-wide evidence, to determine whether it can answer common questions "in one stroke." *Rusoff v. Happy Grp., Inc.*, 187 F.4th 1182, 1193 (9th Cir. 2026). Predominance is a "demanding" inquiry, because class actions are "onerous and costly for defendants, who may feel pressured into settling questionable claims." *Id.* (citation and quotation marks omitted). The plaintiff must also show that a class action is superior to other methods of adjudication, *Olean*, 31 F.4th at 663–64, and "that damages are capable of measurement on a class-wide basis," *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

## ARGUMENT

No court has ever certified a BIPA class like the one plaintiff proposes here. The only BIPA classes that have ever been certified have involved a specific, uniform type of data that the defendant *actually* created for every individual class member using the same technology. This case, by contrast, involves allegations about Meta's hypothetical ability to process, in different ways, multiple *kinds* of recordings that vary dramatically in their *content* from class member to class member. Whether any of those recordings could be used to identify any particular class member cannot be decided for millions of people in a single stroke. The answer to that question will turn on the content of the recording and what *other* information, beyond the recording, Meta has about the user. Certification is also inappropriate because discretionary statutory damages turn on individualized factors, including the nature and extent of each class member's privacy interests in their own voice data. And even setting aside all of these individualized issues, the class should not be certified because a class trial would be unmanageable and would not be superior to other means of adjudicating the claims in question, and because plaintiff is not typical or adequate as a representative of the class.

### I. Plaintiff has not met her burden of proving that common issues predominate.

No member of the putative class can recover unless they can prove (among other things) that Meta could identify them using the specific recordings they uploaded to Facebook and/or Messenger—which, in turn, requires each class member to prove that Meta has a recording reflecting their known

voice. *See* Background A.2. That question cannot be answered with common evidence. Because there is no information within Facebook or Messenger that tells Meta who is speaking in a given recording, neither of those services supplies the known voice recordings that Meta would need for speaker identification. *See* Background A.1 & A.2. Plaintiff contends that Meta could use *other* technologies and information to determine who is speaking in a given Facebook or Messenger recording (such that the recording could then be treated as a known voice). But even on plaintiff's evidence, Meta's ability to do so would depend on the particular content of each class member's recordings as well as a constellation of other individualized factors. Her evidence accordingly *underscores* the individualized, class-member-specific inquiries that would be necessary to determine whether Meta could identify any class member based on their recordings. Plaintiff also offers no classwide method for determining BIPA damages across a diverse proposed class of users with divergent privacy interests and behavior. Each of these problems independently precludes certification.

**A. Whether each class member's recordings could be used to identify that class member is an individualized question.**

To establish liability at trial, each class member must prove that the recordings they uploaded to Facebook and/or Messenger enable Meta to identify them. *See Zellmer*, 104 F.4th at 1126. Plaintiff has not proposed, and cannot propose, any way to make that showing with common proof. To the contrary, each class member's ability to meet that bar will turn on a host of individualized questions about the nature of their recordings and the other information Meta may possess about them.

**1. Each class member must prove that Meta collected or possessed data that could be used to identify that class member, which will require individualized analysis by class member and by recording.**

Plaintiff's claims arise under BIPA, which regulates the possession and collection of six "biometric identifiers"—fingerprints, voiceprints, retina scans, iris scans, and scans of hand and face geometry—as well as "biometric information," defined as information derived from a biometric identifier that is used to identify a person. 740 ILCS 14/10, 15. Even if particular data meets the definition of one of the six listed items, it does not qualify as a biometric identifier subject to BIPA unless it "could be used to identify" an individual. *Zellmer*, 104 F.4th at 1124–25 (citation and emphasis omitted). Even taking as true plaintiff's position that a mere video or audio recording containing a voice

can under some circumstances qualify as a voiceprint, it is undisputed that such a recording is not a biometric identifier if it cannot be used to identify anyone. *See* Dkt. 185 at 2–3; *supra* Background A.2. To establish liability, then, each class member must show that at least one recording they uploaded provided Meta sufficient information to identify them, and specifically that at least one recording provided Meta with their known voice. *See Zellmer*, 104 F.4th at 1125–26.

Relying on Dr. Singh's analysis, this Court held there was a genuine issue of fact as to whether *plaintiff's* recordings met that standard. But that alone is insufficient to allow the class's claims to go forward; due process and the Rules Enabling Act require *every* class member to clear *Zellmer*'s bar before they can recover. *See Dukes*, 564 U.S. at 366–67. And to obtain certification under Rule 23, plaintiff must demonstrate that she can make that showing with *classwide* proof. *See id.* at 350 (plaintiff "must affirmatively demonstrate [her] compliance with the Rule"); *Olean*, 31 F.4th at 664 (plaintiff must "actually prove—not simply plead" that Rule 23 is satisfied); *Ambrosio*, 154 F.4th at 1109–10 (common issues must be "susceptible to generalized, class-wide proof"). If she cannot—meaning that this issue must be litigated class member by class member on the basis of the recordings uploaded by each—then individualized inquiries will predominate, and the class cannot be certified.

**2. The dominant-voice analysis that plaintiff relied on to survive summary judgment cannot provide classwide proof that Meta could identify class members from their recordings.**

Plaintiff survived summary judgment by relying on Dr. Singh's dominant-voice analysis to show that the recordings she uploaded could enable Meta to identify her. *Supra* Background B.2. Dr. Singh analyzed plaintiff's ten private Messenger audio recordings, used publicly available technology (not used by Meta) to determine the most common voice across those recordings, and inferred that this "dominant voice" belonged to plaintiff (and thus could be treated as her known voice). Dkt. 193-15 (Singh Reb. Rep.) at 25–29.[4] But that analysis only worked because a host of plaintiff-specific facts happened to enable it, including how frequently plaintiff's voice happened to appear across her recordings, the number of recordings plaintiff uploaded, the nature of those recordings (audio, as

---

[4] Plaintiff's reliance on the dominant-voice analysis to support her own individual claims at summary judgment highlights the gap in her classwide evidence. The analysis would not have been necessary if any of plaintiff's recordings, standing alone, supplied Meta with an example of her known voice.

opposed to video), and the characteristics and quality of each recording. *See supra* Background B.2; *see also* Ex. 2 (Traynor Sur-Reb. Rep.) ¶¶ 7–9, 14–15, 17.

That dominant-voice analysis thus cannot serve as classwide proof of Meta's ability to identify a user from their recordings. Dr. Singh did not dispute that her analysis rested on individualized facts, or that differences along those dimensions could yield different results. *See* Ex. 5 (Singh Dep.) at 69:1–3, 72:1–13, 80:2–3, 82:9–14, 85:2–16. To the contrary, her analysis cannot be replicated without an individualized examination of the circumstances of each class member's recordings, including:

*Whether the user's voice is the dominant voice across their recordings.* Whether the voices of putative class members are the most common, or dominant, voice across their recordings will vary by class member. Ex. 3 (Kirk Fair Rep.) ¶¶ 73–85; Dkt. 146-8 (Wang Decl.) ¶ 2; Dkt. 146-9 (Dong Decl.) ¶ 2. Some class members have uploaded a single recording in which their voice, if present at all, is one in a crowd; others have uploaded multiple recordings in which theirs is the dominant voice. Dkt. 146-8 (Wang Decl.) ¶ 2; Dkt. 146-9 (Dong Decl.) ¶ 2. The question whether any given class member's recordings could, with Dr. Singh's analysis, be used to identify them could be answered only by examining each class member's recordings and hearing testimony from them as well. Plaintiff's evidence provides no way to resolve the issue classwide; as her own survey expert confirmed, "whether users regularly post their own voice as compared to others' voices, would be an individualized question." Ex. 10 (Klein Dep.) at 90:5–17.

*How many recordings the class member has uploaded.* Dr. Singh testified that "[e]vidence from very small numbers of files" is "unreliable." Ex. 5 (Singh Dep.) at 72:1–3.[5] The viability of Dr. Singh's analysis applied to each class member will thus depend in part on the individualized question of whether each class member uploaded more than some (as yet unidentified) minimum quantum of recordings. Worse still, the undefined threshold number of recordings necessary to enable identification

---

[5] Plaintiff asserts in passing that Dr. Singh's analysis enables Meta to identify users "regardless of the 'number' of audio clips (which can always be segmented into smaller ones)." Mot. 25. That argument is contradicted by Dr. Singh's own testimony, and is contrary to common sense. Ex. 5 (Singh Dep.) at 72:1–13. The ability to segment a single clip into smaller ones is only useful if Meta knows which audio clips should be segmented and which speaker's voice appears in each segment. Unsurprisingly, plaintiff's assertion is unsupported by any evidence or expert analysis. *See* Mot. 25.

will itself vary by class member; Dr. Singh testified that the number of recordings needed to identify a speaker will depend on "the model," "the context," "the channel through which the recording has been sent" by the class member, "and many other factors." *Id.* at 72:4–13.

*Whether the recordings were video or private audio messages.* Dr. Singh testified that videos, unlike private audio messages, "may or may not contain, dominantly, the voice of the user of the account." Ex. 5 (Singh Dep.) at 85:12–16. That makes sense: a private audio message will often (though not always) be recorded by one person to convey information to another via Messenger, whereas a video posted to Facebook might be footage of a child's birthday party, a baseball game, or a high school play; there is little reason to believe it would contain the uploader's voice at all, let alone predominantly. Whether a class member uploaded only videos, only audio, or both would therefore affect whether that class member's recordings could be used to identify them using methods like Dr. Singh's dominant-voice methodology. *See supra* Background B.2.

*The characteristics of each recording.* Whether a recording can be used to identify a speaker also depends on how many people are speaking, whether the class member's own voice is discernible, whether voice-distorting filters are applied to any speaker in the recording, whether a speaker's voice is higher or lower in pitch or volume than their typical baseline, the quality of the audio, and the level of background noise. Ex. 1 (Traynor Rep.) ¶¶ 34, 61, 62–63, 65, 68; Ex. 5 (Singh Dep.) at 72:1–13. Those characteristics differ from one recording to the next, and so from one class member to the next, which plaintiff's own survey expert acknowledged. Ex. 10 (Klein Dep.) at 59:16–23 ("Q. Fair to say it's a fairly individualized issue as to the types of videos that any particular person posts? … A. I think different people post different types of videos, yes.").

These variables confirm that the dominant-voice analysis that plaintiff relied on to survive summary judgment cannot serve as common proof that would answer the key liability question here—which is whether each class member's recordings could be used to identify that class member. To resolve that question, each "member[] of [the] proposed class will need to present evidence that varies from member to member." *Ambrosio*, 154 F.4th at 1110 (citation omitted). That alone defeats predominance. *See Griffith v. TikTok, Inc.*, 2024 WL 4308813, at *10 (C.D. Cal. Sept. 9, 2024)

(denying certification where "each class member's claims turns on the contents of the[ir] information").

**3. None of plaintiff's remaining evidence can provide classwide proof that Meta could identify class members from their recordings.**

Perhaps for the reasons above, plaintiff does not seriously argue that Dr. Singh's analysis could be replicated on a classwide basis. Instead she pivots, relying on evidence about "Meta's conduct, technologies, [and] capabilities"—including several technologies that Meta never developed. Mot. 17; *see id*. 3–8, 14–15. She argues those materials amount to common proof that could show that Meta could identify users without having to establish "the predominance of a user's voice" in their uploaded recordings. *Id.* at 25. But those materials don't satisfy plaintiff's obligation to *prove*—not just plead—that she can satisfy the requirements of Rule 23. *Olean*, 31 F.4th at 664. At class certification, plaintiff must do more than simply assert a theory on which the class claims could rise or fall together. *Id.* She must instead come forward with evidence that "deliver[s] on the promise of classwide proof at trial." *Hinton v. Planned Parenthood Fed. of Am.*, 2026 WL 2959993, at *3 (N.D. Cal. Sept. 30, 2026) (denying class certification because "[t]he record demonstrate[d]" that plaintiffs' supposed "'common evidence' … f[e]ll[] well short" of proving their theory of classwide liability).

The materials plaintiff cites do not "deliver[] on the promise of classwide proof." *Id.* The technologies plaintiff relies on enable Meta to identify speakers based on their voices, if at all, only under certain circumstances. Plaintiff offers no evidence that these technologies—alone or in combination—could identify every user who uploaded even a single recording in which their voice happened to appear, no matter how fleetingly. Nor does she provide any way of determining which class members' recordings would enable identification and which would not. She has no evidence, for instance, of what Meta's systems would require to be able to identify a particular speaker, or any way to determine whether a class member's recordings would meet those requirements. At best, she offers only disjointed and demonstrably incorrect allegations about various systems she claims that Meta either has or could build—which, even on plaintiff's own telling, would require individualized inquiries to assess Meta's ability to identify any particular class member.

**a. Plaintiff's theories rest primarily on technology Meta never built.**

Plaintiff principally contends that Meta could identify class members from their recordings by

using certain technology described in a 2016 voiceprinting patent, which she asserts is "common evidence [that] shows that Meta can easily" identify a user from voice recordings even if their voice is not the "predominan[t]" one. Mot. 25; *see also id.* at 4, 6–7, 14, 26. The hypothetical technology described in the patent would layer information from a voice analysis on top of non-voice "signals"—for example, the potential speaker's social-graph relationships, physical proximity to known users, location data, and conversation content—to estimate the probability that a captured voice belongs to a particular person. Dkt. 157-19 (2016 Patent). Plaintiff posits that Meta could utilize that technology or its "framework" to draw on available non-voice information to determine who is speaking in a given recording (*i.e.*, to generate a known voice), which could then enable Meta to use the recording for speaker identification purposes.[6] Mot. 7, 25–26. This argument is fatally flawed in at least two respects.

First, it is undisputed that Meta has never sought to develop the technology claimed in that ten-year-old patent: it is a dormant piece of paper. Ex. 1 (Traynor Rep.) ¶¶ 108–109 ("Meta's 2016 patent filing does not reflect any technology that was ever built or deployed."); Dkt. 147-5 (Meta's Resp. to Interrog. 11) at 21–22; Ex. 5 (Singh Dep.) at 127:2–18. *Contra* Mot. 4. The technology does not exist at Meta and therefore is irrelevant under BIPA. As this Court held, whether Meta is "capable of identifying" a particular individual turns on what Meta can do "using *technology Meta possesses*." MSJ Order 11 (emphasis added); *see also Zellmer*, 104 F.4th at 1126. Because Meta undisputedly does not practice the 2016 patent and the technology it describes, they cannot serve as a means of common proof of liability. *See Ellis v. Costco*, 657 F.3d 970, 980–81 (9th Cir. 2011) (vacating class certification order that relied on "impermissible legal criteria").

Second, even if the technology described in the patent existed, determining what it enables Meta to do with each class member's recordings would raise even more individualized inquiries than Dr. Singh's dominant-voice analysis. The hypotheticals in plaintiff's own brief illustrate the problem. She

---

[6] In particular, plaintiff suggests that this "[redacted]" would look to any available [redacted]" then use that non-voice information together with the contents of the audio to try to determine the speaker to whom a voice in a recording belongs. Mot. 7; *see also* Mot. 25–26.

describes, for instance, a conversation in which a known speaker asks an unknown speaker "how is Jill doing?" Mot. 25. She suggests that in that scenario, Meta's technology could try to determine the identity of the unknown speaker by scanning the known speaker's friends to look for users with a friend named Jill. *Id.* But even if there were evidence that Meta could successfully undertake such an exercise, that would only raise a host of individualized inquiries (which plaintiff offers no way of answering) about which class members have both the recordings and the non-voice information available to enable any remotely similar analysis. So, too, with plaintiff's reference to her own communications—such as a recording she sent to a friend with the statement "I sent you a voice message." *Id.* Even granting plaintiff's suggestion that Meta could use that information to predict that the recording contained plaintiff's voice, she has offered no hint of how she would determine (much less with classwide proof) which class members' recordings were accompanied by such information and which were not.

In short, even if it were true that Meta could look to information like a class member's "[redacted]" and "[redacted]" in an attempt to ferret out which voice in a set of recordings belonged to that class member, *see id.* at 7, 25, Meta's ability to actually make that determination would vary class member to class member. In particular, it would depend not only on whether Meta had those types of information for any particular class member, but also on whether the information that happened to be available for that class member was sufficient (either alone or in combination) to enable Meta to identify them as the speaker in any of their recordings. Again, plaintiff does not explain how that could be determined at all for a single member of the class, much less for the entire class with common proof.

**b. The technologies Meta *does* have can identify speakers, if at all, in only highly individualized circumstances.**

Plaintiff next describes a number of *existing* technologies that she asserts Meta could use to identify class members; she relies primarily on internal documents and materials that generally describe Meta's research, infrastructure, and technical capabilities. *See* Mot. 3–8, 14–15. Again, plaintiff does not assert that Meta *has* applied these technologies to class members' uploaded Facebook and Messenger audio and video files to try to identify those class members—but she asserts that Meta *could*

do so.[7] This evidence adds nothing to the Rule 23 analysis because plaintiff has proffered no evidence showing what the technologies require to be able to identify a particular speaker, nor has she identified any way to determine whether the recordings Meta has from any particular class member would satisfy those requirements. The record evidence confirms that each of these technologies—like the dominant-voice analysis and the 2016 patent—would require individualized analysis and cannot serve as classwide proof of Meta's ability to use class members' recordings to identify them:

- *Speaker identification and voice verification technologies.* Plaintiff cites Meta's speaker identification and voice verification technologies, including those developed for Meta's [redacted] devices. It is undisputed that each of those technologies can identify a speaker *only* if Meta already possesses a recording with that speaker's known voice. Dkt. 147-11 (Meta's Supp. Resps. to Interrogs. 4–7); Ex. 1 (Traynor Rep.) ¶¶ 142–147, 158–246; Ex. 13 (Scaria Decl.) ¶¶ 4–6, 10; Background A.2. The same is true of the other speaker identification systems plaintiff cites. Ex. 1 (Traynor Rep.) ¶¶ 30–31, 112–125; Ex. 6 (Seltzer Dep.) at 25:7–26:5, 73:4–16, 164:1–165:10. Plaintiff offers no way to determine how these technologies apply to any class member or whether they would enable Meta to identify any class member based on their Facebook and Messenger uploads.[8] Whether they could do so would depend on the individualized circumstances and content of each class member's recordings.

- *Seamless and AudioBox.* These technologies are not designed to identify speakers at all. Dkt. 147-11 (Meta's Supp. Resps. to Interrogs. 4–7) at 10–12; Ex. 1 (Traynor Rep.) ¶¶ 247–260 (AudioBox), 274–298 (Seamless). Plaintiff offers no evidence to support the proposition that they enable Meta to identify any speaker in any video or audio recording, much less a particular class member from the recordings and data Meta has for that class member.

- *Inference and prediction systems.* Meta's [redacted]. Ex. 1 (Traynor Rep.) ¶¶ 32–33, 62, 94–100, 108–109. And

[7] Plaintiff describes [redacted] Mot. 6. But plaintiff does not assert that Meta [redacted], nor that Meta could have done so even had it tried—because, as plaintiff fails to mention, [redacted] *See* Dkt. 147-11 (Meta's Supp. Resp. to Interrog. No. 5) at 16–17. Plaintiff otherwise refers to instances in which Meta has used materially different technologies—which are *not* speaker identification systems and do *not* require a known voice—to process recordings received from Meta users. *See* Mot. 5–6. None of these involved efforts to identify specific speakers in Facebook or Messenger recordings, nor do they show anything about the circumstances in which Meta could do so.

[8] Plaintiff also cites a [redacted] … [redacted] Mot. 4. [redacted] Ex. 1 (Traynor Rep.) ¶¶ 110–111, 352; Dkt. 147-11 (Meta's Resp. to Interrog. No. 4) at 4–5; Ex. 12 (Seltzer Decl.) ¶¶ 24–31.

plaintiff offers no evidence that they would enable Meta to identify a person even if paired with a voice processing system. *Id.* In any event, plaintiff's theory is that these systems work in similar ways to the technology described in the 2016 patent—and so, just as with that hypothetical technology, these systems' ability to identify a particular class member would depend on the particular data Meta has for that class member. *See supra* Section I.A.3.a.

- *Data storage and linkage infrastructure.* Meta's infrastructure for storing data and linking it to users does not entail any analysis of voices within recordings. Ex. 1 (Traynor Rep.) ¶¶ 336–339, 342–348; Ex. 11 (Wang Decl.) ¶¶ 4–9. Instead, it connects a recording to the account that uploaded it; it makes no attempt to connect a voice within a recording to the particular person to whom that voice belongs. Ex. 1 (Traynor Rep.) ¶¶ 32–33, 62, 94–100, 108–109; Ex. 11 (Wang Decl.) ¶¶ 4–9. The evidence does not support plaintiff's suggestion that these systems analyze recordings to determine *who* is speaking, or that they would be capable of making that determination for any class member based on the recordings and data Meta has from that class member. Ex. 1 (Traynor Rep.) ¶¶ 330–339; Ex. 11 (Wang Decl.) ¶¶ 4–9.

- *Preprocessing technologies.* Diarization, [redacted]" Ex. 1 (Traynor Rep.) ¶¶ 282, 289–290, 294, 313. They do not attribute any voice to any person, and there is no evidence as to whether and under what circumstances they could be used with a speaker identification system to identify speakers, let alone putative class members. *See id.*; Ex. 12 (Seltzer Decl.) ¶¶ 32–41.

* * *

Whether focused on technologies Meta does have, or ones that Meta has never developed, plaintiff's arguments all suffer from a similar flaw: None identifies the prerequisites that would need to be met for the technologies to identify *any* class member, and so none provides a basis for determining which class members' recordings would enable Meta to identify them and which would not. To the extent plaintiff argues that the record shows otherwise—that is, if plaintiff contends that the record resolves what these technologies could do with respect to all class members' recordings—those arguments cannot support certification because they mischaracterize the evidence and rely on disputed facts. *See Olean*, 31 F.4th at 667 ("A district court must … resolve disputes about historical facts if necessary to determine whether the plaintiffs' evidence is capable of resolving a common issue central to the plaintiffs' claims."). The record confirms that none of the technologies serves as the common proof demanded by Rule 23(b)(3), and none of plaintiff's evidence is to the contrary.

#### c. The variability in the data Meta has from each class member differentiates this case from every other BIPA class action.

For the same reasons, this case differs from the BIPA cases in which classes have been certified.

*Contra* Mot. 13. Each of those cases involved the use of a particular technology to create a specific, uniform type of data for every class member—for example, embeddings, scans, or face templates. *See, e.g.*, *Svoboda v. Amazon.com, Inc.*, 2024 WL 1363718, at *9 (N.D. Ill. Mar. 30, 2024) (facial geometry that worked "the same for everyone in the class"), *aff'd*, 168 F.4th 956 (7th Cir. 2026); *Gaertner v. Commemorative Brands, Inc.*, 351 F.R.D. 201, 215 (S.D. Ill. 2026) (data generated through "facial-recognition process" applied to each class member); *In re Facebook*, 326 F.R.D. at 543 ("face templates"); *Doe v. Apple Inc.*, 2026 WL 1615260, at *4 (S.D. Ill. June 5, 2026) ("feature vectors"); *Rogers v. BNSF Ry. Co.*, 2022 WL 854348, at *4 (N.D. Ill. Mar. 22, 2022) (no predominance dispute in case involving fingerprints); *Howe v. Speedway LLC*, 2024 WL 4346631, at *2 (N.D. Ill. Sept. 29, 2024) ("templates" derived from fingerprint scans).

Plaintiff's lead-off case—*Doe*—underscores the difference between this case and plaintiff's authorities. *Doe* involved alleged "feature vectors" (or "faceprints") that plaintiffs contended were automatically created by a photo album feature from each face scanned in user-uploaded photos. *Doe*, 2026 WL 1615260, at *2, *4. The court concluded that there was a common liability question: whether the feature vector—a specific type of data that the feature created for each class member—was capable of identifying those class members. *Id.* at *4. Similarly, in *Svoboda*, the court granted certification after finding that questions about the "face-related data" created by Amazon's virtual try-on technology could be "resolved for the class as a whole" using common proof. 2024 WL 1363718, at *9. The court emphasized that the technology at issue "work[ed] (at least at a high level) the same for everyone in the class," with data inputs and outputs the same for each class member. *See id.*

The inquiries that will be necessary in this case are different in both kind and degree: plaintiff doesn't allege that Meta created the same type or amount of data for every class member. Rather, she focuses her claims on what Meta *could do* with each class member's recordings. But as explained above, *see supra* Background A.1, those recordings differ from one another along virtually every dimension. And so, too, does Meta's ability to use them to identify speakers. There is thus no standardized way to determine what capabilities Meta has or does not have based on each class member's recordings—and certainly no way to answer that inherently individualized question with

classwide proof. *Supra* Section I.A.3; *see Ambrosio*, 154 F.4th at 1110; *White*, 104 F.4th at 1194; *Rusoff*, 187 F.4th at 1193; *Miles v. Kirkland's Stores Inc*., 89 F.4th 1217, 1225–26 (9th Cir. 2024).

Plaintiff's efforts to sidestep these individualized issues do not change that conclusion. She contends that the varying content and characteristics of the recordings strike only at "how *accurate* Meta's systems are, not whether Meta is capable of using [voice recordings] to identify." Mot. 21. She relies on this Court's statement, describing Dr. Singh's opinion, that speaker identification models "work on probability," so that a model that does not identify people correctly "100% of the time" can still be "capable of identifying." *Id.* (quoting MSJ Order 9). And she baldly asserts that whether variations between recordings affect Meta's capabilities "is itself subject to common proof and a common answer." *Id.* But gesturing vaguely at "probability" does nothing to alter the requirement that each class member must show that Meta could use their specific recordings to identify them.[9] Indeed, absent that showing, a class member likely does not even have Article III standing, much less a viable claim on the merits. *See Cahen v. Toyota Motor Corp.*, 717 F. App'x 720, 724 (9th Cir. 2017) (plaintiffs suffered no "actual injury" under Article III where data collected is not "individually identifiable to" them); *see also*, *e.g.*, *Heiting v. FKA Distrib. Co.*, 2025 WL 736594, at *3 (C.D. Cal. 2025) (no Article III standing where plaintiff could not show that data at issue was connected to her). And despite her proclamations of having "common proof" and a "common answer" to that question, plaintiff still has provided no way of determining which class members Meta can identify, and which it cannot.

**4. Plaintiff cannot defer individualized inquiries on liability issues to claims administration processes.**

The claims administration tools that plaintiff proposes do not solve her predominance problems, because those tools would deprive Meta of the due process right to fully litigate liability issues for each class member. As plaintiff acknowledges, Meta's records do not reflect which class members have uploaded their own voices, how often, or under what circumstances. Mot. 10–11. That evidence

---

[9] In *Zellmer*, for instance, the Ninth Circuit considered "face signature" data that Meta created from photos uploaded to Facebook, which could be associated with (and hence arguably could identify) Facebook users. 104 F.4th at 1120–21. Nevertheless, the court held that non-users of Facebook still did not have a viable BIPA claim, because Meta could not "identify non-users from their face signatures." *Id.* at 1125–26.

therefore cannot show whether a particular user's uploads are mere voice recordings, or if one or more is a voiceprint subject to BIPA. Plaintiff suggests that the Court could approve the use of self-identifying claim forms and other tools to compensate for these deficiencies and ensure that individualized inquiries would not render class proceedings unmanageable. *Id*. She is incorrect, for at least two reasons.

First, to the extent plaintiff seeks to rely on self-identifying claim forms or class member affidavits to determine which potential class members have uploaded their own voice to Facebook or Messenger, her proposal is foreclosed by Rule 23 and due process. On plaintiff's theory, whether an individual satisfies that condition is not merely a question of class membership, but of liability: plaintiff contends that uploading a single recording of one's own voice is sufficient to show that Meta is capable of identifying that user. Mot. 22 n.6. If plaintiff is wrong about that, then class certification fails for the reasons above. But if plaintiff is right, then Rule 23 and due process require that this core liability question be resolved at trial, with all its attendant procedural protections, not through post hoc claims administration procedures. *Dukes*, 564 U.S. at 367.

Second, even if self-identification were strictly a matter of class membership, the claims administration process would still be improper as a means of adjudication, because Meta would have no practical opportunity to verify or challenge class members' submissions. As noted above, Meta's records do not reflect who is speaking in any Facebook or Messenger recording. So Meta has no way to even spot-check any absent class member's representation that they uploaded their own voice—except, at most, through cross-examination of individual class members. *Mobile Emergency Hous. Corp. v. HP, Inc*., 2023 WL 9550942, at *13 (N.D. Cal. Dec. 8, 2023) (rejecting self-identification procedure because facts that would be attested to were "not susceptible to objective verification").

Plaintiff's proposed use of these administrative tools thus diverges substantially from the "cross-check"-type uses that courts have approved under limited circumstances in other cases. None of those cases involved proposed reliance on class member self-identification as a wholesale substitute for common proof of liability. *See Svoboda*, 2024 WL 1363718, at *11 (claim forms could be "cross check[ed]" against defendant's records). Nor has plaintiff cited any case in which a court has approved

similar mechanisms to resolve comparable issues without meaningful cross-check opportunities that do not exist here. *See id.*; *Doe*, 2026 WL 1615260, at *11 (emphasizing fraud control tools); *C.H. v. Google LLC*, 2026 WL 92063, at *4 (N.D. Cal. Jan. 13, 2026) (passing reference to self-identifying forms in approval of settlement class); *In re Facebook Biometric Info. Privacy Litig.*, 522 F. Supp. 3d 617, 629 (N.D. Cal. 2021) (similar; settlement context). Her attempt to swap litigation for claims administration is exactly the kind of procedural shortchanging that Rule 23 and due process forbid.

**B. Plaintiff cannot obtain statutory damages on a classwide basis.**

Plaintiff offers no classwide method for proving entitlement to damages. BIPA provides for statutory damages of *up to* $1,000 for negligent violations and *up to* $5,000 for reckless or intentional violations. 740 ILCS 14/20(a)(1)–(2), (c). But these damages are discretionary, and a plaintiff is not necessarily "entitled to the full award of liquidated damages permitted." *Clay v. Union Pac. R.R. Co.*, 171 F.4th 975, 983 (7th Cir. 2026). Illinois law recognizes that, when a statute gives a court or jury discretionary authority to award damages, the decisionmaker is to consider the totality of the circumstances "in light of the entire statute, keeping in mind the subject the statute addresses, the legislature's apparent objective in adopting the statute, and the evils sought to be remedied." *Krautsack v. Anderson*, 861 N.E.2d 633, 645 (Ill. 2006); *see, e.g.*, *Williams v. Country Mut. Ins. Co.*, 2015 IL App (1st) 142534-U, ¶ 34 ("totality of circumstances" for discretionary statutory damages); *Herrera v. Benefit Tr. Life Ins. Co.*, 466 N.E.2d 1172, 1176–77 (Ill. App. 1984) (same for punitive damages); *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 62 F. App'x 672, 675 (7th Cir. 2003) (same).

Courts in the Ninth Circuit follow this same rubric. Where statutory damages are discretionary, courts consider multiple factors to determine an appropriate award. *Campbell*, 315 F.R.D. at 268; *see also, e.g.*, *Bliss v. CoreCivic, Inc.*, 711 F. Supp. 3d 1233, 1244 (D. Nev. 2024). For statutes implicating privacy, these factors include "the severity of the violation," "whether or not there was actual damage to the plaintiff," "the extent of any intrusion into the plaintiff's privacy," and "whether there is any useful purpose to be served by imposing the statutory damages amount." *Campbell*, 315 F.R.D. at 268; *Bliss*, 711 F. Supp. 3d at 1244; *see also Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103 (2016) ("[A] district court's 'discretion'" over damages awards "'should be exercised in light of the

considerations' underlying the grant of that discretion," including the purposes of the statute itself). Accordingly, courts and juries have flexibility to consider a wide array of privacy-related factors—including the extent of the intrusion into the person's privacy and the harm it caused to them—when determining whether a particular person is entitled to statutory damages and, if so, in what amount.

These facts will vary across the class. The expert evidence shows, for example, that putative class members value their biometric privacy differently. Ex. 4 (Lehmann Rep.) ¶¶ 14–35. Plaintiff's valuation, for instance, appears to be on the lower end of the spectrum. After meeting with counsel to discuss her participation in this lawsuit, she continued uploading Messenger recordings containing her voice. She testified at her deposition that her practices "have not changed since [she] filed this lawsuit," because she "really do[es]n't pay attention" to such things and "do[es]n't think about it." Ex. 9 (Delgado Dep.) at 173:25–174:18, 180:17–24. And when asked to identify her supposed harm, plaintiff did not claim to have suffered any privacy injury at all; instead, she identified only an injury from Meta's supposed failure to "follow the law set forth in Illinois." *Id.* at 181:11–23. Other class members, however, value their privacy interests differently. Ex. 4 (Lehmann Rep.) ¶¶ 14–35. As a result, ensuring that "each specific class member's award" matches the harm that they suffered will inherently require individualized inquiries, to calibrate each class member's award to (at the very least) the actual harm to their privacy interests. *Campbell*, 315 F.R.D. at 269; *see Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 277 (4th Cir. 2010) (Wilkinson, J., concurring).[10]

Plaintiff offers no way to make these discretionary determinations on a classwide basis. *Campbell* illustrates the point: There, the court explained that, "[w]hile some of the[] factors" relevant to Wiretap Act statutory damages "can be analyzed in a manner common to the class," others—including the "'severity of the violation,'" the "extent of any intrusion into the plaintiff's privacy," and the "question of 'whether or not there was actual damage to the plaintiff'"—warrant individualized

[10] To be sure, bare variation in class member damages will not alone defeat class certification where damages can be computed mechanically across the class. *See, e.g., Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (reversing denial of class certification where the defendant's payroll database would "enable the court to accurately calculate damages and related penalties for each claim"). But there must be some classwide method for that determination. *Comcast Corp.*, 569 U.S. at 34. There is no such method here, where damages would involve non-mechanical, judgment-laden disputes over class-member-specific evidence in thousands of mini-trials.

analyses. *Campbell*, 315 F.R.D. at 268. The damages inquiry "would necessarily involve individual questions about … each specific class member[]" and so "individual issues regarding damages would predominate over common ones." *Id.* at 269. The same is true here, and class certification should be denied for the same reason. *See Comcast Corp.*, 569 U.S. at 34 (plaintiff must offer some methodology "establishing that damages are capable of measurement on a classwide basis"); *Bliss*, 711 F. Supp. 3d at 1242–44 ("[d]etermining whether to award damages" will "necessitate a customized review" for each class member); *Cole v. Gene by Gene, Ltd.*, 322 F.R.D. 500, 507 (D. Alaska 2017) (denying class certification for privacy claims where plaintiff did not provide a "means for measuring damages on a classwide basis that is traceable to [defendant's] conduct").

Plaintiff attempts to sidestep the problem by asserting that damages can be awarded "formulaic[ly]" based on the number of violations for each class member multiplied by the statutory maximum. Mot. 18; *see* Mot. 17–19. But no class member may automatically receive the statutory maximum. Instead, each class member's entitlement will depend on the multi-factor analysis required to assess appropriate damages under BIPA. And Meta has a "due process right to challenge [each class member's] evidence," including at the "damages stage." *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 669 (7th Cir. 2015). The Seventh Amendment, too, preserves to Meta a similar right to test class members' evidence before a jury. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458 (2016) (defendants have same rights in class proceeding as in individual action). There is thus no feasible way to conduct each of these individual adjudications in the context of a single class trial.

### C. At most, any class must be limited to users who sent unencrypted audio recordings via Messenger.

If the Court concludes that any class could be certified, it should not be the class plaintiff proposes. Plaintiff seeks to certify a class of all Illinois users who posted a video to Facebook, or sent an unencrypted recording via Messenger, containing their voice. Mot. 10. But she has introduced no evidence at all that Meta can determine the user who is speaking in a particular *video*, as would be necessary to identify that person based on their voice. *See* Background A.2. The only evidence she has offered to show that Meta has that alleged capability is Dr. Singh's analysis, which was specific to plaintiff's Messenger *audio* recordings. *Supra* Background B.1–2. But according to plaintiff's own

expert, approximately half of the proposed class has only ever uploaded videos and has never uploaded audio recordings like the ones Dr. Singh analyzed. Dkt. 193-16 (Klein Rep.) at 14, Tables 5–6.

And the problem is not merely that plaintiff produced no evidence that Meta can determine who is speaking in any given Facebook or Messenger video. The problem is that, taken at face value,[11] Dr. Singh's analysis of plaintiff's Messenger audio recordings—the only evidence in the record as to Meta's hypothetical ability to infer who is speaking in a recording—underscores why videos *cannot* be used for that purpose. The analysis rested on Dr. Singh's stated "expectation" that the dominant voice in a set of private Messenger audio recordings belongs to the user who uploaded them. Ex. 5 (Singh Dep.) at 76:8–22. But Dr. Singh conceded she would not have the same expectation about the dominant voice in a user's videos, given differences in user behavior with respect to audio and video recordings. Ex. 5 (Singh Dep.) at 85:6–16. Dr. Singh also confirmed she was not offering any opinion as to whether Meta could reliably use videos to identify users who have only ever uploaded their own voice in videos. *Id*. at 86:9–21. And plaintiff offers no evidence that any of the other technologies she references could reliably identify users from videos, either. Accordingly, the proposed class contains millions of users whose claims cannot be resolved using Dr. Singh's analysis, nor by any other evidence plaintiff has put forward.

The only analysis of video recordings that exists in the record is the analysis that Meta's expert, Dr. Traynor, conducted using plaintiff's videos. Ex. 2 (Traynor Sur-Reb. Rep.) ¶¶ 9, 17 & App. A, Ex. 1. Dr. Traynor found that applying Dr. Singh's methodology to plaintiff's *videos* would yield a dominant "voice" consisting of recordings that overwhelmingly do not contain plaintiff's voice. *Id.* Thus, had plaintiff uploaded only videos, as a matter of statistics Dr. Singh's methodology would not have identified plaintiff's voice; it would have instead pointed to a set of recordings that lack *any* voice. *Id.* And there is no other evidence that Meta would be able to use the methodology for anyone else—*i.e.*, no evidence showing Meta has any way to determine which voice in a video belongs to the user. *See id.* ¶¶ 9, 16–17. Accordingly, even if Dr. Singh's analysis extended to anyone other than plaintiff, in no circumstances would it permit certification beyond Illinois users who have uploaded unencrypted

[11] Meta does not concede that Dr. Singh's analysis is substantively correct or methodologically sound, and it will challenge her conclusions at trial if necessary. This section takes the analysis at face value.

Messenger audio recordings with their own voice during the class period. *Id.*; Ex. 5 (Singh Dep.) at 76:8–17, 89:16–18. And even that class would face the individualized issues described in Section I.A.

**II. A class action is not superior to individual suits.**

Plaintiff must also show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). She has failed to do so, and there is no manageable way to try this case as a class action. A class action is not superior where a class trial would be "unmanageable" because it would involve "adjudicating issues specific to each class member's claim." *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1140 (9th Cir. 2022). Here, whether a class member has a claim turns on whether the content of their specific recordings could be used to identify them. *See supra* Section I.A. Litigating those questions would require user-by-user mini-trials. *See Miles*, 89 F.4th at 1226 (class resolution would require a court "to scour through and analyze individual records," which would "undermin[e] the efficiency of class adjudication"); *Hanni v. Am. Airlines, Inc.*, 2010 WL 289297, at *12–13 (N.D. Cal. Jan. 15, 2010) (no superiority in case where each claim "will be highly depend[e]nt on the individual facts"). The same is true of damages. *See supra* Section I.B. Plaintiff offers no practical method for trying those issues classwide, and the analysis each one would require makes clear that she could not.

**III. Plaintiff is neither a typical nor an adequate class representative.**

Finally, plaintiff must show that her claims are typical of the class's claims and that she will adequately protect the class's interests. Fed. R. Civ. P. 23(a). But plaintiff cannot adequately represent the class's interests because she herself lacks Article III standing to bring a claim. And her unusual circumstances subject her to unique defenses that make her atypical and an inadequate representative.

**A. Plaintiff fails to establish that she has Article III standing.**

Plaintiff lacks standing, and accordingly is inadequate as a class representative, because she purports to vindicate a purely hypothetical injury—namely, that Meta *could* apply technology to her recordings to create data that could then be used to identify her. As discussed above, *supra* Section I.A.3.c, that nuance makes this case different from BIPA cases in which classes have been certified; it also makes this case different from BIPA cases in which Article III standing has been upheld.

At summary judgment, this Court left open the possibility that plaintiff's liability theory can satisfy BIPA. MSJ Order 11. But the Court did not address whether the theory can support Article III standing. It cannot, because "fears of hypothetical future harm that is not certainly impending" do not confer standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Like the plaintiffs in *Clapper*, who showed only that the government *could* surveil them, plaintiff has not alleged that Meta *has* created biometric data that it could use to identify her from her recordings—only that Meta *could* do so. 568 U.S. at 410–11. She therefore lacks standing to sue.

The analysis does not change simply because "BIPA applies" even absent a showing that "Meta in fact used plaintiff's voice data to identify her." MSJ Order 7. Although the Ninth Circuit has recognized that BIPA protects a substantive right to privacy, *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1272 (9th Cir. 2019), it later made clear that a plaintiff does not "automatically satisf[y] the injury-in-fact requirement" simply by suing under "a statute protecting a substantive privacy right," *Popa v. Microsoft Corp.*, 153 F.4th 784, 789, 792 (9th Cir. 2025). Thus, to satisfy Article III, plaintiff still must make a case-specific showing of a concrete and particularized injury—which in this context requires her to show a harm analogous to one giving rise to the tort of intrusion upon seclusion. *Id.* at 791–92; *see also Zellmer v. Facebook, Inc.*, 2022 WL 16924098, at *2 (N.D. Cal. Nov. 14, 2022) (not "every plaintiff necessarily has standing to sue under BIPA," and a "case-specific analysis" is required), *aff'd*, 104 F.4th 1117. And unlike in other BIPA cases, where defendants *actually* took action to create biometric data in a manner that permitted an analogy to such a tort, plaintiff here rests impermissibly on the purely *hypothetical* ability to do, which undisputedly has not materialized. *See*, *e.g.*, *Patel*, 932 F.3d at 1274–75; *Ji v. Naver Corp.*, 2022 WL 4624898, at *8 (N.D. Cal. Sept. 30, 2022).

Any analogy to intrusion upon seclusion is all the more strained because plaintiff uploaded seven of her ten Messenger audio recordings mere days prior to filing this lawsuit and two days after first meeting with counsel in this case. Ex. 2 (Traynor Sur-Reb. Rep.) ¶¶ 7–8. Indeed, she posted an additional video to Facebook with her voice even after filing this suit. Ex. 9 (Delgado Dep.) at 152:23–153:22. Plaintiff thus knowingly invited exactly the supposed harm on which she bases her claims, by uploading recordings with a fully informed belief of exactly what Meta could do with them—negating

any claim that she suffered a concrete injury. *See Gershzon v. Meta Platforms, Inc.*, 2026 WL 2970373, at *5 (N.D. Cal. Sept. 30, 2026); *see also Mendia v. Garcia*, 768 F.3d 1009, 1013 n.1 (9th Cir. 2014) (no standing where any injury was self-inflicted); *Rodriguez v. Autotrader.com, Inc.*, 2025 WL 1085787, at *1–2 (C.D. Cal. Apr. 4, 2025) (no standing where plaintiff "s[ought] out privacy violations").

**B. Plaintiff is atypical and inadequate because she is subject to unique defenses.**

Hypothetical injuries aside, plaintiff is atypical and an inadequate representative because she faces unique defenses. A class representative is atypical where their "unique … factual situation require[s] [them] to prepare to meet defenses" that will not be "raised against other members of the proposed class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *Sanchez v. Wal-Mart Stores, Inc.*, 2009 WL 1514435, at *3 (E.D. Cal. May 28, 2009) (Rule 23(a) requires a "'typical' claim … that can be extrapolated classwide"). That is true even if plaintiff maintains that she can overcome that unique defense; even being "subject to arguable defenses" that do not apply to the class broadly is enough to defeat typicality. *Gunderson v. Amazon.com, Inc.*, 350 F.R.D. 376, 387 (N.D. Ill. 2025). The conduct plaintiff undertook immediately before filing suit subjects her to such defenses. *See id.*; *Lineberry v. AddShoppers, Inc.*, 2025 WL 1533136, at *8 (N.D. Cal. May 29, 2025) (litigation conduct may confirm inadequacy); *Sanchez*, 2009 WL 1514435, at *3. In addition to raising questions about standing, plaintiff has exposed herself to unique equitable defenses, including waiver and estoppel. *Gunderson*, 350 F.R.D. at 386 (plaintiff atypical where subject to unique arguable defenses). She has jeopardized her claim to damages, given her self-inflicted harm. And she has raised serious doubts about her credibility, which could undermine the class as a whole. Each is true only of her, precluding her from serving as an adequate or typical class representative.

## CONCLUSION

The Court should deny plaintiff's motion for class certification. At most, any class should be limited to Illinois users who sent unencrypted Messenger audio messages containing their own voice during the Class Period, subject to the exclusions in footnote 3 of plaintiff's motion.

Dated: October 19, 2026

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Lauren R. Goldman*
Lauren R. Goldman

LATHAM & WATKINS LLP

By: */s/ Gary S. Feinerman*
Gary S. Feinerman

*Attorneys for Meta Platforms, Inc.*

**CIVIL L.R. 5-1(i)(3) ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), I, Lauren R. Goldman, hereby attest under penalty of perjury that concurrence in the filing of this document has been obtained from all signatories.

Dated: October 19, 2026

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Lauren R. Goldman*
Lauren R. Goldman